**RANDALL K. EDWARDS, PLLC**
Randall K. Edwards (3787)
136 South Main Street, Suite 700
Salt Lake City, Utah 84101
Telephone (801) 328-0300
Facsimile (801) 534-1559

**LUNDELL & LOFGREN, PC**
Rick S. Lundell (8848)
Brian K. Lofgren (8890)
136 South Main Street, Suite 700
Salt Lake City, Utah 84101
Telephone: (801) 532-4663
Facsimile: (801) 534-1559

**WARREN L. BARNES & ASSOCIATES, LLC**
Warren L. Barnes (11379)
136 South Main Street, Suite 700
Salt Lake City, Utah 84101
Telephone: (801) 532-4663
Facsimile: (801) 534-1559

Attorneys for Plaintiff

---

## UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| EULOGIO HINOJOS<br><br>        Plaintiff,<br><br>vs.<br><br>PARK CITY MUNICIPAL CORPORATION, a municipal corporation, and Does I Through X,<br><br>        Defendant(s). | **PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO RE-OPEN FACT DISCOVERY**<br><br>Case No. 2:07-cv-750<br><br>District Judge Dale A. Kimball<br><br>Magistrate Judge David Nuffer |

COMES NOW Plaintiff EULOGIO HINOJOS, by and through counsel of record, and

respectfully submits this memorandum in support of his motion to re-open fact discovery.

## INTRODUCTION

Plaintiff has received significant and crucial documents and other evidence from the Defendants after fact discovery has closed that are so significant that justice, case law, and equity mandates reopening fact discovery with respect to that evidence. To prevent discovery on these limited issues would be the equivalent of counting a shot released well after the buzzer has sounded, immediately prejudicing the Plaintiff, and permanently altering the playing field to the advantage of the Defendant.

## PROCEDURAL AND FACTUAL HISTORY

1.    Plaintiff hereby incorporates by reference the Facts and supporting documents presented in Plaintiff's Memorandum in Support of Motion for Extension of Deadline to Fact Discovery filed October 18, 2008.

2.    On December 16, 2008, after fact discovery had concluded, Park City provided Plaintiff with a game-changing document, Kent Cashel's investigative report, which detailed his investigation concerning the allegation that Plaintiff had made inappropriate comments to a Park City employee's "white" teenage daughter and the confrontation of Plaintiff by his immediate supervisors at Park City.[1] *See* Memorandum from Kent Cashel to Investigation File – Eulogio (Hugo) Hinojos (March 15, 2006) attached as Exhibit "A".

3.    Plaintiff's counsel deposed Kent Cashel the same day they received the Cashel Investigative Report and during the deposition discovered that Mr. Cashel had possibly not disclosed another high priority document, a detailed report of his interview with Wayne Dayley, which has not been provided to Plaintiff to date. *See* Transcr. Depo. Kent Cashel 13:10-14:9 and 28:22-32:8 (December 16, 2008) attached as Exhibit "B". Mr. Cashel further insisted that any other notes taken with regard to other witnesses would have been referenced in his Memorandum of March 15, 2006. *See*

2

Id. at 28:22-34:4. Also, the Memorandum of March 15, 2006, refers to an incident report filed by

Transit Supervisor Destry Pollard on February 21, 2004, regarding Mr. Hinojos, which was apparently

attached to the memorandum but not provided to Plaintiff. *See* Memorandum from Kent Cashel to

Investigation File – Eulogio (Hugo) Hinojos (March 15, 2006) at Bates numbers PC02735-PC02736.

  4. Mr. Cashel's Deposition was to begin at "9:00 a.m. [on December 16, 2008,] and

continu[e] thereafter until completed." *See* Notice of Taking of Depo. of Kent Cashel (December 15,

2008) attached as Exhibit "C". However, Mr. Cashel arrived nearly an hour late due to weather. There

were also mechanical breakdowns with the court reporter's recording equipment during the deposition.

Previously unknown and undisclosed details came out during the deposition of Mr. Cashel, including but

not limited to the revelation of the documents describe in paragraph 2, *supra*. Plaintiff's counsel was

therefore unable to complete the deposition before Mr. Cashel needed to conclude for the day to attend

another meeting at 1:45 p.m. and outlined on the record the need for continuing Mr. Cashel's deposition.

Defense counsel objected to Plaintiff's request and reserved their rights as to whether they would

produce Mr. Cashel to complete the deposition. *See* Transcr. Depo. Kent Cashel 106:14-109:9.

  5. On January 3, 2009, well after Plaintiff had taken Mr. Cashel's deposition, Park City

provided Plaintiff with a second game-changing document; his detailed report of his interview with

Brittney Angelovich about the alleged incident between Plaintiff and Ms. Angelovich at Davanza's Pizza

in Park City. *See* Letter from Christopher B. Snow to Rick S. Lundell, et al. (January 2, 2009) and

Memorandum from Kent Cashel to Investigation File (March 10, 2006) attached as Exhibit "D".

  6. Plaintiff had requested these documents during fact discovery:

   a. Plaintiff's first interrogatories served on June 24, 2008, specifically Interrogatory No.

    1, requested that Park City identify each person who possessed any document or file

---

[1] Kent Cashel was Deputy Director of Public Works for Park City in 2006.

containing information about Plaintiff.  Park City <u>did not</u> identify Kent Cashel, but rather one person, Kimberli Leier, its Human Resource Manager.  *See* Defs.' Ans. to Pl.'s 1st Set of Interrogs. and Reqs. for Prod. of Docs. (June 24, 2008) attached as Exhibit "E".

    b.  Plaintiff's first request for documents, specifically Request No. 5, served on June 24, 2008 requested production of any record with respect to Hugo's <u>employment</u>.  Park City provided 2,262 Bates stamped documents, none of which contained, included, or referred to Kent Cashel's memoranda documenting his interview with Brittney Angelovich on March 10, 2006 or his final investigative report, dated March 15, 2006.  *Id.*

    c.  Plaintiff's first request for documents, specifically Request No. 11, served on June 24, 2008 requested production of any record with respect to Hugo's <u>termination</u>.  Park City provided 2,262 Bates stamped documents, none of which included or referred to Kent Cashel's memoranda documenting his interview with Brittney Angelovich on March 10, 2006 or his final investigative report, dated March 15, 2006.  *Id.*

7.    Although Defendants identified Kent Cashel in its Initial Disclosures with Chris Angelovich and his daughter, Brittney Angelovich, as individuals likely to have discoverable information, Plaintiff was never informed until <u>after</u> fact discovery that Mr. Cashel had conducted a formal investigation <u>and</u> documented his findings.  *See* Defs.' Initial Disclosures (February 15, 2008) attached as Exhibit "F".

8.    In Plaintiff's second set of interrogatories served on or about July 28, 2008, specifically Interrogatory No. 17., Plaintiff again requested that Park City identify any documents used or referred to

in carrying out any discipline or discharge with respect to Plaintiff. Park City referenced the 2,262 Bates stamped documents, none of which included or referred to Kent Cashel's memoranda regarding his interview with Brittney Angelovich on March 10, 2006 or his Investigative Report, dated March 15, 2006. *See* Defs.' Ans. to Pl.'s 2d Set of Interrogs. and Reqs. for Prod. of Docs. (July 28, 2008) attached as Exhibit "G".

9.     In fact, it was not until the deposition of Chris Angelovich that Park City first revealed that Kent Cashel investigated the alleged misconduct of Plaintiff regarding Mr. Angelovich's minor daughter, including a "photo line-up" in which Ms. Angelovich supposedly identified the Plaintiff. *See* Transcr. Depo. Chris Angelovich, 13:8-9 (October 9, 2008) attached as Exhibit "H".

10.     Park City's Initial Disclosures stated that Kent Cashel and Chris Angelovich were represented, thus restricting contact through counsel. However, Park City did not represent the minor Ms. Angelovich and did not provide any contact information, but disclosed: "Brittney Angelovich, address and phone number unknown. Ms. Angelovich may have knowledge regarding Plaintiff's violations of Park City employment policies and procedures". See Defs.' Initial Disclosures (February 15, 2008).

11.     On or about December 19, 2008, Park City provided Plaintiff with the cellular number for Brittany Angelovich. *See* Aff. Rick S. Lundell ¶ 7 (January 21, 2009) attached as Exhibit "I".

12.     On January 11, 2009, Plaintiff's counsel, Rick S. Lundell, traveled to Neola, which is ten miles North of Roosevelt, in Duchesne County, Utah, without any contact information other than the cellular phone number of Ms. Angelovich and her fiancée's first name, Tino, in a good faith effort to conduct an in person interview with Ms. Angelovich to corroborate information found in the game-changing documents provided post fact discovery. *Id*.

13.     Ms. Angelovich refused to speak to Plaintiff's counsel without her father present and her

attorneys, who she identified as the "attorneys for Park City". *Id.*

14.     Plaintiff's counsel informed Ms. Angelovich that: (1) Park City's attorneys had informed

Plaintiff that they did not represent her in this matter; (2) Park City's attorneys had given Plaintiff's

counsel her cellular phone number so they could speak directly to her; and (3) she could do so without

them present. *Id.*

15.     Ms. Angelovich insisted that she did not wish to speak to Plaintiff's counsel about the

case. *Id.*

## ARGUMENT

Plaintiff respectfully requests this Court re-open fact discovery with specific focus and limited to

(1) the taking of Brittany Angelovich's deposition, (2) establishing electronic verification of the creation

and modification history of Kent Cashel's memoranda (provided after the close of discovery) through

direct expert examination of only these files on Mr. Cashel's computer, (3) obtaining additional

documents mentioned in said memoranda but not provided by Defendants and (4) continuing and

completing the deposition of Kent Cashel regarding these matters.

"Whether to extend or reopen discovery is committed to the sound discretion of the trial court

and its decision will not be overturned on appeal absent abuse of that discretion." *Smith v. United*

*States,* 834 F.2d 166, 169 (10th Cir. 1987). In determining whether discovery should be re-opened, a

court should consider several factors. These factors include:

> 1) whether trial is imminent; 2) whether the request is opposed; 3) whether the non-moving party would be prejudiced, 4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court, 5) the foreseeability of the need for additional discovery in light of the time allowed for discovery by the district court, and 6) the likelihood that the discovery will lead to relevant evidence.

*Id.* In considering each of these factors, the weight lies in favor of re-opening fact discovery with respect to the above-mentioned issues. However, prior to such considerations it is important to lay out the basic history of the revelation of facts leading to the necessity to re-open discovery.

A.   **Defendants did not disclose pertinent information within their control until revealed during depositions or provided after the close of fact discovery.**

It was not until the deposition of Chris Angelovich that Plaintiff first heard of an investigation that was conducted by Kent Cashel, Deputy Director of Public Works for Defendant Park City with respect to an alleged incident of harassment between Plaintiff and Brittany Angelovich. Prior to this revelation, it had not been clear that deposing Kent Cashel and Brittany Angelovich would be of significant importance and necessary. In fact, at the time, the import of taking those depositions appeared slight compared to the importance of the other depositions Plaintiffs had requested. As Plaintiff, by stipulation with opposing counsel, had already exceeded the number of depositions provided for in the Scheduling Order and had initially requested more depositions be provided for in the Scheduling Order, Plaintiff's counsel attempted to depose those witnesses whose testimony appeared important based on disclosures, answers to interrogatories, requests for documents and previous depositions. However, it was far from clear that Mr. Cashel had performed a formal investigation where individuals were interviewed, notes taken and reports produced under direct questioning of three principals in the investigation, Pace Erickson, Jerry Gibbs and Kimberli Leier. *See* Transcr. Depo. Pace Erickson 108:1-14 (September 24, 2008) attached as Exhibit "J", Transcr. Depo. Jerry Gibbs 41:10-43:20 (September 25, 2008) attached as Exhibit "K" and Transcr. Depo. Kimberli Leier 22:15-24:13 (October 9, 2008) attached as Exhibit "L".

Defendants did not provide any written record of the investigation and interview of Brittany Angelovich until more than two months after Mr. Angelovich's deposition and nearly two months after the deadline for fact discovery. On December 16, 2008, Defendants provided Plaintiff's counsel with a memorandum regarding the investigation just minutes prior to the deposition of its author, Kent Cashel. *See* Memorandum from Kent Cashel to Investigation File – Eulogio (Hugo) Hinojos (March 15, 2006). Plaintiff had specifically requested all documents related to Plaintiff's employment and termination with Defendant Park City in its First and Second Sets of Interrogatories and Requests for Production of Documents.

Furthermore, Defendants then mailed Plaintiff's counsel *another* memorandum from Kent Cashel regarding an interview with Brittany Angelovich on January 2, 2009, arriving in counsel's office January 3. *See* Letter from Christopher B. Snow to Rick S. Lundell, et al. (January 2, 2009) and Memorandum from Kent Cashel to Investigation File (March 10, 2006). Plaintiff had specifically requested all documents related to Plaintiff's employment with Defendant Park City in its First Set of Interrogatories. Perhaps more important, the memorandum was not available at Mr. Cashel's deposition. And most important, Plaintiff has not had the opportunity to question Ms. Angelovich under oath regarding the memorandum's representation of her statements.

Even prior to this most recent document disclosure, Plaintiff was not allowed to complete the deposition of Kent Cashel regarding the March 2006 investigation, related documents, and their contents. Due to a snowstorm on the morning of December 16, 2008, Mr. Cashel arrived late, delaying the beginning of the deposition by approximately three-quarters of an hour. The unforeseeable failure of the court reporters electronic equipment also delayed the deposition on at least two occasions. However, when it became apparent that Plaintiff would not be able to complete questioning before Mr. Cashel

needed to depart for another engagement, defense counsel objected to the Plaintiff's characterization of the events of the day and of Mr. Cashel's testimony, which Plaintiff believes needs to be further fleshed out and flushed out. Defense counsel also reserved rights with respect to whether they would produce Mr. Cashel again, implying they would not. The facts that an integral document was produced after the deposition and at least two documents mentioned in Mr. Cashel's memorandum of March 15, 2006, *have not* been produced to date further emphasize the necessity of continuing and completing Mr. Cashel's deposition and taking Brittany Angelovich's deposition, as her central involvement in Mr. Cashel's undisclosed investigation has been made clear by the recently disclosed documents as well as Mr. Cashel's testimony.

It is this piecemeal and untimely "doling" of pertinent facts and documents that should have been provided early in the discovery process by Defendants that necessitates the re-opening of fact discovery and, further, calls into question the reliability of the Memoranda produced by Kent Cashel regarding his investigation and interview of Brittany Angelovich, documents which were produced simultaneously with or subsequent to testimony they appear to support. Each of the factors this Court should consider in granting the motion to re-open fact discovery as to these issues lay in Plaintiffs favor and is discussed in detail below.

## I.      **Trial in this case is not imminent.**

Trial in this case is set to begin October 5, 2009; over nine months away. Although the discovery will require some limited additional time, it is not anticipated that re-opening with regard to the focused, stated issues will require delaying the trial date. To the contrary, the needed discovery will require less than three days of deposition. In any event, even if any delay were necessary, it will be minimal compared to the importance of performing said discovery.

9

**II.**    **While it is anticipated that re-opening discovery will be opposed, the opposing party is responsible for failing to timely provide pertinent documents which revealed the necessity of said discovery.  It is unlikely the extension would prejudice the Defendants.**

While it was not until the deposition of Chris Angelovich that Plaintiff first heard of the investigation conducted by Kent Cashel, it came to light nearly two months after the close of discovery, during the deposition of Kent Cashel on December 16, 2008, that Defendants' counsel allegedly had in their possession documents detailing said investigation even prior to providing initial disclosures on February 15, 2008.  *See* Transcr. Depo. Kent Cashel 9:23-10:20.

More surprisingly, Defendants' counsel then produced Mr. Cashel's March 10, 2006 memorandum, which directly bolstered his own testimony, more than two weeks subsequent to Mr. Cashel's deposition, stating, "[Mr. Cashel] reviewed his records and found the enclosed one page interview of Brittany Angelovich..." Letter from Christopher B. Snow to Rick S. Lundell, et al. (January 2, 2009).  Since Mr. Cashel had presumably reviewed his files and provided those related to this case on at least two occasions, for initial disclosures and then to provide counsel with the March 15, 2006, memorandum, why had he not provided this key, related document?  *See* Transcr. Depo. Kent Cashel 10:9-11.  This self-serving document definitely deserves further scrutiny through the discovery process, as to its genesis by electronic verification, its content by continued deposition of Kent Cashel and its representations by deposition of Brittany Angelovich.  Likewise, Mr. Cashel's memorandum of March 15, 2006, deserves similar scrutiny.

Ms. Angelovich's deposition would not in any way prejudice Defendant since, according to Mr. Cashel, Park City has already spoke directly with Ms. Angelovich and knows her testimony.  In contrast, Plaintiff's Counsel Mr. Lundell traveled to Neola, Utah, to located and interview Ms. Angelovich on January 11, 2009, in a good faith attempt to determine what her testimony may be. Mr. Lundell was

unable to locate Ms. Angelovich's residence, but, while Mr. Lundell was in Neola, she refused to speak

with Mr. Lundell, in person or telephonically, until she had spoken with her father, Chris Angelovich, a

Park City employee.  After speaking with her father, Ms. Angelovich called Mr. Lundell and stated that

she did not feel comfortable speaking to him without her father or her attorneys present.  Mr. Lundell

was surprised she was represented by counsel and asked who her attorneys were, to which she

responded, the "attorneys from Park City."  Mr. Lundell informed Ms. Angelovich that Park City's

attorneys had informed him that they did not represent her in this matter, Park City's attorneys had given

him her cellular phone number so he could speak to her directly, and she could talk to him without them

present.  Ms. Angelovich then insisted that she did not wish to speak to him about this case.  In actuality,

it is the Plaintiff that is greatly prejudiced by being denied the opportunity of taking the deposition of

Ms. Angelovich while Defendant is left at a hefty and unfair advantage.

**III.    Plaintiff was diligent in trying to stay within the scheduling guidelines.**

To begin with, the taking of depositions of Defendant Park City's employees was delayed to

within 30 days of the deadline because those were the only dates Defendants would agree to.  The taking

of depositions was continually delayed through the summer months of 2008 due to Defendants' and their

employees' scheduling conflicts. These late deposition dates put Plaintiff into the unenviable position of

not being able to follow up depositions with substantive discovery requests and necessary depositions

that only became apparent through those depositions.

Furthermore, Defendant did not initially disclose or supplement its answers to interrogatories or

its responses to document requests with respect to any investigation conducted by Mr. Cashel that

directly involved Ms. Angelovich.  This non-disclosure certainly deprived Plaintiff from realizing the

value and materiality of deposing both Mr. Cashel and Ms. Angelovich until their involvement was *brought out* in the deposition of Chris Angelovich.

In spite of Plaintiff's mistaken belief that Kent Cashel and Brittany Angelovich were peripheral witnesses with respect to Plaintiff's claims, Plaintiff's counsel did conduct due diligence in trying to locate Ms. Angelovich through phone listings, internet searches and attempts to locate her biological mother in Oregon. However, no contact information was available to Plaintiff until the deposition of Chris Angelovich, Brittany's biological father. Mr. Angelovich was unable to provide Brittany's telephone number, street address, or even the complete name of his minor daughter's fiancé. Plaintiff's counsel then requested that Park City supplement that information, to which we were told to put our request in writing, which Plaintiff did. Eventually, on or about December 19, 2008, Park city's counsel did provide Ms. Angelovich's telephone number to Plaintiff's counsel with the caution that counsel may not be able to get a hold of Ms. Angelovich since she was at the hospital giving birth. Still today, Plaintiff only knows Ms. Angelovich's telephone number and that Ms. Angelovich lives in Neola Utah with her fiancé, Tino, and her newborn baby. As stated above, Plaintiff's counsel, based on the limited information available, traveled approximately 300 miles over more than six hours from Salt Lake City to Neola in an attempt to get any sort of statement from Ms. Angelovich or perhaps ask her a few questions. It also appears that Ms. Angelovich's father, Chris Angelovich, has undue influence over his emancipated daughter as he has instructed her not to give even a non-sworn statement to Plaintiff's counsel without "her" attorney present (even though she is not represented at present). It is clear that Plaintiff was not only diligent in trying to stay within the scheduling guidelines, but has been diligent since in his attempt to acquire some first-hand knowledge of what Ms. Angelovich's exact involvement was and to what she will testify.

12

IV.   **The need for additional discovery was not foreseeable in light of the time allowed for discovery by the district court.**

As explained above, the need for additional discovery as to these specific issues did not become apparent until the deposition of Chris Angelovich and the production of documents and deposition of Kent Cashel subsequent to the close of fact discover.  Plaintiff did not foresee the undisclosed information that would come out of the ongoing discovery process or the belated production of documents by Defendants.  And once apparent Plaintiff took prompt action to either come to a stipulated agreement or gain some necessary information outside the discovery process.

V.   **It is certain that extending discovery will lead to relevant discoverable information.**

Ms. Angelovich's deposition would be very relevant this case, as it is the alleged remarks that Plaintiff made to Ms. Angelovich when he was off duty, or on duty, depending on whose testimony is believed, that caused Plaintiff's supervisors to demand audience with Plaintiff in their office and confront Plaintiff with the allegation of making unwanted advances on an underage "white girl" who is the daughter of a co-worker.  Defendants' seem to recognize themselves that the deposition of Brittany Angelovich will lead to relevant, discoverable information based on their eventual and very belated supplements of documents regarding investigations directly involving Brittany as well as Defendants' almost prompt agreement to make Kent Cashel available for deposition after the close of fact discovery.  Undoubtedly, re-opening discovery on these limited and specific issues will lead to relevant discoverable information and restore some level of equity to the discovery process in this case.

## CONCLUSION

For the foregoing reasons, the considerations in granting a motion to re-open fact discovery weigh heavily in favor of the Plaintiff.  Plaintiff respectfully requests this Court grant said motion.

13

Dated this 22nd day of January, 2009.

RANDALL K. EDWARDS, PLLC
LUNDELL & LOFGREN, P.C.
WARREN L. BARNES & ASSOCIATES, LLC

Randall K. Edwards
Rick S. Lundell
Warren L. Barnes

14

EXHIBIT "A"

# MEMO



## PARK CITY
### 1884

Exhibit 44
Wit: Cashel
12-16-08
Jennifer A. Russell



**Public Works**

1053 Ironhorse Drive
P.O. Box 1480
Park City, UT 84060
Tel  435.615.5301
Fax 435.615.4904
www.parkcity.org

**To:**   Investigation file – Eulogio (Hugo) Hinojos

**From:**   Kent Cashel

**Subject:**   Investigation Summary

**Date:**   March 15th, 2006

### Purpose of Investigation:

On March 1st Eulogio, following a meeting with his supervisors Pace Ericson and Troy Daley, met with Human Resources Manager Kim Leier and Deputy Public Works Director Kent Cashel and alleged that Pace and Troy had falsely accused him of sexually harrasing a coworker's (Chris Angelovich) daughter.

Eulogio verbally requested that the City investigate his allegation.

### Timeline:

| | |
|---|---|
| February 2004 | Eulogio is accused of making sexually inapropriate gestures and language in the workplace by a female Public Works employee. Determination is made by Jerry Gibbs that incident was a misunderstanding. Mr. Gibbs counseled Eulogio on avoiding behavior or language that could be interpreted as inapropriate. No further incident after counseling. |
| Dec-Jan, 2006 | Eulogio makes comments to Chris Angelovich in the Fleet shop regarding Chris's Daughter (Brittany aged 15). Chris felt these comments were sexual in nature and inapropriate.  Chris A. advised Eulogio to stay away from Brittany. <br><br> A witness to this incident (Wayne Dayley-see interview notes dated March 9th, 2006) indicated that Chris reacted in a verbally aggressive manner to the comments. Mr. Byer indicated that he believed Eulogio meant the comments as a joke and noted that Eulogio appologized immediately to Chris. |

PC02733

| | |
|---|---|
| February 19th, 2006. 6:30 pm (approx). | Brittany and a female friend run into Eulogio at Davanza's restaurant. |
| | Eulogio is on duty having clocked in at 2:30 pm that day |
| | Brittany reports to Chris Angelovich that a hispanic male wearing a City issued red Marker Jacket with a City logo had scared the girls in the restaurant. Brittany alleges that Eulogio was: |
| | 1- staring and winking at her and her friend. |
| | 2- making comments in spanish and in a tone that she interpreted to be sexual in nature. |
| February 27th | Chris Angelovich speaks with Pace Ericson and asks him to speak with Eulogio regarding his behavior. Chris tells Pace that he just wants Eulogio to leave his daughter alone. |
| Feb 27 - 28th | Pace considers if it is appropriate and if so how he should discuss the issue with Eulogio. Key in his decision process is the February 2004 incident. Pace believed this current incident may also be a misunderstanding and determines to counsel Eulogio to avoid any contact or interaction with Brittany. |
| March 1st approx 4:00 pm | Pace and Troy meet with Eulogio in Pace's office to discuss the issue with Eulogio. Pace and Troy indicate that Eulogio listened to what they had to say, denied he had acted or spoke in an inappropriate manner, responded that he would avoid contact with Brittany, thanked Pace and Troy and the meeting ended. |
| March 1st approx. 4:45 pm. | Eulogio appeared at Human Resources in a distraught state of emotion. Eulogio alleged he had been falsely accused by Pace and Troy and he requested investigation into his allegation. |
| | Kim Leier (Human Resource Manager) contacted Kent Cashel (Deputy Public Works Director) and asked that he come meet with Eulogio. Upon arrival and after having observed Eulogio's distraught behavior Kent Cashel relieved Eulogio of Duty. Kent felt it unsafe for Eulogio to operate heavy equipment in his current state. Kim and Kent both advised Eulogio they would look into his allegations immediately. |
| March 2nd | Kim Leier is advised that Eulogio is under doctor's supervision and will likely not be released to return to duty for several days. |

PC02734

| | Tom Bakaly directs Kent Cashel to investigate Eulogio's allegations. |
|---|---|
| March 15th | Kent Cashel completes investigation and forwards report to Tom Bakaly and Human Resource for review. |

Findings:

1- Chris Angelovich did request that Pace and Troy talk with Eulogio about his alleged inapropriate behavior. Pace indicated that he advised Chris that if he had serious concerns or fears regarding Eulogio he should contact the Police.

2- Pace Ericson and Troy Daley did not seek independent verification of Chris Angelovich's allegations prior to meeting with Eulogio to discuss this issue.

3 - Pace Ericson and Troy Daley did not discuss Chris Angelovich's allegations with PW management prior to meeting with Eulogio.

4- Pace Ericson and Troy Dayley were unclear in their minds if the allegations (which occurred at a location outside the workplace) was a workplace issue. No formal disciplinary actions were recorded or filed.

5- Pace Ericson and Troy Dayley believed the incident had the potential to create friction in the workplace between Chris and Eulogio. Based upon this potential friction Pace and Troy believed they had a management responsibility to advise Eulogio of the allegations and to counsel him on how to deescalate the friction by avoiding any contact with Brittany and to cease making any comment or jokes about Brittany.

6 - A witness (Wayne Byer) coroborated that a tense interaction between Chris Angelovich and Eulogio occurred in the fleet shop as Chris Angelovich asserted. Mr. Byers indicated that he could not recall the exact words that Eulogio used regarding Chris's daughter. Mr. Byers said Chris reacted in an agitated fashion and told Eulogio to stay away from Brittany in a clearly assertive tone. The witness said Eulogio acted though he meant the comments as a joke and appologized to Chris.

4 - Brittany during a separate interview coroborated Chris Angelovich's allegations regarding the interaction between her and Eulogio at Davanza's on February 19th.

5- Brittany admitted she did not know Eulogio by name but she was able to identify his photo from a group of public works employees (including one other hispanic male).

6- Eulogio was on duty at the time of the alleged interaction at Davanza's.

7- Previous allegations made against Eulogio regarding sexually inapropriate behaviour in the workplace can be verified through various documentation and interviews. However, no formal investigation file documenting findings and actions taken could be located. Incident report

PC02735

filed by Transit Supervisor Destry Polard 2/21/2004 is contained in this file

Conclusions:

Pace and Troy had reasonable cause (although they were not aware of all the facts at the time) to discuss Chris's allegations with Eulogio as this involved two coworkers, had the possibility of creating tension in the workplace, and the alleged incident occurred while Eulogio was on-duty.

Pace and Troy had trouble discerning whether the alleged incident was a workplace issue due to:

1 - Belief the alleged incident occured outside the workplace.
2 - Failure to gather all available facts prior to meeting with Eulogio.
3 - Failure to discuss issue with PW mgmt team prior to meeting with Eulogio

Pace and Troy determined to follow what they believed to be an appropriate strategy for addressing this issue based upon:

1-Lack of clarity on whether this was a workplace issue or not.

2-No feedback or direction from PW mgmt team.

3-Concern for the well being of both Eulogio, Chris and Brittany.

There is an established (although poorly documented) pattern of allegations against Eulogio of sexually inapropriate behavior in the workplace.

It is difficult to ascertain with any degree of certainty whether Eulogio's behaviors and comments were made with sexual intent or are simply misunderstandings due to langauge and cultural differences.

It is very likely that Eulogio misinterpreted (due to language difficulties) the tone and intent of the discussion regarding Chris's allegations.

PC02736

Recommendations:

After discussions with Kim Leier and Tom Daley it has been determined that Hugo should be questioned as to the allegations upon his return to work. At that time it will be determined what if any disciplinary action is appropriate.

Sexual Harrasment Policy Training for PW supervisory staff and employees.

Standard forms, procedures and training on proper conduct and documentation of all meetings, conversations or investigations with potential of disciplinary outcome.

When possible spanish speaking translator should be made available during any employee interaction with potential for disciplinary outcome.

EXHIBIT "B"

# In The Matter Of:

*Hinojos v.*
*Park City*

---

*Kent Cashel*
*December 16, 2008*

---

*Q & A Reporting, Inc.*
*1872 South Main Street*
*Salt Lake City, Utah  84115*
*801.484.2929*

Original File 12-16-08 Cashel Kent.txt
Min-U-Script® with Word Index

This Page Intentionally Left Blank

Hinojos v.
Park City

Kent Cashel
December 16, 2008

---

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

EULOGIO HINOJOS,

    Plaintiff,

vs.

PARK CITY MUNICIPAL
CORPORATION, a municipal
corporation, RACE
ERICKSON, individually and
in his official capacity
with Park City Municipal
Corporation, and TROY
DAYLEY, individually and
in his official capacity
with Park City Municipal
Corporation, and Does I
through X,

    Defendants.

Case No.
2:07CV00750DAK
Judge D. Kimball

Deposition of: KENT CASHEL
December 16, 2008
9:44 a.m. to 1:54 p.m.

Location: OFFICES OF RANDALL K. EDWARDS, PLLC, and
LUNDELL & LOFGREN
136 South Main Street, Suite 700
Salt Lake City, Utah

Reporter: Jennifer A. Russell, RPR
Notary Public in and for the State of Utah

Q&A Reporting, Inc.
801.484.2929

---

## Page 2

1           A P P E A R A N C E S

2 FOR THE PLAINTIFF:

3      Randall K. Edwards
      RANDALL K. EDWARDS, PLLC
4      136 South Main Street, Suite 700
      Salt Lake City, Utah 84101
5      801.328.0300

6      Rick S. Lundell
      LUNDELL & LOFGREN, PC
7      136 South Main Street, Suite 700
      Salt Lake City, Utah 84101
8      801.532.4663

9      Warren L. Barnes
      WARREN L. BARNES & ASSOCIATES, LLC
10      136 South Main Street, Suite 700
      Salt Lake City, Utah 84101
11      801.532.4663

12 FOR THE DEFENDANTS:

13      Christopher B. Snow
      CLYDE, SNOW, SESSIONS & SWENSON
14      201 South Main Street, 13th Floor
      Salt Lake City, Utah 84111
15      801.322.2516

16 ALSO PRESENT:

17      Eulogio Hinojos

18           I N D E X

19 WITNESS: KENT CASHEL

20  EXAMINATIONS                    PAGE

21  MR. EDWARDS..................................   3

22          E X H I B I T S

23  NO.    DESCRIPTION                PAGE

24  44   3/15/06 memo from Cashel to Investigation   5
         File

25

---

## Page 3

1          P R O C E E D I N G S

2           KENT CASHEL,

3 being first placed under oath, was examined and testified

4 as follows:

5        **EXAMINATION**

6 BY MR. EDWARDS:

7     Q.  Mr. Cashel, have you ever had your deposition

8 taken before?

9     **A.  Yes.**

10     Q.  How many times.

11     **A.  Once.**

12     Q.  When was that.

13     **A.  1988 approximately.**

14     Q.  All right.  I'll give you a little -- nothing

15 has really changed since then, but you may not have kept

16 up the same way that lawyers do who do them every day.

17      As you know, I'll be asking you questions.  You

18 have been sworn under oath.  You are under penalty of

19 perjury to tell me the truth, the whole truth, and

20 nothing but the truth.

21      My questions, your answers will be taken down

22 in a little booklet.  They will also be taken down

23 probably in something that looks a lot like this where

24 we've got kind of a mini transcript as well.  You will

25 have a chance to review the transcript before it's

---

## Page 4

1 finally submitted and signed.  If at any point you

2 determine that you want to make a change in the

3 transcript, you can do that.  I will have the chance to

4 comment on any changes in the transcript.  The example I

5 always use is if someone says what color was the light

6 and it's got in the transcript red and they scratch it

7 out and say green, I can later say you changed it from

8 red to green.

9      My questions, if they are difficult for you to

10 understand or if they are vague or whatever, you can

11 either ask me to give you the question again, which would

12 not be the first time that's ever happened.  If you don't

13 understand a question, just feel free to tell me "I don't

14 understand what it is you are asking" and I'll try to

15 rephrase it so that you do.

16      If you answer a question, I will presume that

17 you understood the question.  All of your answers need to

18 be in verbal form, yes or no instead of a nod of the head

19 or shake of the head, simply because we have a transcript

20 here and it's much easier to take down yes or no rather

21 than uh-huh or uh-uh or nods head or shakes head or

22 leaped across the table and tried to choke attorney to

23 death, which has actually only happened to me once.

24      Your attorney may interject objections.  In the

25 event that occurs, unless you are instructed not to

---

Kent Cashel
December 16, 2008

Hinojos v.
Park City

Page 5

1  answer by your attorney, you are still obligated to
2  answer the question. Many times we file objections as
3  part of this transcript for the record so that in the
4  event that the testimony becomes relevant later in trial
5  we can say, you know, we raised an objection that was an
6  objectionable question and there should have been some
7  changes.
8       Now, do you understand everything I've just
9  told you?
10  A.  Yes.
11  Q.  Okay. Do you have any questions of me before
12  we get started.
13  A.  No.
14  Q.  Let's go ahead and make this the next exhibit
15  in order.
16      (Exhibit-44 marked.)
17  Q.  You've been handed what has been marked as
18  Exhibit-44. Do you recognize this document?
19  A.  Yes.
20  Q.  What is it.
21  A.  It's a record of an investigation that I
22  conducted into allegations raised by Hugo Hinojos.
23  Q.  Do you know Hugo Hinojos?
24  A.  I do.
25  Q.  How long have you known him.

Page 6

1  A.  I'm not sure of the exact date but at least
2  eight years.
3  Q.  When did you first get to know him.
4  A.  I know him as an employee of Public Works, when
5  I came to Public Works in 1990 -- I'm sorry -- 2000.
6  Q.  Did you know him before 2000?
7  A.  I had worked at the city since 1998 so I may
8  been introduced to him before that, but I worked in a
9  different department so --
10      MR. SNOW: Randall, I need to take a short
11  break even though we've only been going for ten seconds.
12  We will be right back.
13      MR. EDWARDS: Sure.
14      (Recess, 9:49 a.m. to 9:50 a.m.)
15  Q.  (BY MR. EDWARDS) You say you went to work at
16  the city in 1998; is that correct?
17  A.  Correct.
18  Q.  What was your job description in 1998?
19  A.  I was a grants accountant.
20  Q.  What does a grants accountant do?
21  A.  Monitors federal grant compliance, FTA, FHWA.
22  Q.  Were you assigned to a specific department or
23  was it just working for the city overall with regard to
24  federal grant compliance.
25  A.  I was with the city's Finance Department.

Page 7

1  Q.  And then did you switch jobs in 2000?
2  A.  Yes.
3  Q.  What was the switch to?
4  A.  I switched to the Transit Director.
5  Q.  All right, and as Transit Director what were
6  your job descriptions?
7  A.  Responsibility for day-to-day operation of the
8  city's transit system.
9  Q.  Were you in a supervisory capacity at that
10  position?
11  A.  Yes.
12  Q.  Who did you supervise.
13  A.  Transit personnel.
14  Q.  How many of those were there?
15  A.  Well, approximately 12 full time regulars and
16  then seasonal personnel 35 to 40.
17  Q.  Were you in a supervisory capacity over Eulogio
18  Hinojos?
19  A.  Not at that time, no.
20  Q.  All right. And how long were you the Transit
21  Director.
22  A.  Until 2003.
23  Q.  All right. And what did you go to from being
24  the Transit Director in 2003?
25  A.  I was promoted to Deputy Public Works Director.

Page 8

1  Q.  Who was the Public Works Director at that time.
2  A.  Jerry Gibbs.
3  Q.  All right. Do you still have that position?
4  A.  I do.
5  Q.  All right, and is Mr. Gibbs still the Public
6  Works Director?
7  A.  He is.
8  Q.  All right. Tell me what your job description
9  is as Public Works Director.
10  A.  I'm responsible primarily for the operation of
11  the transit fleet and the city's parking operation, and I
12  also serve -- I serve at the discretion of the Public
13  Works Director, so a lot of duties as assigned, project
14  oriented duties.
15  Q.  In February of 2006 were you in a position of
16  supervising Mr. Hinojos? I'm going to call him Hugo.
17  A.  Okay.
18  Q.  Were you in a position where you supervised
19  Mr. Hinojos, Hugo?
20  A.  I did not directly supervise Hugo. As Deputy
21  Public Works Director there was a manager between -- in
22  our organizational structure between Hugo and myself.
23  Q.  Can you describe to me what kind of chain of
24  command was between Hugo and you, and Hugo who reported
25  to whom who reported to whom who reported to whom.

Page 9

1        MR. SNOW: Objection as to what time frame are
2   we talking about.
3      Q.   (BY MR. EDWARDS)  February of 2006.
4      A.   February of 2006 Hugo reported to Troy Dayley
5   who reported to a Pace Erickson who then reported to me.
6      Q.   All right, and then you reported to Mr. Gibbs.
7      A.   Mr. Gibbs.
8      Q.   Okay.  Was Kimberli Leier in the chain of
9   command between Hugo and Mr. Gibbs.
10      A.   Kimberli Leier is the Human Resource Director
11   so --
12      Q.   Was she in the chain of command?
13      A.   No.
14      Q.   What is your date of birth?
15      A.   12/15/55.
16        MR. SNOW: Happy birthday yesterday.
17      A.   Thank you.
18      Q.   (BY MR. EDWARDS)  Well, I'll get into your job
19   history in awhile.  What I want to do is get to this memo
20   first.  We just got a copy of this memo.  Do you have any
21   idea why it is that we've only now been given this memo
22   in the last month?
23        MR. SNOW: Yeah.  Let me intercede here for the
24   record.  My understanding was that this was -- I found
25   this memo, actually, in our files that were produced in

Page 10

1   my office.  That were produced by Park City on our
2   initial production.  It was put into -- initially put
3   into a privileged file so when we did our production this
4   was not produced.
5        It was discovered again, actually, by Park City
6   because it had come out from you guys that maybe there is
7   some investigative file, et cetera, so -- and I reviewed
8   my files, didn't find it, asked them to look again and
9   they couldn't find it in their HR files, but Kent Cashel
10   had an electronic copy of it so he forwarded it to us,
11   which is the one I produced.
12        In the meantime, I found that I did have a copy
13   in our privileged file, which was certain documents we
14   pulled to determine and review and analyze if they were
15   privileged or not.  It was determined this is not a
16   privileged document.
17        So the client intended to produce it with the
18   initial production.  Counsel pulled it to review it for
19   privilege.  It was determined that it was not privileged
20   and it was then produced.
21      Q.   (BY MR. EDWARDS)  Okay.  Well, I think that
22   answers my question.  I don't think I need you to answer
23   it.  Do you know when you produced this to your lawyers,
24   when you gave a copy of this to your lawyers.
25      A.   I don't recall the date.

Page 11

1      Q.   Well, was it within the last year, the last two
2   years?
3      A.   Yeah, obviously, within the last year.
4      Q.   Did it come about that you produced it to your
5   lawyers as a result of the lawsuit that we are here
6   discussing today?
7      A.   It came about as a query, if I had any
8   documents that related to it.
9      Q.   I don't want to get into attorney-client
10   privileged communications, but I think you might be able
11   to give me this.  Did the inquiry come from an attorney
12   for the city?
13        MR. SNOW: I'm going to object on the basis of
14   attorney-client privilege and instruct you not to answer.
15        MR. EDWARDS: Okay.  Let me just state for the
16   record I'm not sure that --
17        MR. SNOW: You are asking what an attorney
18   advised him.
19        MR. EDWARDS: I'm asking a yes or no.  Did it
20   come from an attorney.  If the answer is yes, I know what
21   the limit is.  If the answer is no, then I can go
22   further.
23        MR. SNOW: But by saying "did the query" you
24   are assuming what the query is.  Is it a major privilege
25   issue?  I mean, I've described I think the process that

Page 12

1   went -- that occurred.  And you are free to -- go ahead
2   and answer that.  That's fine.
3      Q.   (BY MR. EDWARDS)  Let me ask it again.  Where
4   did the query come from, do you know?
5      A.   It came from the city's attorney's office.
6      Q.   Do you still have the original of this memo on
7   your computer somewhere?
8      A.   I don't know.  I've produced an electronic
9   file.  I assume I still do.
10      Q.   Do you know when this was originally written.
11      A.   Well, it would have been in -- it's a
12   compilation of notes, so it was written between -- in the
13   first two weeks of March 2006.
14      Q.   Let's look at the third page of this memo.  It
15   has in the lower right-hand corner the designation PC
16   02735.  Up in the upper left or in the upper portion of
17   this there are a couple of boxes there, and it says at
18   the bottom: March 15th, Kent Cashel completes
19   investigation and forwards reports to Tom Bakaly and
20   Human Resource for review.
21        Was that the date that this document was
22   completed and forwarded?
23      A.   Yes.
24      Q.   When this was produced to us, none of the notes
25   upon which this investigation file was based were

Kent Cashel
December 16, 2008

Hinojos v.
Park City

---

Page 13

1 produced to us. Do you know any idea why that is?

2     MR. SNOW: Objection. Assumes facts not in

3 evidence. You can answer.

4     A. Well, the notes were kept in this document.

5 This was a running document.

6     Q. (BY MR. EDWARDS) I think you indicated that

7 this was a compilation of notes. Were there separate

8 notes that you took that were then incorporated into this

9 document?

10     A. I can't recall. I just -- this is where I keep

11 -- as I move through an investigation kept my record of

12 that investigation and so --

13     Q. Well, what I'd like to do is look on the first

14 page of this document. This is PC 02733. At the bottom

15 on the left there is December, January 2006. On the

16 right there are two paragraphs and it states in the

17 second paragraph: A witness to this incident -- and it

18 has in parenthesis Wayne Dayley, D-A-Y-L-E-Y, and then a

19 dash, see interview notes dated March 9th, 2006,

20 indicated that Chris reacted in a verbally aggressive

21 manner to the comments.

22     Did you have separate interview notes with

23 regard to Mr. Dayley's being a witness to the incident

24 referred to in that paragraph?

25     A. Based on what's written there, yes.

---

Page 14

1     Q. Do you know where those interview notes are?

2     A. I don't. They would have been submitted at the

3 time I submitted this memo.

4     Q. Submitted to Mr. Gibbs or to Mr. Bakaly or to

5 both. Let me try that again. Who was it submitted to.

6     A. That's stated in the document. It was

7 submitted to Mr. Bakaly.

8     Q. And to Human Resources?

9     A. Correct.

10     Q. Who did you interview with regard to this

11 investigation?

12     A. I interviewed Troy Dayley, Pace Erickson -- I'm

13 going to have to look at my notes here.

14     Q. Feel free, sure.

15     A. Chris Angelovich and his daughter.

16     Q. Brittany?

17     A. Brittany, correct. And I interviewed a Wayne

18 Dayley. That's the list.

19     Q. Did you interview Mr. Hinojos?

20     A. I did on day one and that was the initiation of

21 this investigation, because Hugo had requested that I

22 look into an incident between himself and his

23 supervisors.

24     Q. I'd like to look at page two, PC 02734. In the

25 fourth box down you have on the left-hand side:

---

Page 15

1 March 1st approx 4:00 p.m. And then we have an incident

2 here with Pace and Troy meeting with Eulogio, and then

3 beneath that March 1st approximately 4:45 p.m. he appears

4 at Human Resources.

5     In the second paragraph: Kimberli Leier, Human

6 Resource Manager, contacted Kent Cashel, Deputy Public

7 Works Director, and asked that he come meet with Eulogio.

8     Is that the interview that you are referring

9 to?

10     A. Yes, and that did not -- that's the only

11 interview I was able to complete.

12     Q. Did you attempt to have another interview with

13 Mr. Hinojos that you were unable to either institute or

14 complete after that?

15     A. Hugo did not return to work after that and I

16 did not have the opportunity to conduct a follow-up

17 interview.

18     Q. Did you make any attempt to contact him while

19 he was not at work?

20     A. No.

21     Q. Why not?

22     A. I was directed to wait until he returned to

23 work.

24     Q. Who directed you?

25     A. The City Manager and the Human Resource

---

Page 16

1 Director.

2     Q. Did you have communications with Mr. Bakaly and

3 Ms. Leier about how to conduct your investigation?

4     A. No. Only at the initiation of the

5 investigation I received direction to conduct the

6 investigation, and then there was discussion on

7 March 15th when I produced the memo that you have in

8 front of you.

9     Q. When you say were directed to carry out an

10 investigation, who directed you to do that.

11     A. Tom Bakaly, the City Manager.

12     Q. What date did he direct you to do that?

13     A. I don't recall the exact date. It was on or

14 after -- or it was after initial contact with Hugo. My

15 recollection is that that was March 1st but --

16     Q. Is it your recollection that you met with

17 Mr. Hinojos on March 1st?

18     A. That's my recollection of the date, yes.

19     Q. When you put down dates on this memo, did you

20 try to be as accurate as possible in the date and the

21 time with regard to the incidents that you are referring

22 to?

23     A. I did.

24     Q. What did you do to verify that indeed the

25 meeting that occurred between you and Mr. Hinojos

---

Page 17

1  occurred on March 1st.
2     A.  I went from memory, and it was such a short
3  time before so -- so I relied on memory.
4     Q.  Did you look at any calendars?
5     A.  I can't recall.
6     Q.  When Mr. Bakaly gave you the instruction to
7  initiate an investigation, what did he tell you.
8        MR. SNOW: Let me just interpose an objection
9  to the extent that if counsel was present in any meeting
10 with you and Mr. Bakaly, I'm instructing you not to
11 divulge any conversations or communications that occurred
12 during the meeting with Tom Daley or any other attorney
13 that was present involving this incident.
14    A.  Okay.
15       MR. SNOW: You can answer with that caveat.
16    Q.  (BY MR. EDWARDS)  Well, let me lay some
17 foundation.  Who was there at the meeting between you and
18 Mr. Bakaly where you were instructed to initiate an
19 investigation.
20    A.  It was solely Mr. Bakaly and myself.
21    Q.  How long did that meeting take place.
22    A.  The duration of the meeting?
23    Q.  Yes.
24    A.  Less than five minutes.
25    Q.  What were you told by Mr. Bakaly.  Well, better

Page 18

1  yet, can you tell me what you said and what he said.
2  Just tell me what the meeting was.  Did you initiate the
3  meeting?
4     A.  No.  Mr. Bakaly initiated the meeting.
5     Q.  All right.  And where was it?
6     A.  It was in the hallway outside council chambers.
7     Q.  And what did he tell you with regard to an
8  investigation.
9     A.  It was an extremely brief conversation, that he
10 asked me to look into a meeting that had taken place
11 between Hugo and his supervisors, Troy Dayley and Pace
12 Erickson.
13    Q.  Did he tell you why he wanted you to look into
14 it?
15    A.  Yes.
16    Q.  What did he tell you.
17    A.  He wanted the facts of what had transpired
18 there.
19    Q.  Why?  Did he tell you that?
20       MR. SNOW: Objection.  Calls for speculation.
21 You can answer.
22    Q.  (BY MR. EDWARDS)  Well, let me rephrase it.
23 Did he tell you why he wanted those facts?
24    A.  He wanted the facts from that meeting.
25    Q.  Did he give you any indication as to why it is

Page 19

1  that he wanted those facts?
2        MR. SNOW: Objection.  Asked and answered.
3     Q.  (BY MR. EDWARDS)  Go ahead and answer.
4     A.  He wanted the facts from the meeting is what he
5  told me.
6     Q.  Did he give any indication whether he was
7  looking into maybe some sort of personnel action in
8  regard to either Mr. Erickson, Mr. Dayley or Mr. Hinojos?
9        MR. SNOW: Objection.  Asked and answered.
10    A.  At that time he only wanted the facts of what
11 had occurred at that meeting.
12    Q.  (BY MR. EDWARDS)  All right.  And other than
13 telling you to look into the meeting, did he say anything
14 else when you met with him the first time when this
15 investigation was initiated.
16    A.  No.
17    Q.  Had you had any prior discussion with Mr.
18 Bakaly about the fact that there had been a meeting
19 between Mr. Erickson, Mr. Dayley, and Mr. Hinojos prior
20 to him initiating this investigation.
21       MR. SNOW: Objection.  Vague and ambiguous.
22 You can answer, if you can.
23    A.  Well, can you repeat the question?
24    Q.  (BY MR. EDWARDS)  Yeah.  Let me tell you where
25 it is I'm going here.  There are a couple things I'd like

Page 20

1  to know.  First of all, how it is that Tom Bakaly knew
2  that there was a meeting that he instructed you to
3  investigate and, second of all, whether you had any
4  discussion with him about a meeting between Mr. Hinojos,
5  Mr. Dayley, and Mr. Erickson before he asked you to do
6  this investigation.
7        Let's take them one at a time.  Do you have any
8  idea how Mr. Bakaly knew there had been a meeting between
9  Mr. Erickson, Mr. Hinojos, and Mr. Dayley that he wanted
10 you to look at?
11    A.  No, I don't know.  I can only speculate.
12    Q.  I don't want you to speculate, at least not on
13 this.  Had you had any discussion with him before he
14 asked you to initiate this investigation about the fact
15 that there had been a meeting with Mr. Hinojos, Mr.
16 Erickson, and Mr. Dayley?
17    A.  No.
18    Q.  Had you ever conducted any kind of
19 investigation such as the one that Mr. Bakaly asked you
20 to undertake with regard to this meeting.  Had you ever
21 done that before?
22    A.  Yes.
23    Q.  How many times.
24    A.  I don't know the exact count, but several.
25    Q.  More than ten?

Page 21

1    A.  Yes.

2    Q.  More than 20?

3    A.  Over my career?  Is that the question, over my

4  career?

5    Q.  Yes.

6    A.  Yes.

7    Q.  More than 20.

8    A.  Yes.

9    Q.  More than 30.

10   A.  I don't know.

11   Q.  So at least 20 plus.

12   A.  Yes.

13   Q.  Was there a protocol that you followed in doing

14  an investigation?

15   A.  Yes.

16   Q.  What was that protocol.

17   A.  To identify the parties that were involved, to

18  gather the facts from interviews, and then to -- based

19  upon that is make a recommendation to the City Manager

20  and the Human Resource Director.

21   Q.  Did you have an understanding when you

22  undertook this investigation that you were to make

23  recommendations to Human Resources and to the City

24  Manager?

25   A.  Yes.

Page 22

1    Q.  And what were the recommendations to address.

2    A.  The recommendations would be based upon my

3  findings during the course of the investigation.

4    Q.  Did you understand that it was your purpose to

5  see whether there had been violations of city policy in

6  doing this investigation.

7    A.  Well, that wasn't specifically identified but

8  it's inferred when I look into a Human Resource issue.

9    Q.  What was specifically identified other than I

10  want you to look into the meeting.

11      MR. SNOW:  Objection.  Vague and ambiguous.

12  You can answer, if you can.

13   Q.  (BY MR. EDWARDS)  Do you understand my

14  question?

15   A.  No, I don't.

16   Q.  My notes indicate that you had a brief

17  conversation with Mr. Bakaly in the hallway near the City

18  Council chambers at which he told you to look into the

19  meeting between Hugo, Mr. Erickson, and Mr. Dayley, and

20  he wanted the facts.  What I'm asking you is whether you

21  were given any further instruction as to what to do other

22  than to simply look into the meeting.

23   A.  No.  He wanted the facts, what had transpired

24  in that meeting.

25   Q.  All right.  Now, did you understand having

Page 23

1  gathered what the facts were with regard to that meeting

2  that you were to make recommendations to the City Manager

3  and to the Human Resources Department.

4    A.  Yes.

5    Q.  All right.  My question is recommendations as

6  to what.

7       MR. SNOW:  Objection.  Calls for speculation,

8  vague and ambiguous.  You can answer it, if you can.

9    A.  I have to go to my previous answer, which is to

10  look into the facts of this meeting between Pace and Troy

11  and Hugo, what had transpired.

12   Q.  (BY MR. EDWARDS)  All right.  Either I'm not

13  being clear in my questions or I'm just plain dense.

14      MR. SNOW:  I think you are being clear, and I

15  think he's answered the question.

16   Q.  (BY MR. EDWARDS)  Well, I'm going to continue

17  to ask the questions until I get at least some idea as to

18  what it is that you were to do.  You were to look into

19  the meeting and you were to make recommendations.  My

20  question is after you found out what the facts are about

21  a meeting, what recommendations do you make?  I mean, do

22  you make a recommendation that I've looked into the facts

23  and this is what they are?  What is it that you were

24  recommending?  What was the point of a recommendation.

25      MR. SNOW:  Objection.  Argumentative, asked and

Page 24

1  answered, vague and ambiguous.

2       MR. EDWARDS:  It's compound, too.

3       MR. SNOW:  Compound.  Thank you.  You can

4  answer, if you can.

5    A.  Recommendations would be based upon the facts

6  that were discovered in the course of the investigation.

7    Q.  (BY MR. EDWARDS)  Okay, and my question is were

8  you going to make recommendations as to potential

9  discipline?

10   A.  It depends.

11   Q.  Was that a possibility.

12      MR. SNOW:  Objection.  Asked and answered.

13      MR. EDWARDS:  I'll ask it again.

14      MR. SNOW:  Calls for speculation.

15   Q.  (BY MR. EDWARDS)  Is it a possibility that you

16  would be making recommendations as to discipline?

17   A.  Yes.

18   Q.  Was it a possibility that you would be making

19  recommendations as to whether a particular witness should

20  be believed or not.

21      MR. SNOW:  Objection.  Calls for speculation.

22   A.  Repeat the question, please.

23   Q.  (BY MR. EDWARDS)  Did you understand that you

24  were to make recommendations as to whether certain

25  witnesses you interviewed were to be believed or not.

Page 25

1      A.   Again, I was to find the facts of the case.  I
2  was to interview people and present those facts to the
3  City Manager and the Public -- or, excuse me, the Human
4  Resource Director.
5      Q.   All right.  I have that your protocol was,
6  number one, to identify the parties involved.
7      A.   Correct.
8      Q.   Number two, to gather the facts from interviews
9  and, number three, to make recommendations to Human
10 Resources and the City Manager.  Was there any other
11 protocol that you followed.
12     A.   No.
13     Q.   Is this protocol written down or was this
14 something that you simply knew from having done 20 plus
15 investigations prior to this time.
16     A.   That protocol is not written down.  It is based
17 upon my experience as a manager.
18     Q.   Okay.  Had you ever been in a situation prior
19 to this time where you had undertaken an investigation
20 and made recommendations for disciplinary action based on
21 your investigation of the facts.
22     A.   Please repeat that.
23     Q.   Prior to the time that you did this
24 investigation involving Mr. Hinojos, Mr. Dayley, and Mr.
25 Erickson had you ever undertaken any other investigation

Page 26

1  where you had made recommendations that disciplinary
2  action would be taken.
3      A.   Yes.
4      Q.   How many times.
5      A.   More than I can count.  I've been a manager
6  most of my career.
7          MR. SNOW:  When you say career, are you talking
8  about your career at Park City or over your career as a
9  manager.
10     A.   My career as a manager.
11         MR. EDWARDS:  I'll get into that.
12         MR. SNOW:  Just wanted to put some context in
13 there.
14     Q.   (BY MR. EDWARDS)  In this case who were the
15 parties that were involved that you identified.
16     A.   Pace Erickson, Troy Dayley, Hugo, and then
17 as -- those were the initial parties that I knew and
18 then, as you asked before, then there was Chris
19 Angelovich and Brittany, his daughter, and Wayne Dayley.
20     Q.   I'd like to look at the third page here.  There
21 are findings that you make, and under finding number six
22 you have a witness and then you have in parenthesis Wayne
23 Bier.  Is that actually Wayne Dayley and there was a
24 mistake somewhere?  Finding number six:  A witness,
25 parens, Wayne Bier, end parens, corroborated that a --

Page 27

1      A.   There is a typo in that name, and there is a
2  discrepancy there between the summary and this finding,
3  but it was a --
4      Q.   It's the same guy?
5      A.   Yes.
6      Q.   And do you recall whether his name was Bier or
7  Dayley?
8      A.   I don't.
9      Q.   Okay.  We will call him Wayne.
10     A.   Okay.
11     Q.   All right.  Any other parties that you
12 identified besides the six that you've told us about,
13 Pace, Troy, Hugo, Chris, Brittany --
14         MR. SNOW:  That are not in this memo?
15     Q.   (BY MR. EDWARDS)  That he identified as people
16 to look at as part of this investigation.
17     A.   No, not at this stage.
18     Q.   All right.  I have number two part of the
19 protocol to gather facts from interviews.  Now, did you
20 record these interviews?
21     A.   No.
22     Q.   Why not.
23     A.   I didn't record them.
24     Q.   Is there a reason you didn't record them?
25     A.   It was a preliminary investigation I was

Page 28

1  conducting.
2      Q.   You understood that there could possibly be
3  disciplinary sanctions that could arise as a result of
4  your investigation, correct?
5      A.   Yes.
6      Q.   And you did not think that it was important to
7  memorialize these investigations through tape recording?
8          MR. SNOW:  Objection.  Argumentative, calls for
9  speculation, asked and answered.
10     Q.   (BY MR. EDWARDS)  Go ahead and answer.
11     A.   It was a preliminary investigation.
12     Q.   So the answer is no, you did not think it was
13 important.
14         MR. SNOW:  Objection.  Asked and answered,
15 calls for speculation.  You can go ahead and answer.
16     Q.   (BY MR. EDWARDS)  It's been asked anyway.  I'm
17 not sure it's ever been answered.
18     A.   Repeat the question.
19     Q.   You did not consider it important to tape
20 record these interviews, correct?
21     A.   At this preliminary stage of the interview.
22     Q.   All right.  Did you take written notes in these
23 interviews.
24     A.   You have those before you.
25     Q.   This is all the notes that were there?

Page 29

1    A.   Yes.   There were some attached to this
2  apparently, but that was it.   It was a preliminary stage
3  of an investigation.
4    Q.   Let's take a quick break.
5        (Recess, 10:26 a.m. to 10:30 a.m.)
6    Q.   Did you take handwritten notes.
7    A.   I generally -- no, I did not.
8    Q.   I'm sorry, go ahead.   Did you take any kind
9  of --
10       MR. SNOW:   Just one second.
11   Q.   (BY MR. EDWARDS)   You are right.   Go ahead and
12  be as thorough as possible.
13       MR. SNOW:   Finish your response, if you had
14  something further to say with respect to recording your
15  notes or written notes or et cetera.
16   A.   My practice is that I keep my notes in a
17  preliminary stage of an investigation in the document
18  that you have before you.
19   Q.   (BY MR. EDWARDS)   Okay.   When you spoke, for
20  example, with Mr. Erickson, during the time that you were
21  talking to him, did you have a pad out and you were
22  taking notes when you were speaking with him?
23   A.   No.
24   Q.   Did you have a computer out that you were
25  taking notes on while you spoke with him.

Page 30

1    A.   No.
2    Q.   How is it that you were then able to remember
3  what it is that you spoke to Mr. Erickson about.   I mean,
4  did you write something down after you spoke with him?
5    A.   Yes, and you have that document before you.
6    Q.   So this was sort of a work in progress and you
7  would update it after every interview?
8    A.   Yes.
9    Q.   With the exception of Wayne where you have
10  interview notes dated March 9, 2006, correct?
11       MR. SNOW:   Objection.   Assumes facts not in
12  evidence.
13   Q.   (BY MR. EDWARDS)   Well, let's get the facts
14  down in evidence then.   Can you show me on this timeline
15  anywhere that there is a note dated March 9, 2006 at all
16  with regard to Mr. Dayley or anybody else.
17   A.   I don't know where you are referencing a --
18  March 9th date.
19   Q.   All right.   Let's look on page one.   Down at
20  the bottom in the lower right-hand square we have in the
21  second paragraph:   A witness to this incident, parens,
22  Wayne Dayley, dash, see interview notes dated March 9,
23  2006, end parens.   That's what I'm looking at.
24   A.   Correct.
25   Q.   Other than that date in that little note can

Page 31

1  you show me anywhere in this timeline that there is a
2  date of March 9th that refers to an interview with Mr.
3  Dayley.
4    A.   No.   That's the sole reference.
5    Q.   All right, so there was a separate interview
6  note dated March 9, 2006 with regard to Wayne Dayley that
7  is not contained in this document; is that correct?
8    A.   No.   As I indicated before, it was attached to
9  this document as far as I know.
10       MR. SNOW:   Well, let me just interject for the
11  record.   We believe we produced everything responsive to
12  your discovery request.   We will certainly look again to
13  see if there is a separate attachment to these notes.   We
14  didn't receive any -- counsel has not received any
15  separate notes with respect to Park City's production.
16  We will -- assuming you are going to request those, and
17  I'm making that assumption --
18       MR. EDWARDS:   I think that's a fair assumption.
19       MR. SNOW:   -- we will certainly go back and
20  look and see if there is a separate set of notes that
21  were attached and if those can be located.   But as of
22  right now there has been a diligent search for all
23  relevant documents with respect to your discovery
24  requests and those have not been found or located, but we
25  will -- I'll talk with my client again and see if there

Page 32

1  is another -- somewhere that they have not looked and
2  also talk with Mr. Cashel.
3    Q.   (BY MR. EDWARDS)   So would it be fair to say
4  then that this investigation summary that you have in
5  front of you as Exhibit-44 is incomplete at least to the
6  extent that does not have the interview notes dated
7  March 9, 2006 regarding Wayne Dayley.
8    A.   The notes are not attached.
9    Q.   Okay.   Are there other notes that you took with
10  regard to any other witnesses that also were not attached
11  to Exhibit-44.
12   A.   They would be referenced in this document, and
13  I don't see any so --
14   Q.   All right, so Wayne Dayley was the only witness
15  that you had separate notes on that were not incorporated
16  into this document as a work in progress; is that
17  correct?
18       MR. SNOW:   I'm going to object to a
19  mischaracterization of his testimony.   You can go ahead
20  and answer the question, if you can.
21   Q.   (BY MR. EDWARDS)   Well, I'll withdraw the
22  question and ask one that I think -- let me tell you what
23  it is I'm trying to find out.   We know that there were
24  separate interview notes with regard to Mr. Dayley that
25  are not incorporated into Exhibit-44.   My question is

Page 33

1 whether there were notes that you took that were separate
2 from this Exhibit-44 with regard to Pace Erickson.
3     MR. SNOW: Let me make an objection to the
4 question. The characterization is that Mr. Dayley's
5 notes are not reflected or have not been incorporated
6 into this memo. I believe the memo does incorporate
7 those notes, and so I object to the mischaracterization
8 of your understanding of what Mr. Cashel has testified
9 to.
10     Q.   (BY MR. EDWARDS) All right. With that
11 objection having been made, were there separate notes
12 with regard to Pace Erickson.
13     A.   If there were separate notes, they would be
14 referenced in this document.
15     Q.   Okay, so since they were not referenced in this
16 document, would it be your conclusion that there were
17 not.
18     A.   That's my recollection, yes.
19     Q.   With regard to Troy Dayley were there separate
20 notes. I'm going to go through each one.
21     A.   No, I follow. Not that I can recall.
22     Q.   All right. With regard to Mr. Angelovich?
23     A.   Not that I can recall.
24     Q.   With regard to Ms. Angelovich, Brittany?
25     A.   Not that I can recall.

Page 34

1     Q.   And did you make any separate notes with regard
2 to Mr. Hinojos.
3     A.   No, other than are referenced here or, I mean,
4 are in this document.
5     Q.   I'd like you to look at Exhibit-28. It's in
6 this file here. Now I'll tell you we have had several
7 depositions prior to yours and that's where all of these
8 different files came from.
9         Exhibit-28, if you look on the very first page
10 in the lower right-hand corner, it says witness, Kimberli
11 Leier. So what that means is that this investigative
12 file was attached as an exhibit to her deposition. I'd
13 like you to look at this and tell me whether you have
14 ever seen this document before today, Exhibit-28?
15     MR. SNOW: Take your time to review it, the
16 pages.
17     Q.   (BY MR. EDWARDS) In fact, as you are looking
18 through it, what I'm going to ask you next is whether you
19 were the author of any of the documents that we find in
20 Exhibit-28, so look at them with that in mind.
21     A.   Okay. I've reviewed the multiple pages of this
22 document. Please repeat your question.
23     Q.   Let me first ask you if you authored any of
24 those documents.
25     A.   I've seen no document in here that I authored.

Page 35

1     Q.   All right. Prior to today have you ever seen
2 these documents.
3     A.   I've reviewed the documents. There is many
4 pages. This is the first time that I've seen them as
5 best I can tell with this review.
6     Q.   As part of your investigation did you review
7 any documents at all?
8     A.   I did. I recall reviewing time sheets, time
9 records.
10     Q.   Anything else?
11     A.   I reviewed a file as well of a previous
12 incident that involved Hugo.
13     Q.   All right. Other than looking at time records
14 and a file of a previous incident involving Hugo, any
15 other documents that you reviewed.
16     A.   You are referring to the course of this
17 investigation?
18     Q.   Yes, as part of your investigation.
19     A.   Not that I recall.
20     Q.   Did you attach copies of the time records or of
21 the file of the previous incident to your investigative
22 report when it was submitted to either the City Manager
23 or to Human Resources.
24     A.   No. They were available if required.
25     Q.   When you state that you reviewed time sheets or

Page 36

1 time records, what did you look at.
2     A.   I looked at Hugo's work schedule to determine
3 if an incident that was alleged by Mr. Angelovich had
4 occurred during a time when Hugo was on a work shift.
5     Q.   Did you look at actual time clock records? Do
6 employees clock in?
7     A.   They stamp a time card.
8     Q.   Did you look at a time card?
9     A.   Yes.
10     Q.   Where would I be able to look at time cards?
11     A.   Those should be maintained. I don't know what
12 the -- they should be maintained at the city according to
13 their record retention requirements, wherever that is.
14     Q.   Let me make sure I understand. Did you look at
15 his work schedule and also at his actual time stamp, time
16 clock records; is that correct?
17     A.   That's my recollection, yes.
18     Q.   I'd like to look on page two of your report.
19 On the very top we have the date February 19, 2006, 6:30
20 p.m. approximately. Brittany and a female friend run
21 into Eulogio at Davanza's Restaurant. Where do you get
22 that information?
23     A.   From Brittany.
24     Q.   Eulogio was on duty having clocked in at 2:30
25 that day. Where did you get that information.

Kent Cashel
December 16, 2008

Hinojos v.
Park City

Page 37

1    A.  As best as I can recall that would have come
2  from the time sheet.
3    Q.  Okay, and I think you've given me two time
4  records.  Would that have come from his actual time
5  punch-in record -- what's that called, just the actual
6  time clock record?
7    A.  Just a time card.
8    Q.  Would it have come from the time card?
9    A.  I don't recall.
10   Q.  Do you recall whether it would have come from
11 his schedule.
12   A.  My statement says having clocked in at 2:30
13 p.m., so based upon that I'm assuming I took that from
14 his card.  I did look at both.
15   Q.  When you spoke to Brittany, did she verify that
16 this incident had occurred on February 19, 2006 at
17 approximately 6:30 p.m.?
18   A.  Yes.
19   Q.  Okay.  The next item:  Brittany reports to
20 Chris Angelovich that a Hispanic male wearing a city
21 issue red Marker jacket with a city logo had scared the
22 girls in the restaurant.  Where did you get that
23 information, that she had reported to Chris Angelovich
24 about this Hispanic male.
25   A.  Well, that information was provided to me by

Page 38

1  both Chris and Brittany, so I heard it first from Chris
2  and followed up with a discussion with Brittany where she
3  verified that that was -- that had occurred or alleged.
4    Q.  All right, and then we have next:  Brittany
5  alleges that Eulogio was, and then number one, staring
6  and winking at her and her friend; two number, making
7  comments in Spanish and in a tone that she interpreted to
8  be sexual in nature.  Where did you get that information
9  from.
10   A.  From statements from Brittany, and Chris as
11 well.
12   Q.  Do you recall when it is that you actually
13 wrote down this information that is found in this square
14 here at the top of page two of your report?
15   A.  No, not specifically.
16   Q.  It would have been after you spoke with Chris
17 and Brittany?
18   A.  Yes.
19   Q.  How soon after you talked to them.
20   A.  I don't know specifically how soon, but it
21 would have been very shortly after.  It's my practice to
22 make these notes following an interview.
23   Q.  Well, within an hour, a day, a week?  Can you
24 give me --
25   A.  Within an hour.

Page 39

1    Q.  Have you reviewed any depositions in
2  preparation for your testimony here today?
3    A.  None, no.
4    Q.  Have you reviewed any documents other than --
5  well, have you reviewed any documents at all in
6  preparation for your deposition testimony here today.
7    A.  I reviewed this document when I presented it to
8  the attorney's office when they requested it.
9    Q.  How long ago was that?
10   A.  It's been several weeks.  I don't know the
11 precise date.
12   Q.  Within the last, say, six weeks have you
13 reviewed any documents relative to this case?
14   A.  No.
15   Q.  When you spoke with Mr. Hinojos on I believe
16 you've got it written down here as March 1st at
17 approximately 4:45, do you have any idea how long you
18 were there at the meeting with him?
19   A.  I don't know the precise time.  I would guess
20 sometime between 15 minutes and a half-hour.
21   Q.  All right.  Let's look at that particular box.
22 It's on page two, fifth one down.  The reference is:
23 March 1st approx 4:45 p.m.  Eulogio appeared in Human
24 Resources in a distraught state of emotion.
25      Were you there when he appeared?

Page 40

1    A.  No.
2    Q.  Where did you get the information from upon
3  which you wrote this particular sentence.
4    A.  Well, he appeared is just -- I mean, that's
5  based on my -- I arrived probably ten minutes or so after
6  he had first arrived.  I don't know exactly, so that's
7  based on his condition when I arrived.
8    Q.  You presumed that he had arrived at Human
9  Resources in a distraught state of emotion although you
10 had not seen him when he arrived; is that correct?
11     MR. SNOW:  Objection.  Argumentative.
12   Q.  (BY MR. EDWARDS)  I'm trying to clarify.  I'm
13 not trying to argue with you.
14   A.  I think I've answered.  I based it on the
15 condition that I observed when I arrived shortly after
16 his first interaction with Kim Leier.
17   Q.  Did you speak with Kim Leier about his
18 emotional state when he arrived?
19   A.  I'm sure we did as we debriefed.
20   Q.  So we can add Kim Leier to the list of
21 witnesses you spoke with with regard to information that
22 made its way into your report?
23   A.  In terms of this sentence, yes.
24   Q.  Okay.  Do you recall what else you spoke to
25 Ms. Leier about with regard to any information that is in

Page 41

1  this report.
2     A.  I'm sorry, repeat that.
3     Q.  Do you recall whether you had any further
4  conversation with Ms. Leier with regard to information
5  that made its way into your report.
6     A.  Under reference of March 2nd, there is a
7  reference there where I was advised by Kim when Hugo
8  might return to work.
9     Q.  Do you recall when you spoke to Ms. Leier to
10  receive that information?
11     A.  I can only rely on what's here in the document,
12  which states March 2nd.
13     Q.  So do you believe that you spoke to her on
14  March 2nd?
15     A.  I don't know. It's too long ago. I'm relying
16  on what's in the document.
17     Q.  How many times did you speak to Ms. Leier with
18  regard to information that you were looking for to
19  include in your report.
20     A.  I don't know the exact number of conversations,
21  but information that's included in my report, if it came
22  from Kim Leier, it would be referenced as information
23  from Kim Leier.
24     Q.  I understand. What I'm asking is whether you
25  have any recollection as to how many times you spoke to

Page 42

1  her. Would it be more than once?
2     MR. SNOW: Objection. Asked and answered.
3     MR. EDWARDS: It's been asked.
4     MR. SNOW: It's also been answered.
5     A.  If I had spoken with Kim Leier in reference to
6  this investigation, it will be referenced in this
7  document.
8     Q.  (BY MR. EDWARDS) Okay, so on March 1st we have
9  the information that he appeared at Human Resources in a
10  distraught state of emotion. That's information that I
11  think you already indicated that you got from Kim Leier.
12  You indicated on March 2nd --
13     MR. SNOW: I'm going to object to the
14  mischaracterization. He testified that it was from Kim
15  Leier and also his own personal observations.
16     Q.  (BY MR. EDWARDS) You also indicated on
17  March 2nd that Kim Leier was advised that Eulogio is
18  under a doctor's supervision. My question is whether you
19  received those two items of information separately or in
20  the same meeting with Kim Leier.
21     A.  I would have received those separately.
22     Q.  Okay. Let's go up to March 1st. We have again
23  in this box of 4:45 p.m., the second sentence of the
24  first paragraph: Eulogio alleged he had been falsely
25  accused by Pace and Troy and he requested investigation

Page 43

1  into his allegation.
2     Where did you get that information?
3     A.  From Hugo.
4     Q.  Okay. Next we have: Kim Leier, Human Resource
5  Manager, contacted Kent Cashel, Deputy Public Works
6  Director, and asked that he come meet with Eulogio.
7     Where did you get that information, from
8  yourself?
9     A.  Sorry, repeat that question?
10     MR. SNOW: Just move on.
11     Q.  (BY MR. EDWARDS) Well, what I want is the
12  source of every single sentence that you've got in this
13  document. We are going to go through it one bit at a
14  time here. And so when we have Kim Leier contacted you
15  and asked that you come to meet with him, that's
16  information that you had from your own personal
17  knowledge, correct, because she contacted you.
18     A.  You were asking me where I wrote Kim Leier
19  contacted Kent Cashel, where I got that information?
20     Q.  I keep calling you Cashel. I'm sorry. Yes.
21  You got that from your own --
22     A.  It's not apparent? That's based on my own
23  observation. She contacted me.
24     Q.  All right. Upon arrival and after having
25  observed Eulogio's distraught behavior Kent Cashel

Page 44

1  relieved Eulogio of duty.
2     That also came from your own experience,
3  correct?
4     A.  Yes.
5     Q.  All right. Kent felt it unsafe for Eulogio to
6  operate heavy equipment in his current state.
7     That also came from your own experience?
8     A.  Yes.
9     Q.  Why is it that you felt it was unsafe for him
10  to operate heavy equipment in his current state?
11     A.  Based on observable behavior in that meeting.
12     Q.  What was that observable behavior.
13     A.  He was extremely distraught and distracted.
14     Q.  Was he crying?
15     A.  On the verge.
16     Q.  Do you recall specific words, phrases,
17  sentences that he used?
18     A.  I don't.
19     Q.  Do you recall whether he denied that he had
20  made any kind of sexual overtures toward Brittany?
21     A.  He did.
22     Q.  Do you recall what he said with regard to Pace
23  and Troy, stating that he had been falsely accused. Do
24  you have any recollection of what precisely he said.
25     A.  I don't recall precisely.

Page 45

1  Q. Do you recall generally what he said.
2  A. Yes. He alleged that the statements were
3  false.
4  Q. Did you believe him?
5  A. I had no reason not to.
6  Q. I'm not sure that was my question. Did you
7  believe him, not whether you had a reason not to believe
8  him.
9  MR. SNOW: Objection. Asked and answered. You
10 may not have liked his answer, but he answered it.
11 Q. (BY MR. EDWARDS) Well, it's a yes or no. Did
12 you believe him?
13 MR. SNOW: He can answer it any way he wants
14 to. He doesn't have to say yes or no. You can answer
15 the question the best you see fit.
16 Q. (BY MR. EDWARDS) I'll keep asking it until I
17 get a yes or no. Did you believe him or not?
18 MR. SNOW: You don't have to answer it yes or
19 no, okay? Quit instructing the witness how to answer.
20 MR. EDWARDS: Quit instructing the witness how
21 to answer, counsel.
22 A. I had no reason not to believe him at that
23 point.
24 Q. (BY MR. EDWARDS) Did you have any opinion as
25 to whether he was telling you the truth?

Page 46

1  MR. SNOW: Objection. Calls for speculation.
2  You can answer it.
3  A. I can't recall.
4  Q. (BY MR. EDWARDS) Did he tell you what Pace and
5  Troy had said to him that he thought was false.
6  A. I can't recall specifically but it was related
7  to this incident with -- the incident with Brittany.
8  Q. Okay. I'd like to look on the third page,
9  under finding number four: Brittany during a separate
10 interview corroborated Chris Angelovich's allegations
11 regarding the interaction between her and Eulogio at
12 Davanza's on February 19th.
13   You had a separate interview with Brittany?
14 A. I'm sorry, let's back up. You say reference
15 number four, finding four?
16 Q. Finding -- well, it's interesting. I'm sorry,
17 this is weird. We've got four, five, six, and then we've
18 got another four, five, and six. This is number four,
19 two, the second number four.
20 A. Okay. Yes, I had a separate interview. I met
21 first with Chris and then followed up with Brittany.
22 Q. Did you speak to her alone?
23 A. I did not.
24 Q. Was Chris present at all times that you spoke
25 with her?

Page 47

1  A. Chris was present at all times that I spoke
2  with her.
3  Q. What date was that.
4  A. I have to rely on the document which says --
5  the date's not identified here in here and I cannot
6  recall.
7  Q. Do you have any idea why you did not put down
8  the date that you met with her and Chris?
9  A. I don't.
10 Q. Is everything that Brittany told you during the
11 separate interview stated under the box on page two on
12 the top under February 19th, 2006?
13 A. I'm sorry, please repeat your question.
14 Q. My question is, we have this reference on page
15 two of your report at the top, a box:  February 19, 2006,
16 6:30 p.m. approx. And my question is whether everything
17 that Brittany told you in the separate interview that you
18 had with her, whether that is reflected in these notes.
19 A. That is a summary of our conversation.
20 Q. Is there anything that you recall that she said
21 that is not summarized in this conversation -- or in
22 this note. I'm sorry.
23 A. I have a recollection that I had spoken with
24 her about -- I'm not sure it's reflected here. I don't
25 see it -- if she knew Hugo personally and -- because she

Page 48

1  could not identify him by name, and so I presented her
2  with photos of numerous Public Works employees and she
3  identified Hugo.
4  Q. How many photos did you show her?
5  A. I don't know the exact number, but it would
6  have been somewhere 10 to 12.
7  Q. Well, let's look on the second number five on
8  page three of your report, because I think there is a
9  reference to that. It's the third paragraph from the
10 bottom.
11 A. Okay.
12 Q. Brittany admitted she did not know Eulogio by
13 name but she was able to identify his photo from a group
14 of Public Works employees, and then parens, including one
15 other Hispanic male.
16   Where did you get the photos?
17 A. We have a photo board of all our employees.
18 Q. Well, what is it like. Are they all on one
19 board and you pulled the board down and showed it to her?
20 A. No. They are just fastened to the board so I
21 could remove them, so I removed several male pictures and
22 brought them in.
23 Q. Did you take all the male pictures of everyone
24 that works at Public Works?
25 A. No. There would have been more than 12.

Page 49

1    Q.   Why did you select the 12 that you did?
2    A.   They were just grabbed at random.
3    Q.   Chris Angelovich was present with her when she
4  made this identification from the photos?
5    A.   Yes.
6    Q.   Did he make any comment with regard to any of
7  the photos?
8    A.   No, not that I recall.
9    Q.   Do you recall him helping her at all in
10  identifying Hugo's photo?
11    A.   No. That was the purpose of putting the photos
12  out. I would have recognized that and remembered it.
13    Q.   Have you ever conducted a photo line-up before
14  this?
15    A.   No.
16    Q.   Have you received any kind of training as a
17  peace officer?
18    A.   No.
19    Q.   Other than having carried out investigations
20  during your years as manager and sort of on-the-job
21  training from doing that, have you ever received any kind
22  of formal training on how to do an investigation?
23    A.   As it relates to Human Resource issues, yeah,
24  I've received training throughout my career.
25    Q.   Tell me a little bit about that training, what

Page 50

1  you have received.
2    A.   It will just be general in nature, training in
3  terms of gathering facts related to Human Resource
4  incidents that occur in the workplace.
5    Q.   Have you ever taken a course on how to carry
6  out an investigation for a Human Resources matter?
7    MR. SNOW: Objection. Vague and ambiguous as
8  to course.
9    Q.   (BY MR. EDWARDS) Do you understand what I mean
10  by the word course?
11    A.   No, not specifically.
12    Q.   All right, let me rephrase it. Have you taken
13  a class in how to carry out an investigation?
14    A.   I've never had a class specific to carrying out
15  an investigation, although it's been a topical matter in
16  classes I've taken both in my business education as well
17  as my MBA.
18    Q.   All right. Let's talk a little bit about your
19  educational and work background. Actually, do you want
20  to take a break? I'm kind of moving into a new area.
21    MR. SNOW: Yeah, let's take a quick break. How
22  much time do you anticipate?
23    MR. EDWARDS: Two to three more hours.
24    MR. SNOW: Oh, really?
25    MR. EDWARDS: Yes.

Page 51

1    MR. SNOW: Well, we have until noon. I
2  understand we started late. We will talk about --
3    A.   I've got some appointments.
4    (Recess, 11:12 a.m. to 11:32 a.m.)
5    Q.   (BY MR. EDWARDS) Mr. Cashel, let's talk a
6  little bit about your education and work background. You
7  graduated from college?
8    A.   I did.
9    Q.   Where?
10    A.   University of Utah.
11    Q.   When?
12    A.   I'm sorry, did you say when?
13    Q.   When, yeah. Sorry.
14    A.   It would have been -- my undergraduate degree
15  was in 1992.
16    Q.   What was your major field of study?
17    A.   Business with a focus in accounting.
18    Q.   All right. Did you get post-graduate
19  education?
20    A.   I did.
21    Q.   Where.
22    A.   At the University of Utah.
23    Q.   What was the degree that you took.
24    A.   MBA.
25    Q.   When was that.

Page 52

1    A.   I graduated in 1995, I believe. That's the
2  best I can recall.
3    Q.   All right. Was there any specific area within
4  the MBA major or course of study that you focused on.
5    A.   No.
6    Q.   So kind of a general MBA?
7    A.   Yes.
8    Q.   The reason I ask that, I've got a daughter who
9  is -- she and her husband are both getting MBAs and he's
10  in one field of study and she's in another. He's in
11  human resources and she's in accounting, which hardly
12  overlap at all. Yours was just kind of a general MBA?
13    A.   Well, you can concentrate your classes, but
14  there is not a major, if you will, a formally claimed
15  major.
16    Q.   Was there an area of concentration that you
17  had?
18    A.   It was general in nature.
19    Q.   Did you take any classes with regard to human
20  resources in preparation for your MBA? Let me try that
21  again in English. In studying for your MBA did you take
22  any human resources classes?
23    A.   Yes.
24    Q.   How many.
25    A.   I don't recall the exact number. There would

Page 53

1 have been more than one.
2    Q.   Do you recall whether employee discipline was
3 ever a subject of discussion in any of the MBA courses
4 that you took.
5    A.   What do you mean specifically by employee
6 discipline.
7    Q.   Well, either the reasons for or the methods of
8 employee discipline.  We can take those one at a time.
9 Did you ever take -- did you ever have any kind of course
10 work in, for example, what would constitute generally in
11 the workplace the kind of behavior that would merit
12 employee discipline.
13    A.   Yes.  I mean, not a specific course in that,
14 but there had to be topical matter within that management
15 curriculum that would have covered that.
16    Q.   Did you have any discussion to your
17 recollection with regard to sexual harassment in the
18 workplace?
19    A.   Yes, both in business law classes, I'm sure,
20 and outside my general MBA I've had training throughout
21 my career specific to that.
22    Q.   Have you had any specific training with regard
23 to sexual harassment in the workplace since you have gone
24 to work for Park City.
25    A.   Yes.

Page 54

1    Q.   Are you aware that there is a specific policy
2 of Park City with regard to sexual harassment in the
3 workplace.
4    A.   Yes.
5    Q.   Have you reviewed that policy ever?
6    A.   Yes.
7    Q.   In fact, why don't we look at that.
8 Exhibit-27.
9    MR. SNOW:  So the 2005?
10    Q.   (BY MR. EDWARDS)  Yes.  In fact, I'll go ahead
11 and qualify that.  I'm putting in front of you
12 Exhibit-27, which was actually attached as an exhibit to
13 Mr. Gibbs' deposition.  It states at the very first page
14 that it is dated July 1, 2005, and also further states
15 that it is Park City Municipal Employee Policies and
16 Procedures.  Have you ever seen this document before in
17 any form?  And when I say in any form, I mean it might
18 have come in a different form when it was originally
19 issued to the city.
20    A.   Yes.
21    Q.   All right.  Did you have any kind of training
22 with regard to any of the policies and procedures that
23 are contained in this document.
24    A.   Yes.
25    Q.   Do you recall whether this document was ever

Page 55

1 the focus of any training in Park City?  Let me give you
2 a little bit of background as to where I'm going.  In my
3 former life I was actually a city attorney of a city and
4 every year when we had new policies and procedures come
5 out we'd have a meeting and issue them and we would talk
6 about updates and any specific problems that we were
7 having.  Did they have anything like that at Park City?
8    A.   I can't specifically recall if we had one when
9 this document was issued, but in general we do have those
10 meetings, and we are required to sign a statement that we
11 have received the document, and so they generally cover
12 changes from the previous year.
13    Q.   To your knowledge Park City has had a sexual
14 harassment policy since you went to work there, correct?
15    A.   Yes, best I can recall.
16    Q.   Can you tell me generally what you understand
17 sexual harassment to be?
18    A.   Well, I think it's any unwanted advance.
19    MR. SNOW:  Let me just interpose an objection.
20 Calls for a legal conclusion.  But you can answer,
21 continue with your answer.
22    Q.   (BY MR. EDWARDS)  All right.  Any unwanted
23 advance.
24    A.   That's sexual in nature.
25    Q.   Prior to the investigation that you undertook

Page 56

1 with regards to Mr. Hinojos had you ever done any
2 investigation of an accusation of sexual harassment in
3 the workplace, ever, anywhere that you've ever worked.
4    A.   Not that I can recall.
5    Q.   Did you understand the investigation that you
6 were undertaking with regard to Mr. Hinojos to involve
7 allegations of sexual harassment?
8    A.   Sorry, repeat that question?
9    Q.   Did you understand that the focus or at least
10 an item -- let me try it again.  Did you understand that
11 the investigation that you undertook with regard to
12 Mr. Hinojos involved elements of sexual harassment.
13    A.   No, I don't believe that it did, at least as it
14 relates to Park City's policy.
15    Q.   Why not.
16    A.   I believe it was related to tension in the
17 workplace between two employees.
18    Q.   Can you explain what you mean by that?  Why is
19 it that sexual harassment under Park City's policies and
20 procedures wasn't involved in your opinion.
21    A.   It didn't involve an employee of the city in
22 the context of sexual harassment, but it did involve two
23 employees and potential tension in the workplace.
24    Q.   Did you ever come to the conclusion as part of
25 your investigation that Mr. Hinojos had indeed made

Page 57

1 comments of a sexual nature to Brittany Angelovich?
2   A.   No, only allegations.
3   Q.   Okay. Why did you reference in your
4 investigation a matter from February 2004? It's on page
5 one, very first box under the timeline.
6   A.   I'm sorry, you said that's on page one?
7   Q.   Of your investigation --
8   A.   Okay, I'm sorry.
9   Q.   -- February 2004.
10   A.   That was only by reference of it was a previous
11 incident in which Hugo was involved.
12   Q.   Did you understand Mr. Angelovich to have been
13 involved in that incident?
14   A.   No. I understood Hugo to be involved in that
15 incident.
16   Q.   Did you understand Mr. Erickson to be involved
17 in that incident at all.
18   A.   Oh, I'm sorry, I'm used to him being called
19 Pace. Pace Erickson. Yeah, I'm sorry.
20        MR. SNOW: Just so we are clear, we are talking
21 about the February 2004 incident?
22        MR. EDWARDS: I am.
23   A.   And, I'm sorry, repeat the question about Pace.
24   Q.   (BY MR. EDWARDS) Did you understand Pace
25 Erickson to have any involvement in this incident in

Page 58

1 February 2004.
2   A.   No, I did not.
3   Q.   Did you understand Troy Dayley to have any
4 involvement in the incident of February 2004.
5   A.   I can't recall.
6   Q.   If the original assignment given to you by
7 Mr. Bakaly was to look into a meeting between Mr.
8 Erickson, Mr. Dayley, and Mr. Hinojos and neither Mr.
9 Erickson or Mr. Dayley were involved in this incident of
10 February 2004, why did you refer to it or investigate it?
11   A.   Well, in the context of conducting an incident
12 in the workplace it would be and it is a practice to look
13 at previous incidents to see if there is anything there
14 that's contextual.
15   Q.   Did you look at any previous incidents
16 involving Mr. Erickson that might give context to the
17 meeting that he had with Mr. Hinojos.
18   A.   I did.
19   Q.   What did you look at.
20   A.   I would have looked at -- you know, I can't
21 recall exactly what I looked at. What I can -- with the
22 content that I would generally look at would be any sort
23 of work history that we had.
24   Q.   Did you look at Mr. Dayley's history to give
25 context to the meeting that had occurred between him and

Page 59

1 Mr. Hinojos.
2   A.   I would have, yes.
3   Q.   Do you recall specifically what you looked at?
4   A.   I don't.
5   Q.   Were you aware of the fact that at one time
6 Mr. Hinojos had made an accusation against Mr. Dayley
7 that he had broken into a vehicle of his?
8   A.   No. That's the first I heard that.
9   Q.   Were you aware of the fact that Mr. Hinojos had
10 made accusations against Mr. Dayley for having broken
11 into a locked work space.
12   A.   Sorry, repeat that. I know it's --
13   Q.   Yeah. Let me try it again in a little shorter
14 form. Were you ever informed that Mr. Hinojos had
15 accused Troy Dayley of breaking a lock so he could get
16 into Mr. Hinojos' locked work space at Park City.
17   A.   I have no recollection of being made aware of
18 that.
19   Q.   Were you aware of any bad blood between Mr.
20 Dayley and Mr. Hinojos that might have given context to
21 the meeting in February or March of 2006.
22   A.   The first -- this would be the first time I was
23 made aware of, when I began this investigation.
24   Q.   But my question is during that investigation
25 were you made aware of any bad blood that had preceded

Page 60

1 the meeting between them that would have given some
2 context to that meeting.
3   A.   What do you mean by bad blood?
4   Q.   Any kind of either personal or professional
5 difference between the two of them.
6   A.   I don't recall that coming up.
7   Q.   Would that have been important for you to have
8 known in order to have a full context for the meeting
9 that you were asked to investigate?
10   A.   What would have been important?
11   Q.   For you to have known whether there would have
12 been any bad blood between Mr. Hinojos and either Mr.
13 Dayley or Mr. Erickson.
14        MR. SNOW: Objection. Calls for speculation.
15 You can answer.
16   A.   In terms it would be contextual, yes, but I was
17 not made aware of it so --
18   Q.   (BY MR. EDWARDS) Did you look into it.
19   A.   I was not aware of it so I did not look into
20 it.
21   Q.   Without being aware of it did you ever question
22 either Mr. Dayley or Mr. Erickson or anyone else about
23 whether there was any sort of a history between them and
24 Mr. Hinojos that was negative in any way prior to this
25 meeting.

Page 61

1   A.   I've no recollection of having discussions of
2 that nature, and if I had it would be reflected in this
3 document.
4   Q.   Do you recall whether you were ever made aware
5 that there had ever been any kind of complaints made
6 about Mr. Erickson by Hispanic workers in Park City prior
7 to the time that Mr. Erickson met with Mr. Hinojos on
8 March 1st, 2006.
9   A.   I was not aware of that, no.
10   Q.   Were you aware whether there had been any
11 complaints made by Mr. Dayley -- or made against -- I'm
12 going to try it again.  Were you aware of whether
13 Hispanic workers in Park City had ever made any
14 complaints about Mr. Dayley prior to the time that he met
15 with Mr. Hinojos at the end of February, beginning of
16 March 2006.
17   A.   January -- sorry, give me that date again?
18   Q.   The reason I bring that up is because you have
19 listed here the date that they met with him as March 1st
20 at approximately 4:00 p.m.  I'm not sure that that's the
21 exact date, but for the purposes of this deposition let's
22 go ahead and presume that it is.  Were you aware that
23 prior to this meeting of March 1st between Pace and Troy
24 and Mr. Hinojos, were you aware of whether there had ever
25 been any complaint made against Troy Dayley by Hispanic

Page 62

1 workers in the city of Park City.
2   A.   I was not aware prior to March 1st, your
3 question.
4   Q.   Yeah, it was a bad question because,
5 obviously -- my question is this.  In investigating this
6 incident were you aware of whether there had ever been
7 any complaint against Troy Dayley by Hispanic workers
8 before March 1st.
9   A.   No, I was not aware.
10   Q.   I'd like to look at -- well, let me ask you
11 this.  Was going to work for Park City the first time you
12 had ever worked for a public employer?
13   A.   No.  I was employed by Sandy City.
14   Q.   What did you do at Sandy City.
15   A.   I was a Public Works Management Analyst.
16   Q.   How long were you there?
17   A.   Approximately three years.
18   Q.   From when to when.
19   A.   It would have been '92 to '95.  I'm sorry, '95
20 to '98.  I'm sorry.
21   Q.   Okay.  I'd like to look at the bottom of page
22 three of your report, PC 02735, the very last paragraph,
23 number seven:  Previous allegations made against Eulogio
24 regarding sexually inappropriate behavior in the
25 workplace can be verified through various documentation

Page 63

1 and interviews.
2   Q.   Did you have any specific interviews with
3 regard to the previous allegations?
4   A.   Yes.  I interviewed the -- they weren't
5 interviews.  They were discussions with the management,
6 discussions with the Director of Public Works and --
7   Q.   Mr. Gibbs?
8   A.   Mr. Gibbs, yes.
9   Q.   All right.  Anyone else?
10   A.   No.
11   Q.   So would it be fair to add Mr. Gibbs to our
12 list of people that you spoke with in doing this
13 investigation?
14   A.   I spoke with him but it was not a formal
15 interview.
16   Q.   All right.  The difference that you see between
17 a formal interview and a discussion is what.
18   A.   Mr. Gibbs had provided to me contextually that
19 this had occurred, that this complaint had occurred and
20 that was that.
21   Q.   Did he tell you why he thought that it was
22 important for you to know that?
23   A.   I don't recall.  I recall him pointing that
24 out.
25   Q.   Did he give you any documentation?

Page 64

1   A.   No.  As I recall, what I did then is look to
2 the files that are contained in HR.
3   Q.   And what were you able to find.  It says:  No
4 formal investigation file documenting findings and
5 actions taken could be located.
6   A.   It was minimal as my statement has there.
7   Q.   Let's go to the next sentence:  Incident report
8 filed by transit supervisor Destery Pollard 2/21/2004 is
9 contained in this file.
10       What file are you referring to?  Was it
11 contained as part of this investigation file, or was it
12 contained in the HR file?
13   A.   I don't recall the source of that document.  I
14 think and my recollection is I'm referring to the
15 document that I provided, this document.
16   Q.   All right, so the incident report was also
17 forwarded along with this investigation file?
18   A.   That's my recollection.
19   Q.   Let's look at the next page.  I think it's page
20 four of your investigation file.  It's PC 02736.  You
21 came to some conclusions.  Were you instructed to come up
22 with conclusions?
23   A.   Yes.  I was asked to look into the facts and
24 make a set of recommendations.
25   Q.   Okay.  In doing your investigation did you

Page 65

1 anticipate that it was possible that Mr. Hinojos could
2 receive some sort of employee discipline.
3   **A.   Yes, but let me just qualify, probably not or not**
4 **based on this level of investigation, which was**
5 **preliminary.**
6   Q.   Did you understand it to be your role to make
7 any recommendation as to whether further investigation
8 should be done in order to determine whether employee
9 discipline was warranted?  Did you understand that
10 question?  I can try it again.
11   **A.   No.**
12   Q.   What I'm trying to figure out is this.  You did
13 this investigation.  I think you just said you probably
14 couldn't be disciplined based on this preliminary
15 investigation.  My question is, did you see it as your
16 role to make a recommendation as to whether anything more
17 should be done that might lead to disciplinary action
18 against him.
19   **A.   Yes, I do.  I think it was -- I was to look**
20 **into the facts and make a set of recommendations based on**
21 **what I found.**
22   Q.   Did you foresee that there was a possibility
23 that Mr. Pace Erickson could possibly be disciplined as a
24 result of this incident.
25   **A.   Yes.**

Page 66

1   Q.   And Mr. Dayley as well?
2   **A.   Yes.**
3   Q.   Ms. Leier?
4   **A.   That was not my role.  I was to look into the**
5 **meeting that occurred and the facts around that -- Oh,**
6 **I'm sorry -- not anything more.**
7   Q.   No, I shouldn't have interrupted you.  I
8 thought you were done.
9   MR. SNOW:  Not anything with -- did you finish?
10   **A.   Yeah, not anything outside of that meeting.  It**
11 **was the facts surrounding that meeting and that incident.**
12   Q.   (BY MR. EDWARDS)  At any time that you were
13 doing this investigation did you anticipate that there
14 might be a lawsuit that would arise as a result of this
15 meeting.
16   **A.   Well, of course as a manager almost every**
17 **action I take there is a potential for a lawsuit so --**
18   Q.   All right.  I want to look actually at the last
19 page, page PC 2737.  First recommendation:  After
20 discussions with Kim Leier and Tom Daley it has been
21 determined that Hugo should be questioned as to the
22 allegations upon his return to work.  At that time it
23 will be determined what, if any, disciplinary action is
24 appropriate.
25     How many discussions did you have with Kim

Page 67

1 Leier in which it was determined that Hugo should be
2 questioned as to the allegations upon his return to work.
3   MR. SNOW:  Objection.  Assumes facts not in
4 evidence.
5   Q.   (BY MR. EDWARDS)  All right.  I'll withdraw it
6 and I'll try it again.  What are you talking about here
7 with regard to discussions with Kim Leier.  How many
8 discussions did you have.
9   **A.   I don't know the number.**
10   MR. SNOW:  Let me just interpose another
11 objection.  To the extent you had discussions with Kim
12 Leier and Tom Daley together, those discussions are
13 protected by Park City's attorney-client privilege and I
14 instruct you not to answer.  To the extent you had
15 conversations outside of Tom Daley's presence with Kim
16 Leier, you can answer his questions.
17   MR. EDWARDS:  I don't want to argue with you on
18 the record, but I do want to get some qualifications so
19 that I don't ask questions that are going to receive
20 objections.  Is it your position that I can't ask him how
21 many meetings he had with Kim Leier?
22   MR. SNOW:  No, you can ask that, definitely.
23   Q.   (BY MR. EDWARDS)  How many meetings did you
24 have with Kim Leier whether Mr. Daley was present or not.
25   **A.   I don't know the number of meetings we had.**

Page 68

1 Kim Leier is keeper of the employee files and records
2 that I would have been going through.  There would have
3 been some interaction there.  We had a meeting where I
4 presented this memo and my findings and conclusions.
5   Q.   Who was present at that meeting.
6   **A.   It would have been Tom Daley and Kim Leier.**
7   Q.   Do you know when that meeting was?
8   **A.   I don't.  There is no date referenced here so**
9 **it would have been prior to presenting this memo to**
10 **Mr. Bakaly.**
11   Q.   I think you indicated that you had sent this --
12 on page three, the very last box there, it's at the top
13 under March 15th:  Kent Cashel completes investigation,
14 forwarded report to Tom Bakaly and Human Resource for
15 review.  So your meeting with Kim Leier and Mr. Daley was
16 before that time?
17   **A.   Yes, it was.**
18   Q.   Do you have any idea why Mr. Daley was part of
19 that process?
20   **A.   It's a Human Resource issue and we were**
21 **supposed to make a set of recommendations back to the**
22 **City Manager.  Just due course there that would occur.**
23   Q.   Generally does Mr. Daley oversee investigations
24 that may have disciplinary implications in Human
25 Resources?

Page 69

1  A.  No, but he -- I mean, let me back up.  He would
2 be involved at prior to making a final recommendation to
3 the City Manager.
4  Q.  Any idea why?
5  A.  No, I don't.  No.
6  Q.  All right.  I'm back on the last page.  The
7 second recommendation:  Sexual harassment policy training
8 for PW supervisory staff and employees.
9     Now I think you've already testified you didn't
10 see this as a sexual harassment issue, correct?
11  A.  No, I did not.
12  Q.  Why did you recommend that the PW supervisory
13 staff and employees undertake sexual harassment policy
14 training?
15  A.  The reason that is recommended was because
16 there was difficulty in determining whether or not this
17 was sexual harassment in the workplace prior to the
18 initial contact with Pace and Hugo, and Troy was at that
19 meeting as well, so that is where that recommendation
20 comes from is to provide clarity to the supervisors and
21 managers of what our policy is and how they should act
22 accordingly.
23  Q.  Were you thinking specifically Mr. Dayley, Mr.
24 Erickson when you made this recommendation?
25  A.  No, I was thinking in general based on the lack

Page 70

1 of clarity that occurred in that interaction, leading up
2 to that interaction.
3  Q.  The lack of clarity on the part of Mr. Erickson
4 and Mr. Dayley?
5  A.  Yes.  In a general nature it was, yes.
6  Q.  They were the PW supervisory staff that was
7 involved in this particular incident, correct?
8  A.  Correct, which highlighted -- this
9 recommendation is based on the information I gathered
10 there, not specifically to them, but just in a general
11 nature that we needed that training.
12  Q.  All right.  The next recommendation:  Standard
13 forms.  Procedures and training on proper conduct and
14 documentation of all meetings, conversations or
15 investigations with potential of disciplinary outcome.
16     What are you referring to there.  What was the
17 genesis of that recommendation.
18  A.  Well, as stated previously in the document is
19 that the need for files becomes important in any sort of
20 investigative process.  And so that's just a general
21 management statement that we've noticed that could be
22 improved.
23  Q.  Well, I think you reference that you couldn't
24 find the formal investigation file with regard to the
25 previous allegation against Mr. Hinojos, correct?

Page 71

1  A.  That's referenced in the document, yes.
2  Q.  Is that what you are referring to in making
3 this recommendation?
4  A.  That's a general statement.
5  Q.  Did you feel like you had adequately preserved
6 the documentation of the meetings, conversations or
7 investigations that you undertook with regard to this
8 investigation?
9  A.  I do, because this was a preliminary level
10 investigation.
11  Q.  Okay.  Tell me what you mean by preliminary
12 level investigation and whether that has some separate
13 meaning other than any other type of investigation.
14  A.  It would mean just -- it would mean what you
15 see reflected in this document, which is a review of any
16 allegation or incident that's occurred in the workplace
17 and to report back to the management level that's
18 requested it on the findings, initial findings of those
19 facts that may lead to a recommendation to look into the
20 issue further, which this document states, which I refer
21 you back to that we needed to have a discussion with Hugo
22 to close this file.
23  Q.  Okay.  Did you foresee that there was at least
24 the possibility that this could get bumped up to a higher
25 legal of investigation.

Page 72

1  A.  Well, of course.  Any time I look at something
2 there is a possibility for it being bumped up higher.  I
3 had not reached any final conclusions based on fact that
4 I did not have a chance to close it out with a discussion
5 with Hugo.
6  Q.  Did you make any changes to this investigation
7 report after you met with Kim Leier and Mr. Daley and
8 before you sent it off to Mr. Bakaly?
9  A.  Did I make -- can you be more specific?
10 Changes to what.
11  Q.  Well, I'm not really sure.  Here is what I'm --
12 I'm sort of stabbing in the dark.  What is it that you
13 presented to Ms. Leier and Mr. Daley when you met with
14 them before you submitted your report to Mr. Bakaly.
15  A.  It would have been the facts that are contained
16 here.
17  Q.  All right, and were they in written form?
18  A.  I don't recall.
19  Q.  Do you recall whether you either changed a
20 written report or actually wrote a report after you met
21 with Ms. Leier and Mr. Daley before you sent this off to
22 Mr. Bakaly.
23  A.  Yes, I had to, because there are statements in
24 there after discussions -- you know, I added material to
25 that.  That was a meeting leading up to our meeting with

Page 73

1 Tom, Mr. Bakaly.
2    Q.   Did you make any changes to this report after
3 it was submitted to Mr. Bakaly.
4    A.   No.
5    Q.   So would it be fair to say that the last change
6 that was made in this report was no later than March 15th
7 of 2006?
8    A.   Based on the dates contained in the document,
9 yes.
10   Q.   Is that your independent recollection as well?
11   A.   It's my recollection, yes.
12   Q.   Going back to your recommendation number three
13 with regard to standard forms, procedures and training,
14 did you feel that the meeting between Hugo and Troy and
15 Pace was adequately documented.
16   A.   I don't recall at the time if I did or didn't.
17   Q.   Do you recall whether there ever was any
18 documentation of that meeting on the part of either --
19 let me try it again -- Troy or Pace?
20   A.   I have no recollection of any documentation
21 so --
22   Q.   Do you recall whether you asked them to write
23 any kind of statement with regard to that meeting.
24   A.   No, I did not.
25   Q.   Did you ever write a statement of your own that

Page 74

1 you asked them to review and either sign or at least
2 ratify.
3    A.   No, I did not.
4    Q.   Why not.
5    A.   I don't recall what the reasoning was for not
6 doing that.
7    Q.   All right. Let's go to the next one, next
8 recommendation: When possible, a Spanish-speaking
9 translator should be made available during any employee
10 interaction with potential for disciplinary outcome.
11       Why?
12   A.   My recollection is that was based on I felt
13 that there was the potential for misunderstanding.
14   Q.   Did you feel that there was a misunderstanding
15 in the meeting between Troy and Pace and Hugo?
16   A.   I don't know specifically that I -- I can't
17 recall if I specifically thought there was a
18 misunderstanding, but I do believe there was a potential
19 for that.
20   Q.   Let's go back a page, PC 02736. I'd like to
21 look at the last two paragraphs: It is difficult to
22 ascertain with any degree of certainty whether Eulogio's
23 behaviors and comments were made with sexual intent or
24 are simply misunderstandings due to language and cultural
25 differences.

Page 75

1        What did you base that on?
2    A.   I based that on my personal understanding that
3 language and cultural differences often create
4 misunderstandings.
5    Q.   Next you said: It is very likely that Eulogio
6 misinterpreted due to language difficulties the tone and
7 intent of the discussion regarding Chris' allegations.
8        What do you base that on?
9    A.   Based on the severity of or what I believe to
10 be the severity of Hugo's reaction to that meeting and
11 that solely.
12   Q.   You didn't base it on anything that you spoke
13 to Mr. Erickson about?
14   A.   Well, indirectly, yes. I'm sure I used those
15 discussions as part of that.
16   Q.   Did you base it in any way on anything that you
17 talked to Mr. Dayley about. When I say Mr. Dayley, I
18 mean to say Troy Dayley. There is about ten Dayleys in
19 the city as far as I can tell.
20   A.   I'm sorry, repeat your question?
21   Q.   Yeah. Was it your determination that it is
22 very likely that Eulogio misinterpreted the tone and
23 intent of the discussion regarding Chris' allegations due
24 to language difficulties based in any way on discussions
25 that you had with Troy Dayley.

Page 76

1    A.   Yes. I based that on discussions with them as
2 I reference in, I believe, here the 27th and 28th of
3 February, the minutes there, that their intent was to
4 counsel Hugo and that this was not a disciplinary
5 meeting.
6    Q.   All right. Let's talk about that for a second.
7 Well, let's go off the record for one second.
8        (Off the record.)
9        (Lunch recess, 12:17 p.m. to 12:56 p.m.)
10   Q.   (BY MR. EDWARDS) All right. Let's go back on
11 the record. When you spoke with Mr. Gibbs, did he ever
12 indicate to you that he had had any discussions with Troy
13 or Pace about the meeting that had occurred with
14 Mr. Hinojos?
15   A.   Yes, he would have.
16   Q.   What did he tell you.
17   A.   I don't recall. It would have been a general
18 discussion in nature that two managers in the workplace
19 have.
20   Q.   Do you recall whether he told you any specifics
21 that he had talked to Troy or Pace about?
22   A.   Specifics about?
23   Q.   About his meeting with either one of them.
24   A.   No, he didn't indicate he had had a meeting
25 with them. I thought you had asked -- what did you ask,

Page 77

1 the previous question?

2   Q. I'll try it again.

3   A. I'm sorry.

4   Q. No, that's a fair objection. It's actually the

5 first objection today that I can sustain.

6     My question is whether Jerry Gibbs ever told

7 you that he had met with or talked with either Troy or

8 Pace about their meeting with Hugo.

9   A. I don't recall. We interact so many times

10 throughout the day. We work in the same workplace. We

11 didn't have any formal meetings or in depth discussions.

12 There may have been some casual reference, but that's my

13 recollection.

14   Q. Before you sent this investigation file off to

15 the City Manager did you ever send a copy of it over to

16 Jerry Gibbs for either his review or approval?

17   A. I was asked by Tom Bakaly to investigate,

18 conduct this investigation, so I took it directly to him.

19   Q. So the answer is no, you did not send it to

20 Mr. Gibbs?

21   A. No, I did not.

22   Q. Other than simply providing a little bit of

23 background to you about this prior incident in 2004 did

24 Mr. Gibbs have any input at all into your investigation.

25   A. He did indicate to me this previous incident

Page 78

1 that you had questioned me on with Hugo in the workplace

2 that involved the allegations by a transportation

3 supervisor. He had reminded me that that had occurred.

4   Q. Were you aware of that other than the fact that

5 Mr. Gibbs told you about it? Did you have any knowledge

6 just kind of generally that there had been any incident

7 involving somebody from transportation?

8   A. I was aware of it. I didn't know the details.

9   Q. Had you done any investigation at all when that

10 occurred.

11   A. No.

12   Q. Do you know whether Mr. Erickson or Mr. Troy

13 Dayley did any investigation at that time.

14   A. I don't know.

15   Q. Do you know whether Ms. Leier had done any kind

16 of investigation at that time.

17   A. I don't know.

18   Q. Do you know whether Mr. Gibbs had ever done any

19 investigation.

20   A. I did not know at the time I began this

21 investigation. As I began looking into that I did find

22 that he had done some level of investigation looking into

23 it.

24   Q. Okay.

25   A. And, hence, the reference to that in this

Page 79

1 document.

2   Q. You've probably answered this but let me make

3 sure I understand correctly. I'm looking on page three

4 of your investigative file, and at the very top of that,

5 PC 02735, at the very top of that it looks like it's kind

6 of a hold-over from the previous box of March 2nd: Tom

7 Bakaly directs Kent Cashel to investigate Eulogio's

8 allegations.

9     Was that the date that Mr. Bakaly told you to

10 do an investigation was the 2nd of March?

11   A. Yes, that's my recollection.

12   Q. Let's talk a little bit about the previous

13 incident in 2004. You refer to it on the very first

14 page. In fact, it's the very first thing in the

15 timeline: Eulogio is accused of making sexually

16 inappropriate gestures and language in the workplace by a

17 female Public Works employee.

18     Do you know what kind of sexually inappropriate

19 gestures and language he was accused of making?

20   A. Well, these related to the allegations raised

21 first by Chris Angelovich and then by his daughter

22 Brittany.

23   Q. Well, no, I'm talking about the incident in

24 February of 2004.

25   A. Oh, I'm sorry. I apologize. I misunderstood

Page 80

1 your question.

2   Q. You know, that would not actually be the first

3 and I'm sure not the last time that will happen.

4   A. Yeah, now what was your question on that?

5   Q. My question is what types of sexually

6 inappropriate gestures and language was Hugo accused of

7 making to your knowledge.

8   A. You know, I do not recall.

9   Q. All right. Determination is made by Jerry

10 Gibbs that incident was a misunderstanding.

11     Now you got that information from Mr. Gibbs; is

12 that right?

13   A. Correct.

14   Q. Did you also get it from any of the written

15 materials that Mr. Gibbs gave to you.

16   A. I would have -- any written material, I'm

17 assuming based on the way we keep those documents, would

18 have come from Human Resource. And your question related

19 to that material was --

20   Q. Well, my question is -- well, you've just told

21 me that that was based in part -- that sentence was based

22 in part on what Mr. Gibbs told you. I'm asking whether

23 you also looked at any written material from Mr. Gibbs

24 upon which you base that statement that he had made the

25 determination that the incident was a misunderstanding.

Page 81

1   A.  I looked for written material.  I don't know
2  exactly what I was able to find, and I do reference in
3  here that, you know, the lack of solid documentation
4  there to back up anything there so --
5   Q.  Okay.  Mr. Gibbs counseled Eulogio on avoiding
6  behavior or language that could be interpreted as
7  inappropriate.
8       Again, is that information you got from
9  speaking directly with Mr. Gibbs?
10   A.  I don't know where I drew that from, if it was
11  from written or it's just an observation, so I don't know
12  if it came from written material or a discussion.
13   Q.  And then you have:  No further incident after
14  counseling.
15      Is that information you got from Mr. Gibbs?
16   A.  Well, I don't know based on my memory exactly
17  what that -- where that came from.  I did look -- I
18  looked at the written record.  It's likely that's where
19  that came from, but I don't know for sure.
20   Q.  And I probably already asked you about this but
21  I'm going to ask it again.  Did you ever talk to either
22  Erickson -- Pace Erickson or Troy Dayley about this 2004
23  incident?
24   A.  Prior to or after, after this --
25   Q.  At any time.

Page 82

1   A.  There may have been a reference to it but if --
2  lacking any -- my recording it here, there was no
3  conversation that was specifically directed at that
4  topic.
5   Q.  On the third page of your investigation, we've
6  gone through this.  This last paragraph, it's paragraph
7  seven on PC 02735:  Previous allegations made against
8  Eulogio regarding sexually inappropriate behavior in the
9  workplace can be verified through various documentation
10  and interviews.
11      In doing this interview were you concerned that
12  you had a repeat offender with Hugo with regard to
13  sexually inappropriate behavior?
14   A.  No.  I think I'm just -- would always point out
15  anything that was in a workplace history that may have
16  context in the investigation that we were conducting
17  so --
18   Q.  Make sure I understand.  I think you had
19  already testified that you did not consider the incident
20  involving the meeting to be a workplace issue that arose
21  from sexually inappropriate behavior.  Am I correct or am
22  I wrong about that?
23      MR. SNOW:  Let me object to the
24  mischaracterization of the testimony.  You can go ahead
25  and answer.

Page 83

1   Q.  (BY MR. EDWARDS)  That may actually be a well-
2  taken objection.  I'm trying to find out what your
3  testimony is.  Was the meeting that gave rise to your
4  investigation, did that arise from what you considered to
5  be sexually inappropriate behavior in the workplace?
6   A.  You are asking if the investigation arose from
7  an allegation of sexually inappropriate behavior in the
8  workplace.
9   Q.  Yes.
10   A.  Okay.  I just want to make sure I'm clear on
11  that.
12   Q.  At least you got my question right.  I'm not
13  sure I did.
14   A.  This investigation stemmed from the meeting
15  that was held between Pace Erickson, Troy, and Hugo, and
16  the allegations made by a fellow employee that had the
17  potential to create tension in the workplace.
18   Q.  You didn't see it as a sexual harassment issue,
19  correct?
20   A.  No.
21   Q.  But you did have concerns that there was
22  sexually inappropriate behavior in the workplace?  That's
23  my question.
24   A.  I don't know if concern is a fair
25  characterization.  I had -- I noted that this was in the

Page 84

1  work history.
2   Q.  Which leads me back to my question as to
3  whether you thought you had a repeat offender.  If you
4  didn't think it was sexual harassment in the workplace
5  and you weren't sure whether it was sexually
6  inappropriate behavior in the workplace, what relevance
7  did this 2004 incident have at all?
8      MR. SNOW:  Objection.  Asked and answered about
9  ten times now.
10      MR. EDWARDS:  Answer it 11.  I'm not sure I got
11  the answer that I understand.
12      MR. SNOW:  You can answer it if it's different
13  than your previous responses.
14      MR. EDWARDS:  He can answer it even if it's
15  not.
16   A.  May I stick with my previous testimony on it.
17   Q.  (BY MR. EDWARDS)  It was an item of interest,
18  something you thought they should be aware of.
19   A.  It was an item in an employee's work history
20  that I noted in the investigation, yes.
21   Q.  Did you do any further investigation into this
22  2004 incident other than to just simply look at what
23  Mr. Gibbs had told you and to talk to Mr. Gibbs.
24   A.  As I previously noted and is noted in this
25  document, I looked for anything I could find related to

Page 85

1  that.
2  Q. Did you try to talk to any of the witnesses.
3  A. No.
4  Q. Did you talk to the victim, the alleged victim?
5  A. No.
6  Q. Did you even know who the alleged victim was?
7  A. I knew that she was an employee of the city by
8  reference.
9  Q. Did you try to find out her identity?
10  A. Well, I had her name.
11  Q. Did you try to contact her?
12  A. No.
13  Q. Why not.
14  A. I didn't think it important in terms of the
15  investigation.
16  Q. Was it important to you whether the incident
17  actually constituted some sort of sexually inappropriate
18  behavior in the workplace in 2004?
19  A. It was important to me in terms of that it was
20  an incident that was in an employee's file, one of the
21  people that was involved in this incident. There had
22  been an investigation and resolution and I didn't look
23  further into that.
24  Q. Was it important to you as to whether it was
25  well founded or not.

Page 86

1  A. Not in context of this investigation.
2  Q. Why not?
3  A. Well, there is no findings or conclusions based
4  on that so I just didn't drill any deeper. It's there.
5  It's called out. This was a preliminary level
6  investigation.
7  Q. Did you intend when you referenced this earlier
8  2004 incident that would factor into a determination
9  as to whether disciplinary action would be appropriate
10  against Mr. Hinojos in 2006?
11  A. It was a fact that I had uncovered in the file
12  and so by that I reference it in the document.
13  Q. Could you read back my last question? Because
14  I'm not sure I got an answer to it.
15  (Question read: Did you intend when you
16  referenced this earlier 2004 incident that that would
17  factor into a determination as to whether disciplinary
18  action would be appropriate against Mr. Hinojos in 2006?)
19  MR. SNOW: Is there a question pending?
20  Q. (BY MR. EDWARDS) Yeah. Can you answer the
21  question that I asked?
22  MR. SNOW: He's already answered it.
23  A. I felt like I answered that question.
24  MR. SNOW: Is there another question pending?
25  MR. EDWARDS: Yeah, it is another question

Page 87

1  pending.
2  MR. SNOW: What is?
3  MR. EDWARDS: I'm about to formulate it. Then
4  I'll speak it.
5  MR. SNOW: Can I object before?
6  MR. EDWARDS: Go ahead.
7  MR. SNOW: Object.
8  (Off the record.)
9  Q. (BY MR. EDWARDS) All right. Let's look at the
10  second to last page here, your conclusions. We've gone
11  through some of them. Because maybe this will help me to
12  understand. It's the third from the bottom. It's on
13  page PC 02736, the third paragraph from the bottom. It
14  says: There is an established although poorly documented
15  pattern of allegations against Eulogio of sexually
16  inappropriate behavior in the workplace.
17  What do you mean by pattern of allegations
18  against Eulogio.
19  A. More than one.
20  Q. And more than one was the incident in 2004 and
21  the incident in 2006?
22  A. I can't -- I don't know the answer to that
23  question. I can't recall.
24  Q. Of what relevance is it that there is a pattern
25  of allegations.

Page 88

1  A. Sorry, of what?
2  Q. Of what relevance was it that there was a,
3  quote, pattern of allegations against Eulogio of sexually
4  inappropriate behavior in the workplace?
5  A. That was a conclusion that I reached looking at
6  the file and based on my interview, so I thought that,
7  you know, I thought that that was noteworthy as a
8  conclusion.
9  Q. Was it relevant to anything that you were
10  investigating.
11  A. It was relevant in terms of it was an
12  employee's work history.
13  Q. All right. Let's go to the top of your
14  conclusions. Pace and Troy had reasonable cause -- okay,
15  I'm sorry, we are on the same page. At the top it says:
16  Conclusions. Pace and Troy had reasonable cause,
17  although they were not aware of all the facts at the
18  time, to discuss Chris' allegations with Eulogio as this
19  involved two co-workers, had the possibility of creating
20  tension in the workplace and the alleged incident
21  occurred while Eulogio was on duty.
22  Now you've already indicated that you came to
23  the conclusion that the alleged incident occurred while
24  Eulogio was on duty because you had looked at time cards
25  and also a schedule; is that correct?

Page 89

1   A.   That's my testimony, yes.
2   Q.   All right.  Now, when you indicate Pace and
3 Troy had reasonable cause, what do you mean by that.
4   A.   What I mean by that is that a reasonable
5 manager in my opinion had justification for discussion
6 with the employees involved to determine what the facts
7 were and try to understand those.
8   Q.   When you state the alleged incident occurred
9 while Eulogio was on duty, did you conclude that an
10 incident indeed did occur between Eulogio and Brittany?
11   A.   The document speaks for itself there.  It's an
12 alleged incident.
13   Q.   Well, I'm just -- I'm not asking you what the
14 document says.  I'm asking what you concluded in your own
15 mind.  I mean, you've talked to Chris Angelovich.  You've
16 talked to Brittany.  She's picked his photo out of a
17 line-up.  You've looked at his time cards.  You've come
18 to the conclusion that, you know, whatever happened was
19 while he was on duty.  My question is, did you ever come
20 to the conclusion that something happened?
21   A.   No, I did not come to that conclusion because I
22 was unable to complete this because we didn't have all
23 sides of the story.
24   Q.   Did you ever come to the conclusion that
25 something did not happen.

Page 90

1   A.   No.
2   MR. SNOW:  Objection.  Asked and answered.
3   Q.   (BY MR. EDWARDS)  When you say you didn't have
4 the chance to hear both sides of the story, you had heard
5 Hugo deny adamantly that anything had happened, hadn't
6 you?
7   A.   In our meeting he had denied allegations, which
8 I still was not clear what those were at the time of that
9 meeting.  And so that was the only contact I had had with
10 him, so I don't think that was adequate to base a
11 conclusion that you are referencing on.
12   Q.   Did you understand Hugo when he spoke to you?
13   A.   Yes.
14   Q.   Do you have any problems understanding Hugo
15 when he speaks in English to you?
16   A.   Not that I can recall, no.
17   Q.   Have you ever made a recommendation that Hugo
18 receive training in English in order for him to progress
19 in the Park City department, Public Works Department?
20   A.   Have I made that recommendation.
21   Q.   Yes.
22   A.   No, not that I recall.
23   Q.   Are you aware of whether anyone ever has?
24   A.   I have no recollection of that being -- that
25 recommendation being made.

Page 91

1   Q.   Let's go to the next paragraph here on
2 conclusions on PC 02736:  Pace and Troy had trouble
3 discerning whether the alleged incident was a workplace
4 issue due to -- and you have three.  Number one, belief
5 the alleged incident occurred outside the workplace.
6   Who had the belief that the alleged incident
7 occurred outside of the workplace.
8   A.   They did.  This is based on both Pace and Troy.
9   Q.   This is information they told you.
10   A.   This is information -- this is my conclusions
11 based upon the information that they shared with me.
12   Q.   Okay.  Failure to gather all available facts
13 prior to meeting with Eulogio.
14   What available facts is it that they failed to
15 gather before they met with him.
16   A.   Well, prior to that they had -- they did not --
17 well, they just hadn't investigated fully the whole
18 incident.
19   Q.   You knew that one or both of them had spoken
20 with Chris Angelovich, correct?
21   A.   Yes.  Chris had brought -- I found that as a
22 course of my investigation that Chris had spoken with
23 them.
24   Q.   What other facts did they need?  Did you
25 believe that it was appropriate for either or both of

Page 92

1 them to speak to Brittany?
2   A.   I can't recall if that was an issue or not in
3 my mind.
4   Q.   All right.  If not, what other facts do you
5 think they should have gathered, available facts prior to
6 meeting with Eulogio.
7   A.   You know, I can't recall everything that
8 underlies that statement.
9   Q.   Whose idea was it for you to meet with
10 Brittany.
11   A.   I asked Chris if she would be willing to speak
12 with me and he indicated that she would.
13   Q.   Why did you want to meet with her?
14   A.   I wanted corroboration of Chris' story.
15   Q.   Do you feel like you got adequate corroboration
16 of Chris' story from Brittany?
17   A.   I believe I got adequate corroboration for this
18 level of assessment which only notes that that's her
19 allegation that was corroborated.
20   Q.   Even if it had not been corroborated you still
21 had a workplace issue that could have caused tension
22 between two employees, didn't you?
23   A.   Yes.  The incident occurred.  That's why the
24 investigation -- the incident was there.  That's why the
25 investigation began.

Page 93

1    Q.   As part of this investigation were you also
2 looking into whether it would be appropriate to bring any
3 kind of a personnel action against Chris Angelovich?
4    A.   This investigation was on -- was to determine
5 what the facts were surrounding the meeting between Hugo,
6 Pace, and Troy. This was just to gather the facts and
7 provide those back to the City Manager.
8    Q.   I'm sorry, go ahead.
9    A.   No, go ahead.
10    Q.   Then what possible relevance would
11 corroborating whether or not something had happened
12 between Brittany and Hugo from Brittany have had to your
13 investigation?
14    A.   Well, had there not been corroboration I would
15 have indicated that it was not corroborated, which is
16 going to provide information to the City Manager.
17    Q.   All right. Number three here: Failure to
18 discuss issue with PW management team prior to meeting
19 with Eulogio.
20        Did you feel that Pace and Troy should have
21 spoken with somebody in the PW management team before
22 they met with Hugo?
23    A.   With all issues involving employees we ask that
24 they have a discussion with us prior to keep us informed
25 of things that are occurring in the workplace.

Page 94

1    Q.   Is that part of some sort of a procedure or
2 protocol with the city?
3    A.   It's informally the way that we manage. We
4 want to use all the available experience and
5 understanding of city policies and procedures.
6    Q.   Did Troy or Pace violate any city policies or
7 procedures by not meeting or discussing the issue with
8 somebody from the PW management team before they met with
9 Hugo?
10    A.   They violated no formal policy.
11    Q.   How about an informal policy.
12    A.   They should have had a discussion with either
13 Jerry or I as the managers of the department. That's
14 what the statement notes. That's a conclusion.
15    Q.   Do you recall whether either or both of them
16 got any kind of employee discipline for not having done
17 what they should have done there in having a discussion
18 with you or Jerry?
19    A.   We discussed it with them. Again, the purpose
20 of this investigation was not focused on disciplinary
21 action. It was to find the facts of the meeting.
22    Q.   Had there been a violation of city policy with
23 regard to this meeting you would have made some sort of
24 recommendation, wouldn't you?
25    A.   If I had found a violation of city policy or as

Page 95

1 a manager, all those, I would note it. Maybe -- we have
2 a progressive discipline process. It starts with a
3 verbal discussion.
4    Q.   You mean had Pace and Troy pulled Hugo into the
5 office and hit him over the head with a baseball bat that
6 would have been a violation, correct?
7    A.   Yes.
8    Q.   You would have noted that as part of your
9 conclusions and recommendations, wouldn't you, if there
10 had been a violation of policy by hitting him in the head
11 with a baseball bat?
12    A.   That's a formal policy within the city policy.
13    Q.   That's what I'm trying to figure out.
14    A.   I stated there is no formal -- there was no --
15 I noted no formal violation of a formal policy.
16    Q.   My question is whether you were looking for any
17 violations of formal policy. And I've heard you give --
18 well, I'm not going to argue with you. Were you looking
19 to see if there were violations of formal policies as
20 part of your investigation?
21    A.   It's my job as a manager to do that, every
22 minute I work is to ensure the policies are adhered to,
23 so yes. Always I'm looking for -- to ensure our policies
24 are adhered to.
25    Q.   In order to do that in this case you needed to

Page 96

1 make a determination whether somebody was lying and
2 somebody was telling the truth with regard to the
3 incident between Hugo and Brittany Angelovich, didn't
4 you?
5        MR. SNOW: Objection. Mischaracterizes his
6 prior testimony.
7    A.   Yeah.
8        MR. SNOW: He's told you --
9        MR. EDWARDS: I'm not even characterizing prior
10 testimony.
11        MR. SNOW: Yeah, you are, and he's told you the
12 purpose of the investigation about 30 times. It's been
13 asked and answered over and over again.
14    Q.   (BY MR. EDWARDS) Didn't you have to make some
15 sort of determination as to whether Chris Angelovich was
16 telling the truth in order to determine whether there had
17 been a violation of city policy by Hugo?
18        MR. SNOW: Objection. Mischaracterizes prior
19 testimony, assumes facts not in evidence.
20    Q.   (BY MR. EDWARDS) Go ahead and answer.
21    A.   I was looking for the facts of the meeting. I
22 was not looking for anything beyond that.
23    Q.   But in order to come to what the conclusion was
24 as to the facts of the meeting you had to make a
25 determination that people were telling you the truth,

Page 97

1 didn't you?

2    MR. SNOW: Objection. Vague and ambiguous.

3    Q. (BY MR. EDWARDS) Do you understand my

4 question?

5    A. Yes, I understand the question.

6    Q. All right. Do you have an answer?

7    A. I was not asked -- I was asked to provide my

8 perception of the facts and to record what I found, which

9 I did here.

10    Q. So you made no conclusion as to whether Pace

11 Erickson was telling you the truth about the meeting.

12    A. If I had made that conclusion, it would be

13 recorded in this document.

14    Q. Okay. Let's go to the next conclusion: Pace

15 and Troy determined to follow what they believed to be an

16 appropriate strategy for addressing this issue.

17    Now, let's just stop there and we will go to

18 what it is they based it on. You based your statement to

19 the City Manager that they determined to follow what they

20 believed to be an appropriate strategy, that was based on

21 what Pace and Troy told you they determined, correct?

22    A. I think that's what that sentence says. It

23 says: Pace and Troy determined to follow what they

24 believed to be an appropriate strategy for addressing the

25 issue based upon those three items noted below.

Page 98

1    Q. All right. Let's look at the three items. One

2 of them was lack on clarity whether this was a workplace

3 issue or not. They told you that they were not clear as

4 to whether this was a workplace issue or not?

5    A. That was the purpose of their meeting, to

6 gather facts -- with Hugo was to gather facts to his side

7 of the story.

8 .   Q. I understand. My question is, did Pace and

9 Troy tell you that they lacked clarity on whether this

10 was a workplace issue or not.

11    A. I base that statement on what I gathered from

12 interviews with them.

13    Q. So they did tell you that.

14    A. I can't say they specifically told me that.

15 That's my conclusion based on what they told me.

16    Q. Okay. All right. No feedback or direction

17 from PW management team.

18    Did Pace and Troy tell you that they determined

19 to follow what they believed to be an appropriate

20 strategy for addressing this issue based on no feedback

21 or direction from the PW management team.

22    A. Their strategy was based upon just that, no

23 feedback or direction from the Public Works management

24 team because this was not brought to our attention prior

25 to the meeting.

Page 99

1    Q. Did they tell you that they based their

2 decision as to what they believed was an appropriate

3 strategy because they had no feedback or direction from

4 the PW management team.

5    A. That's my conclusion based on what they told me

6 in my interviews with them.

7    Q. Did they ever say to you: We wish we would

8 have had some feedback or direction from the PW

9 management team before we met with this guy.

10    A. They never said that to me.

11    Q. Did you ever get any impression that they had

12 that feeling in their minds, that they wished that there

13 had been some feedback or direction from the PW

14 management team?

15    A. Again, that's a conclusion based upon what I --

16 what information they had provided me. It's a management

17 conclusion based on the information they had

18 provided me.

19    Q. All right. And then we have the third one:

20 Concern for the well-being of both Eulogio, Chris, and

21 Brittany.

22    Did Pace and Troy tell you that they determined

23 to do what they did based on their concern for the

24 well-being of Eulogio, Chris, and Brittany.

25    A. Yes, that's what they told me. That is my

Page 100

1 conclusion based upon the information I gathered from

2 those interviews.

3    Q. In doing your investigation did you do any kind

4 of background check with regard to whether Chris

5 Angelovich had ever had any complaints against him by

6 other employees in the Public Works Department.

7    A. I did the same level of look that I would have

8 done on Hugo, so I would have looked at files to see if

9 there was anything relevant.

10    Q. So you did review his file, Chris Angelovich?

11    A. That's my recollection, yes.

12    Q. Where did you get that file.

13    A. The only files I have access to would have come

14 out of Human Resource.

15    Q. Are there separate files other than what is in

16 Human Resources that either you or Mr. Gibbs keep in the

17 Public Works Department. Let me clarify that. With

18 regard to Public Works employees.

19    A. Are there separate employee files.

20    Q. Yeah. What I'm trying to figure out is you've

21 got -- I know you've got a roster of Public Works

22 employees and not everything that they are going to deal

23 with is going to end up in their Human Resources file,

24 you know, their work schedules or their time issues or if

25 they request a day off or something like that. What I'm

## Page 101

1 trying to figure out, is there a separate file separate
2 and apart from Human Resources that you have in Public
3 Works with regard to each employee that works in Public
4 Works.
5    A.   The only files we are allowed to maintain on an
6 employee other than regulatory files, that would be
7 driver's license or things that are specific to our
8 operation there that we need to maintain those files,
9 need to be in HR, in Human Resources. Now we may have a
10 copy of a document that's filed there, but we are not to
11 maintain separate files.
12    Q.   Do you recall whether you ever saw any evidence
13 that there had been any complaints against Chris
14 Angelovich from any other employee in the Human Resources
15 Department.
16    A.   If I had noticed that, it would be in this
17 report.
18    Q.   Do you know an employee by the name of Frank
19 Nunviller?
20    A.   Yes, I know Frank.
21    Q.   Do you know that he has any kind of a
22 relationship with Chris Angelovich?
23    A.   I don't.
24    Q.   Are you aware that Mr. Nunviller's daughter was
25 at one time married to Mr. Angelovich?

## Page 102

1    A.   That's the first I've heard that. I didn't
2 know that, no.
3    Q.   You've never heard of any bad blood between
4 Frank Nunviller and Chris Angelovich?
5    A.   Between Frank and Chris?
6    Q.   Yes.
7    A.   No, I have not been aware -- been made aware of
8 that.
9    Q.   Did Mr. Nunviller's name come up while you were
10 doing your investigation in this matter?
11    A.   No.
12    Q.   Have you ever been made aware that there have
13 been any complaints against Troy Dayley with regard to
14 anger management?
15    A.   No.
16    Q.   How about Mr. Erickson, Pace Erickson.
17    A.   No.
18    Q.   Are you aware of whether there has ever been
19 any complaint made against anyone who is in any
20 supervisory position in the Public Works Department on
21 the basis of racial discrimination toward Hispanic
22 workers.
23    A.   Repeat the question so I'm sure to answer it
24 accurately.
25    Q.   Are you aware of whether there has ever been

## Page 103

1 any kind of a complaint against any supervisory person in
2 the Public Works Department on the basis of
3 discrimination against Hispanic workers.
4    A.   I'm not aware.
5    Q.   Have you ever been informed that there had been
6 complaints with regard to work assignments by Hispanic
7 workers.
8    A.   I'm not aware.
9    Q.   Have you ever heard any complaints by any
10 Hispanic workers that they were forced to work overtime
11 when non-Hispanic workers were not.
12    A.   I'm not aware.
13    Q.   Have you ever heard that any Hispanic worker
14 has ever made a claim that they have been asked to do
15 jobs without proper support where proper support was
16 furnished to non-Hispanic workers. Well, did you
17 understand that question?
18    A.   No. You lost me.
19    Q.   I'm afraid I almost lost myself.
20       MR. SNOW: I followed you.
21    Q.   (BY MR. EDWARDS) You've heard it about four
22 times. Have you ever heard any Hispanic worker -- well,
23 have you ever heard any Hispanic worker make any
24 complaint that they were being discriminated against in
25 any way in the Public Works Department.

## Page 104

1    A.   No.
2    Q.   Have you ever heard Hispanic workers claim that
3 they were called fucking Mexicans.
4    A.   No.
5    Q.   Fucking wetbacks.
6    A.   No.
7    Q.   Have you ever heard those phrases ever used in
8 the Public Works Department directed toward Hispanic
9 workers.
10    A.   I have not heard those statements directed
11 toward Hispanic workers.
12    Q.   I guess that begs the next question. Have you
13 ever heard them directed at anyone or ever heard those
14 phrases while you have been in the employ of Park City.
15    A.   No.
16    Q.   We are going to take a break. I may be able to
17 get this in under the wire.
18       MR. SNOW: I have confidence in you, Randall.
19       (Recess, 1:40 p.m. to 1:43 p.m.)
20    Q.   (BY MR. EDWARDS) Let's go back on the record.
21 Have you ever heard the term Mexican backhoe?
22    A.   Not until now.
23    Q.   Do you have any knowledge of the manner by
24 which on-call assignments are done in the Streets
25 Department?

Hinojos v.
Park City

Kent Cashel
December 16, 2008

Page 105

1   A.  I don't know.

2   Q.  Have you ever heard any complaint that Hispanic
3   workers were required to take on-call assignments while
4   other non-Hispanics were not?

5   A.  I can't recall.  I hear complaints about
6   on-call assignments from everyone.  If I had heard that,
7   I would have acted on it.

8   Q.  Did Jerry Gibbs ever tell you that Hugo Hinojos
9   had complained that he was being treated unfairly by Troy
10  Dayley, other than in this meeting.  Let me try that
11  again.  Other than the meeting that you were asked to
12  investigate, did Jerry Gibbs ever tell you that Hugo
13  Hinojos had made a complaint to him that he was being
14  treated unfairly by Troy Dayley.

15  A.  I have no recollection of that.  Again, I would
16  have acted on that had I heard that.

17  Q.  All right.  I'm going to ask the same question
18  with regard to Pace Erickson.

19  A.  And you'd get the same answer.  I'm just not
20  aware of that.

21  Q.  On this Exhibit-44, which is the investigative
22  report, the dates that are found on there, are they true
23  and accurate?

24  A.  They are what I recorded at the time of making
25  the report.

Page 106

1   Q.  What did you base that on.

2   A.  What did I base what on.

3   Q.  The dates that you recorded at the time.

4   A.  Which dates are we talking about?  I mean,
5   there is several different dates so, you know --

6   Q.  Any of them.

7   A.  Some might have been on a calendar.  If it
8   related to -- there is dates that relate to incidents
9   that were communicated to me, that would have been as a
10  result of a communication I received.  And the dates --
11  so that's it.  I mean, there is incidents and then
12  there's -- so it would depend.  If you can be more
13  specific --

14  MR. EDWARDS:  You know what?  I'm not going to
15  be able to get done today.  We will have to bring him
16  back.  I apologize, but I'm not going to be able to
17  finish.  I wish I could.

18  MR. SNOW:  That's fine.  I'm going to reserve
19  our right to -- just state for the record that we have
20  produced -- we had agreed to produce Mr. Cashel for the
21  morning of December 16th.  He arrived an hour late due to
22  weather.  I believe we've been here for four or five
23  hours, and we will reserve our rights with respect to
24  whether we will produce Mr. Cashel again.

25  MR. EDWARDS:  Well, then let's keep going.  I

Page 107

1   mean, I've got another hour's worth of questions.  Let's
2   go ahead.

3   MR. SNOW:  Well, he needs to leave for a work
4   meeting at 1:45 and I believe it's probably 1:45 now.

5   MR. EDWARDS:  Yeah.  I mean, we've got a couple
6   of choices here.  I mean, either I can be allowed my time
7   to ask all the questions that I need, indeed you can
8   bring him back, or we can go forward.  I mean, the fact
9   of the matter is I'm not responsible for the weather.  I
10  wish I were the master of time and space but I'm not.
11  I'm not responsible for the fact that we've had some
12  mechanical breakdowns here.  I've tried to get through
13  these questions as best I can in the time allowed.  I'm
14  not going to make gratuitous comments about the amount of
15  time that was wasted on objections, but I do believe that
16  we have -- I have done everything I know how to get
17  through this and, frankly, there are some areas that I
18  need to do some questioning on that I'd like to get
19  through.  I don't know that it will take more than a
20  half-hour, but I think it will probably take at least
21  that much.

22  I'd like to -- and I'll outline them right now
23  so in the event we end up having to go through some
24  motion, we can make that determination.

25  I wanted to ask him specifically about the

Page 108

1   basis upon which he made his notations with regard to
2   February 27th, also February 27th and 28th.  Also, with
3   regard to the meeting of March 1st at approximately
4   4:00 p.m. which is set forth.  I believe that we have
5   treated that in some generality, but I wanted to talk
6   about the specific details.

7   Then there was one other item that I wanted to
8   get into which was the basis upon which he made the
9   determinations as to which dates there were here.  I also
10  want to get into the fact that there is a -- there are
11  notations made here with regard to portions of this
12  investigation as to the dates.  For example, that the
13  investigation was completed and sent forth on March 15th,
14  but there are no notations with regard to other portions
15  of the investigation.  For example, the reference to the
16  interview notes dated March 9th of 2006, which is
17  referenced generally at the bottom of page 2733, but
18  which has no independent indication as to what was discussed
19  of an independent indication as to what was discussed
20  other than just simply see interview notes, which this
21  witness has indicated that he forwarded but which have
22  not been provided to us.

23  Given all of that I think that it would
24  probably be in our best interest to just agree that we
25  can go forward rather than to have to fight it.

Page 109

1      MR. SNOW: And for the record I'll object to

2  the characterization, the mischaracterization of his

3  testimony. The weather has not been an issue on the time

4  that it has taken to depose Mr. Cashel. The agreement

5  was to produce him for three hours in the morning of

6  December 16th. We have done that. We have complied with

7  our agreement. We are reserving our rights with respect

8  to whether we will produce Mr. Cashel again. That said,

9  let's go off the record.

10     MR. EDWARDS: Okay. Off the record.

11     (Off the record.)

12     MR. SNOW: We will reserve reading and signing.

13     (Proceedings adjourned at 1:54 p.m.)

14                    * * *

15     (Reading copy sent to Mr. Snow)

16

17

18

19

20

21

22

23

24

25

Page 110

1              C E R T I F I C A T E
   STATE OF UTAH        )
2                       ss.
   COUNTY OF SALT LAKE  )
3
      I, Jennifer A. Russell, a Registered Professional
4  Reporter and Notary Public in and for the State of Utah,
   do hereby certify:
5
      That the testimony of KENT CASHEL, the witness in the
6  foregoing proceeding named, was taken on December 16,
   2008; that said witness was by me, before examination,
7  duly sworn to testify the truth in said cause;

8      That the testimony of said witness was reported by me
   in stenotype and thereafter transcribed into typewritten
9  form, and that a true and correct transcription of said
   testimony is set forth in the foregoing pages, numbered
10 from 3 through 109 inclusive;

11     I further certify that after said testimony was
   transcribed, a reading copy of same was sent to
12 Christopher Snow to be submitted to the witness for
   reading and signature and signed before a Notary Public.
13
      I further certify that I am not of kin or otherwise
14 associated with any of the parties to said cause of
   action and that I am not interested in the event thereof.
15
      WITNESS MY HAND at Salt Lake City, Utah, this 28th
16 day of December, 2008.

17

18

19              Jennifer A. Russell, RPR
                Utah License No. 86-103972-7801
20              Notary Public Commission Expires:
                    October 9, 2009
21

22

23

24

25

Page 111

1  Case: Hinojos v. Park City et al
   Case No.: 2:07CV00750DAK.  Date taken: 12/16/08
2  Reporter: Jennifer A. Russell, Q & A Reporting, Inc.,
   1872 South Main Street, Salt Lake City, Utah, 84115
3
4              WITNESS CERTIFICATE

   State of Utah        )
5                       ss.
   County of Salt Lake  )
6
      I, KENT CASHEL, HEREBY DECLARE that I am the witness
7  referred to in the foregoing testimony; that I have read
   the transcript and know the contents thereof; that with
8  these corrections I have noted this transcript truly and
   accurately reflects my testimony.
9  PAGE-LINE        CHANGE/CORRECTION        REASON

10 _____    _____    _____

11 _____    _____    _____

12 _____    _____    _____

13 _____    _____    _____

14 _____    _____    _____

15 _____    _____    _____

16 _____    _____    _____

17 _____    _____    _____

18 _____    _____    _____

19 _____    _____

20 _____        No corrections were made.

21              _____
                KENT CASHEL
                Signed under penalty of perjury
22
   SUBSCRIBED and SWORN to at
23 _____, this _____ day of_____, 2008.
24              _____
                Notary Public
25

**0**

**02733 (1)**
13:14
**02734 (1)**
14:24
**02735 (4)**
12:16;62:22;79:5;
82:7
**02736 (4)**
64:20;74:20;
87:13;91:2
**02737 (1)**
66:19

**1**

**1 (1)**
54:14
**1:40 (1)**
104:19
**1:43 (1)**
104:19
**1:45 (2)**
107:4,4
**1:54 (1)**
109:13
**10 (1)**
48:6
**10:26 (1)**
29:5
**10:30 (1)**
29:5
**11 (1)**
84:10
**11:12 (1)**
51:4
**11:32 (1)**
51:4
**12 (4)**
7:15;48:6,25;49:1
**12/15/55 (1)**
9:15
**12:17 (1)**
76:9
**12:56 (1)**
76:9
**15 (1)**
39:20
**15th (5)**
12:18;16:7;68:13;
73:6;108:13
**16th (2)**
106:21;109:6
**19 (3)**
36:19;37:16;47:15
**1988 (1)**
3:13
**1990 (1)**
6:5
**1992 (1)**
51:15

**1995 (1)**
52:1
**1998 (3)**
6:7,16,18
**19th (2)**
46:12;47:12
**1st (15)**
15:1,3;16:15,17;
17:1;39:16,23;42:8,
22;61:8,19,23;62:2,
8;108:3

**2**

**2/21/2004 (1)**
64:8
**2:30 (2)**
36:24;37:12
**20 (4)**
21:2,7,11;25:14
**2000 (3)**
6:5,6;7:1
**2003 (2)**
7:22,24
**2004 (16)**
57:4,9,21;58:1,4,
10;77:23;79:13,24;
81:22;84:7,22;85:18;
86:8,16;87:20
**2005 (2)**
54:9,14
**2006 (23)**
8:15;9:3,4;12:13;
13:15,19;30:10,15,
23;31:6;32:7;36:19;
37:16;47:12,15;
59:21;61:8,16;73:7;
86:10,18;87:21;
108:16
**2733 (1)**
108:17
**27th (3)**
76:2;108:2,2
**28th (2)**
76:2;108:2
**2nd (7)**
41:6,12,14;42:12,
17;79:6,10

**3**

**30 (2)**
21:9;96:12
**35 (1)**
7:16

**4**

**4:00 (3)**
15:1;61:20;108:4
**4:45 (4)**
15:3;39:17,23;
42:23

**40 (1)**
7:16

**6**

**6:30 (3)**
36:19;37:17;47:16

**9**

**9 (5)**
30:10,15,22;31:6;
32:7
**9:49 (1)**
6:14
**9:50 (1)**
6:14
**92 (1)**
62:19
**95 (2)**
62:19,19
**98 (1)**
62:20
**9th (4)**
13:19;30:18;31:2;
108:16

**A**

**able (10)**
11:10;15:11;30:2;
36:10;48:13;64:3;
81:2;104:16;106:15,
16
**access (1)**
100:13
**according (1)**
36:12
**accordingly (1)**
69:22
**accountant (2)**
6:19,20
**accounting (2)**
51:17;52:11
**accurate (2)**
16:20;105:23
**accurately (1)**
102:24
**accusation (2)**
56:2;59:6
**accusations (1)**
59:10
**accused (6)**
42:25;44:23;
59:15;79:15,19;80:6
**across (1)**
4:22
**act (1)**
69:21
**acted (2)**
105:7,16
**action (10)**
19:7;25:20;26:2;

65:17;66:17,23;86:9,
18;93:3;94:21
**actions (1)**
64:5
**actual (4)**
36:5,15;37:4,5
**actually (14)**
4:23;9:25;10:5;
26:23;38:12;50:19;
54:12;55:3;66:18;
72:20;77:4;80:2;
83:1;85:17
**adamantly (1)**
90:5
**add (2)**
40:20;63:11
**added (1)**
72:24
**address (1)**
22:1
**addressing (3)**
97:16,24;98:20
**adequate (3)**
90:10;92:15,17
**adequately (2)**
71:5;73:15
**adhered (2)**
95:22,24
**adjourned (1)**
109:13
**admitted (1)**
48:12
**advance (2)**
55:18,23
**advised (3)**
11:18;41:7;42:17
**afraid (1)**
103:19
**again (28)**
4:11;10:5,8;12:3;
14:5;24:13;25:1;
31:12,25;42:22;
52:21;56:10;59:13;
61:12,17;65:10;67:6;
73:19;77:2;81:8,21;
94:19;96:13;99:15;
105:11,15;106:24;
109:8
**against (22)**
59:6,10;61:11,25;
62:7,23;65:18;70:25;
82:7;86:10,18;87:15,
18;88:3;93:3;100:5;
101:13;102:13,19;
103:1,3,24
**aggressive (1)**
13:20
**ago (2)**
39:9;41:15
**agree (1)**
108:24
**agreed (1)**
106:20

**agreement (2)**
109:4;7
**ahead (16)**
5:14;12:1;19:3;
28:10,15;29:8,11;
32:19;54:10;61:22;
82:24;87:6;93:8,9;
96:20;107:2
**allegation (5)**
43:1;70:25;71:16;
83:7;92:19
**allegations (21)**
5:22;46:10;56:7;
57:2;62:23;63:3;
66:22;67:2;75:7,23;
78:2;79:8,20;82:7;
83:16;87:15,17,25;
88:3,18;90:7
**alleged (13)**
36:3;38:3;42:24;
45:2;85:4,6;88:20,
23;89:8,12;91:3,5,6
**alleges (1)**
38:5
**allowed (3)**
101:5;107:6,13
**almost (2)**
66:16;103:19
**alone (1)**
46:22
**along (1)**
64:17
**although (4)**
40:9;50:15;87:14;
88:17
**always (3)**
4:5;82:14;95:23
**ambiguous (6)**
19:21;22:11;23:8;
24:1;50:7;97:2
**amount (1)**
107:14
**Analyst (1)**
62:15
**analyze (1)**
10:14
**Angelovich (22)**
14:15;26:19;
33:22,24;36:3;37:20,
23;49:3;57:1,12;
79:21;89:15;91:20;
93:3;96:3,15;100:5,
10;101:14,22,25;
102:4
**Angelovich's (1)**
46:10
**anger (1)**
102:14
**answered (19)**
19:2,9;23:15;24:1,
12;28:9,14,17;40:14;
42:2,4;45:9,10;79:2;
84:8;86:22,23;90:2;

96:13
anticipate (3)
50:22;65:1;66:13
apart (1)
101:2
apologize (2)
79:25;106:16
apparent (1)
43:22
apparently (1)
29:2
appeared (4)
39:23,25;40:4;
42:9
appears (1)
15:3
appointments (1)
51:3
appropriate (10)
66:24;86:9,18;
91:25;93:2;97:16,20,
24;98:19;99:2
approval (1)
77:16
approx (3)
15:1;39:23;47:16
approximately (9)
3:13;7:15;15:3;
36:20;37:17;39:17;
61:20;62:17;108:3
area (3)
50:20;52:3,16
areas (1)
107:17
argue (3)
40:13;67:17;95:18
Argumentative (3)
23:25;28:8;40:11
arise (3)
28:3;66:14;83:4
arose (2)
82:20;83:6
around (1)
66:5
arrival (1)
43:24
arrived (8)
40:5,6,7,8,10,15,
18;106:21
ascertain (1)
74:22
assessment (1)
92:18
assigned (2)
6:22;8:13
assignment (1)
58:6
assignments (4)
103:6;104:24;
105:3,6
assume (1)
12:9
Assumes (4)

13:2;30:11;67:3;
96:19
assuming (4)
11:24;31:16;
37:13;80:17
assumption (2)
31:17,18
attach (1)
35:20
attached (7)
29:1;31:8;21;32:8,
10;34:12;54:12
attachment (1)
31:13
attempt (2)
15:12,18
attention (1)
98:24
attorney (8)
4:22,24;5:1;11:11,
17,20;17:12;55:3
attorney-client (3)
11:9,14;67:13
attorney's (2)
12:5;39:8
author (1)
34:19
authored (2)
34:23,25
available (6)
35:24;74:9;91:12,
14;92:5;94:4
avoiding (1)
81:5
aware (34)
54:1;59:5,9,17,19,
23,25;60:17,19,21;
61:4,9,10,12,22,24;
62:2,6,9;78:4,8;
84:18;88:17;90:23;
101:24;102:7,7,12,
18,25;103:4,8,12;
105:20
awhile (1)
9:19

**B**

back (18)
6:12;31:19;46:14;
68:21;69:1,6;71:17,
21;73:12;74:20;
76:10;81:4;84:2;
86:13;93:7;104:20;
106:16;107:8
background (5)
50:19;51:6;55:2;
77:23;100:4
backhoe (1)
104:21
bad (5)
59:19,25;60:3,12;
62:4;102:3

Bakaly (27)
12:19;14:4,7;16:2,
11;17:6,10,18,20,25;
18:4;19:18;20:1,8,
19;22:17;58:7;68:10,
14;72:8,14,22;73:1,
3;77:17;79:7,9
base (9)
75:1,8,12,16;
80:24;90:10;98:11;
106:1,2
baseball (2)
95:5,11
based (46)
12:25;13:25;
21:18;22:2;24:5;
25:16,20;37:13;40:5,
7,14;43:22;44:11;
65:4,14,20;69:25;
70:9;72:3;73:8;
74:12;75:2,9,24;
76:1;80:17,21,21;
81:16;86:3;88:6;
91:8,11;97:18,18,20,
25;98:15,20,22;99:1,
5,15,17,23;100:1
basis (3)
11:13;102:21;
103:2;108:1,8
bat (2)
95:5,11
becomes (2)
5:4;70:19
began (4)
59:23;78:20,21;
92:25
beginning (1)
61:15
begs (1)
104:12
behavior (16)
43:25;44:11,12;
53:11;62:24;81:6;
82:8,13,21;83:5,7,
22;84:6;85:18;
87:16;88:4
behaviors (1)
74:23
belief (2)
91:4,6
below (1)
97:25
beneath (1)
15:3
besides (1)
27:12
best (7)
35:5;37:1;45:15;
52:2;55:15;107:13;
108:24
better (1)
17:25
beyond (1)

96:22
Bier (3)
26:23,25;27:6
birth (1)
9:14
birthday (1)
9:16
bit (7)
43:13;49:25;
50:18;51:6;55:2;
77:22;79:12
blood (5)
59:19,25;60:3,12;
102:3
board (4)
48:17,19,19,20
booklet (1)
3:22
both (12)
14:5;37:14;38:1;
50:16;52:9;53:19;
90:4;91:8,19,25;
94:15;99:20
bottom (8)
12:18;13:14;
30:20;48:10;62:21;
87:12,13;108:17
box (8)
14:25;39:21;
42:23;47:11,15;57:5;
68:12;79:6
boxes (1)
12:17
break (5)
6:11;29:4;50:20,
21;104:16
breakdowns (1)
107:12
breaking (1)
59:15
brief (2)
18:9;22:16
bring (4)
61:18;93:2;
106:15;107:8
Brittany (34)
14:16,17;26:19;
27:13;33:24;36:20,
23;37:15,19;38:1,2,
4,10,17;44:20;46:7,
9,13,21;47:10,17;
48:12;57:1;79:22;
89:10,16;92:1,10,16;
93:12,12;96:3;99:21,
24
broken (2)
59:7,10
brought (3)
48:22;91:21;98:24
bumped (2)
71:24;72:2
business (3)
50:16;51:17;53:19

96:22

**C**

calendar (1)
106:7
calendars (1)
17:4
call (2)
8:16;27:9
called (4)
37:5;57:18;86:5;
104:3
calling (1)
43:20
Calls (9)
18:20;23:7;24:14,
21;28:8,15;46:1;
55:20;60:14
came (12)
6:5;11:7;12:5;
34:8;41:21;44:2,7;
64:21;81:12,17,19;
88:22
can (69)
4:3,7,10;5:5;8:23;
11:21;13:3;17:15;
18:1,21;19:22,22,23;
20:11;22:12,12;23:8,
8;24:3,4;26:5;28:15;
30:14,25;31:21;
32:19,20;33:21,23,
25;35:5;37:13;38:23;
40:20;41:11;45:13,
14;46:2;52:2,13;
53:8;55:15,16,20;
56:4,18;58:21;60:15;
62:25;65:10;67:16,
22;72:9;75:19;77:5;
82:9,24;84:12,14;
86:20;87:5;90:16;
106:12;107:6,7,8,13,
24;108:25
capacity (2)
7:9,17
card (5)
36:7,8;37:7,8,14
cards (3)
36:10;88:24;89:17
career (9)
21:3;4:26:6,7,8,8,
10;49:24;53:21
carried (1)
49:19
carry (3)
16:9;50:5,13
carrying (1)
50:14
case (4)
25:1;26:14;39:13;
95:25
CASHEL (18)
3:2,7;10:9;12:18;
15:6;32:2;33:8;43:5,

19,20,25;51:5;68:13;
79:7;106:20,24;
109:4,8
**casual (1)**
77:12
**cause (3)**
88:14,16;89:3
**caused (1)**
92:21
**caveat (1)**
17:15
**certain (2)**
10:13;24:24
**certainly (2)**
31:12,19
**certainty (1)**
74:22
**cetera (2)**
10:7;29:15
**chain (3)**
8:23;9:8,12
**chambers (2)**
18:6;22:18
**chance (4)**
3:25;4:3;72:4;90:4
**change (2)**
4:2;73:5
**changed (3)**
3:15;4:7;72:19
**changes (6)**
4:4;5:7;55:12;
72:6,10;73:2
**characterization (3)**
33:4;83:25;109:2
**characterizing (1)**
96:9
**check (1)**
100:4
**choices (1)**
107:6
**choke (1)**
4:22
**Chris (32)**
13:20;14:15;
26:18;27:13;37:20,
23;38:1,1,10,16;
46:10,21,24;47:1,8;
49:3;79:21;89:15;
91:20,21,22;92:11;
93:3;96:15;99:20,24;
100:4,10;101:13,22;
102:4,5
**Chris' (5)**
75:7,23;88:18;
92:14,16
**city (55)**
6:7,16,23;10:1,5;
11:12;15:25;16:11;
21:19,23;22:5,17;
23:2;25:3,10;26:8;
35:22;36:12;37:20,
21;53:24;54:2,15,19;
55:1,3,3,7,13;56:21;

59:16;61:6,13;62:1,
1,11,13,14;68:22;
69:3;75:19;77:15;
85:7;90:19;93:7,16;
94:2,5,6,22,25;
95:12;96:17;97:19;
104:14
**city's (8)**
6:25;7:8;8:11;
12:5;31:15;56:14,19;
67:13
**claim (2)**
103:14;104:2
**claimed (1)**
52:14
**clarify (2)**
40:12;100:17
**clarity (5)**
69:20;70:1,3;98:2,
9
**class (2)**
50:13,14
**classes (5)**
50:16;52:13,19,22;
53:19
**clear (4)**
23:13,14;57:20;
83:10;90:8;98:3
**client (2)**
10:17;31:25
**clock (4)**
36:5,6,16;37:6
**clocked (2)**
36:24;37:12
**close (2)**
71:22;72:4
**college (1)**
51:7
**color (1)**
4:5
**coming (1)**
60:6
**command (3)**
8:24;9:9,12
**comment (2)**
4:4;49:6
**comments (5)**
13:21;38:7;57:1;
74:23;107:14
**communicated (1)**
106:9
**communication (1)**
106:10
**communications (3)**
11:10;16:2;17:11
**compilation (1)**
12:12;13:7
**complained (1)**
105:9
**complaint (8)**
61:25;62:7;63:19;
102:19;103:1,24;
105:2,13

**complaints (9)**
61:5,11,14;100:5;
101:13;102:13;
103:6,9;105:5
**complete (3)**
15:11,14;89:22
**completed (2)**
12:22;108:13
**completes (2)**
12:18;68:13
**compliance (2)**
6:21,24
**complied (1)**
109:6
**compound (2)**
24:2,3
**computer (2)**
12:7;29:24
**concentrate (1)**
52:13
**concentration (1)**
52:16
**concern (3)**
83:24;99:20,23
**concerned (1)**
82:11
**concerns (1)**
83:21
**conclude (1)**
89:9
**concluded (1)**
89:14
**conclusion (21)**
33:16;55:20;
56:24;88:5,8,23;
89:18,20,21,24;
90:11;94:14;96:23;
97:10,12,14;98:15;
99:5,15,17;100:1
**conclusions (11)**
64:21,22;68:4;
72:3;86:3;87:10;
88:14,16;91:2,10;
95:9
**condition (2)**
40:7,15
**conduct (5)**
15:16;16:3,5;
70:13;77:18
**conducted (3)**
5:22;20:18;49:13
**conducting (3)**
28:1;58:11;82:16
**confidence (1)**
104:18
**consider (2)**
28:19;82:19
**considered (1)**
83:4
**constitute (1)**
53:10
**constituted (1)**
85:17

**contact (5)**
15:18;16:14;
69:18;85:11;90:9
**contacted (6)**
15:6;43:5,14,17,
19,23
**contained (8)**
31:7;54:23;64:2,9,
11,12;72:15;73:8
**content (1)**
58:22
**context (10)**
26:12;56:22;
58:11,16,25;59:20;
60:2,8;82:16;86:1
**contextual (2)**
58:14;60:16
**contextually (1)**
63:18
**continue (2)**
23:16;55:21
**conversation (6)**
18:9;22:17;41:4;
47:19,21;82:3
**conversations (5)**
17:11;41:20;
67:15;70:14;71:6
**copies (1)**
35:20
**copy (7)**
9:20;10:10,12,24;
77:15;101:10;109:15
**corner (2)**
12:15;34:10
**correctly (1)**
79:3
**corroborated (5)**
26:25;46:10;
92:19,20;93:15
**corroborating (1)**
93:11
**corroboration (4)**
92:14,15,17;93:14
**council (2)**
18:6;22:18
**Counsel (5)**
10:18;17:9;31:14;
45:21;76:4
**counseled (1)**
81:5
**counseling (2)**
81:14
**count (2)**
20:24;26:5
**couple (3)**
12:17;19:25;107:5
**course (13)**
22:3;24:6;35:16;
50:5,8,10;52:4;53:9,
13;66:16;68:22;
72:1;91:22
**courses (1)**
53:3

**cover (1)**
55:11
**covered (1)**
53:15
**co-workers (1)**
88:19
**create (2)**
75:3;83:17
**creating (1)**
88:19
**crying (1)**
44:14
**cultural (2)**
74:24;75:3
**current (1)**
44:6,10
**curriculum (1)**
53:15

**D**

**Daley (11)**
17:12;66:20;
67:12,24;68:6,15,18,
23;72:7,13,21
**Daley's (1)**
67:15
**dark (1)**
72:12
**dash (2)**
13:19;30:22
**date (20)**
6:1;9:14;10:25;
12:21;16:12,13,18,
20;30:18,25;31:2;
36:19;39:11;47:3,8;
61:17,19,21;68:8;
79:9
**dated (8)**
13:19;30:10,15,22;
31:6;32:6;54:14;
108:16
**dates (10)**
16:19;73:8;
105:22;106:3,4,5,8,
10;108:9,12
**date's (1)**
47:5
**daughter (5)**
14:15;26:19;52:8;
79:21;101:24
**Davanza's (2)**
36:21;46:12
**day (6)**
3:16;14:20;36:25;
38:23;77:10;100:25
**Dayley (49)**
9:4;13:18;14:12,
18;18:11;19:8,19;
20:5,9,16;22:19;
25:24;26:16,19,23;
27:7;30:16,22;31:3,
6;32:7,14,24;33:19;

58:3,8,9;59:6,10,15,
20;60:13,22;61:1,
14,25;62:7;66:1;
69:23;70:4;75:17,17,
18,25;78:13;81:22;
102:13;105:10,14
**D-A-Y-L-E-Y (1)**
13:18
**Dayleys (1)**
75:18
**Dayley's (3)**
13:23;33:4;58:24
**day-to-day (1)**
7:7
**deal (1)**
100:22
**death (1)**
4:23
**debriefed (1)**
40:19
**December (3)**
13:15;106:21;
109:6
**decision (1)**
99:2
**deeper (1)**
86:4
**definitely (1)**
67:22
**degree (3)**
51:14,23;74:22
**denied (2)**
44:19;90:7
**dense (1)**
23:13
**deny (1)**
90:5
**department (15)**
6:9,22,25;23:3;
90:19,19;94:13;
100:6,17;101:15;
102:20;103:2,25;
104:8,25
**depend (1)**
106:12
**depends (1)**
24:10
**depose (1)**
109:4
**deposition (5)**
3:7;34:12;39:6;
54:13;61:21
**depositions (2)**
34:7;39:1
**depth (1)**
77:11
**Deputy (4)**
7:25;8:20;15:6;
43:5
**describe (1)**
8:23
**described (1)**
11:25

**description (2)**
6:18;8:8
**descriptions (1)**
7:6
**designation (1)**
12:15
**Destery (1)**
64:8
**details (2)**
78:8;108:6
**determination (9)**
75:21;80:9,25;
86:8,17;96:1,15,25;
107:24
**determinations (1)**
108:9
**determine (7)**
4:2;10:14;36:2;
65:8;89:6;93:4;
96:16
**determined (11)**
10:15;19;66:21,23;
67:1;97:15,19,21,23;
98:18;99:22
**determining (1)**
69:16
**difference (2)**
60:5;63:16
**differences (2)**
74:25;75:3
**different (5)**
6:9;34:8;54:18;
84:12;106:5
**difficult (2)**
4:9;74:21
**difficulties (2)**
75:6,24
**difficulty (2)**
69:16
**diligent (1)**
31:22
**direct (1)**
16:12
**directed (8)**
15:22,24;16:9,10;
82:3;104:8,10,13
**direction (7)**
16:5;98:16,21,23;
99:3,8,13
**directly (3)**
8:20;77:18;81:9
**Director (17)**
7:4,5,21,24,25;8:1,
6,9,13,21,9:10;15:7;
16:1;21:20;25:4;
43:6;63:6
**directs (1)**
79:7
**discerning (1)**
91:3
**disciplinary (12)**
25:20;26:1;28:3;
65:17;66:23;68:24;

70:15;74:10;76:4;
86:9,17;94:20
**discipline (10)**
24:9,16;53:2,6,8,
12;65:2,9;94:16;95:2
**disciplined (2)**
65:14,23
**discovered (2)**
10:5;24:6
**discovery (2)**
31:12,23
**discrepancy (1)**
27:2
**discretion (1)**
8:12
**discriminated (1)**
103:24
**discrimination (2)**
102:21;103:3
**discuss (2)**
88:18;93:18
**discussed (2)**
94:19;108:19
**discussing (2)**
11:6;94:7
**discussion (19)**
16:6;19:17;20:4,
13;38:2;53:3,16;
63:17;71:21;72:4;
75:7,23;76:18;81:12;
89:5;93:24;94:12,17;
95:3
**discussions (15)**
61:1;63:5,6;66:20,
25;67:7,8,11,12;
72:24;75:15,24;76:1,
12;77:11
**distracted (1)**
44:13
**distraught (5)**
39:24;40:9;42:10;
43:25;44:13
**divulge (1)**
17:11
**doctor's (1)**
42:18
**document (47)**
5:18;10:16;12:21;
13:4,5,9,14;14:6;
29:17;30:5;31:7,9;
32:12,16;33:14,16;
34:4,14,22,25;39:7;
47:4;54:16,23,25;
55:9,11;61:3;64:13,
15,15;70:18;71:1,15,
20;73:8;79:1;84:25;
86:12;89:11,14;
97:13;101:10
**documentation (8)**
62:25;63:25;
70:14;71:6;73:18,20;
81:3;82:9

**documented (2)**
73:15;87:14
**documenting (1)**
64:4
**documents (13)**
10:13;11:8;31:23;
34:19,24;35:2,3,7,
15;39:4,5,13;80:17
**done (17)**
20:21;25:14;56:1;
65:8,17;66:8;78:9,
15,18,22;94:16,17;
100:8;104:24;
106:15;107:16;109:6
**down (15)**
3:21,22;4:20;
14:25;16:19;25:13,
16;30:4,14,19;38:13;
39:16,22;47:7;48:19
**drew (1)**
81:10
**drill (1)**
86:4
**driver's (1)**
101:7
**due (6)**
68:22;74:24;75:6,
23;91:4;106:21
**duration (1)**
17:22
**during (9)**
17:12;22:3;29:20;
36:4;46:9;47:10;
49:20;59:24;74:9
**duties (2)**
8:13,14
**duty (6)**
36:24;44:1;88:21,
24;89:9,19

**E**

**earlier (2)**
86:7,16
**easier (1)**
4:20
**education (3)**
50:16;51:6,19
**educational (1)**
50:19
**EDWARDS (80)**
3:6;6:13,15;9:3,
18;10:21;11:15,19;
12:3;13:6;17:16;
18:22;19:3,12,24;
22:13;23:12,16;24:2,
7,13,15,23;26:11,14;
27:15;28:10,16;
29:11,19;30:13;
31:18;32:3,21;33:10;
34:17;40:12;42:3,8,
16;43:11;45:11,16,
20,24;46:4;50:9,23,

25;51:5;54:10;
55:22;57:22,24;
60:18;66:12;67:5,17,
23;76:10;83:1;84:10,
14,17;86:20,25;87:3,
6,9;90:3;96:9,14,20;
97:3;103:21;104:20;
106:14,25;107:5;
109:10
**eight (1)**
6:2
**either (21)**
4:11;15:13;19:8;
23:12;35:22;53:7;
60:4,12,22;72:19;
73:18;74:1;76:23;
77:7,16;81:21;91:25;
94:12,15;100:16;
107:6
**electronic (2)**
10:10;12:8
**elements (1)**
56:12
**else (15)**
19:14;30:16;
35:10;40:24;60:22;
63:9
**emotion (3)**
39:24;40:9;42:10
**emotional (1)**
40:18
**employ (1)**
104:14
**employed (1)**
62:13
**employee (20)**
6:4;53:2,5,8,12;
54:15;56:21;65:2,8;
68:1;74:9;79:17;
83:16;85:7;94:16;
100:19;101:3,6,14,
18
**employees (14)**
36:6;48:2,14,17;
56:17,23;69:8,13;
89:6;92:22;93:23;
100:6,18,22
**employee's (3)**
84:19;85:20;88:12
**employer (2)**
62:12
**end (5)**
26:25;30:23;
61:15;100:23;107:23
**English (3)**
52:21;90:15,18
**ensure (2)**
95:22,23
**equipment (2)**
44:6,10
**Erickson (37)**
9:5;14:12;18:12;
19:8,19;20:5,9,16;

22:19;25:25;26:16;
29:20;30:3;33:2,12;
57:16,19,25;58:8,9,
16;60:13,22;61:6,7;
65:23;69:24;70:3;
75:13;78:12;81:22,
22;83:15;97:11;
102:16,16;105:18
**established (1)**
87:14
**et (2)**
10:7;29:15
**Eulogio (33)**
7:17;15:2,7;36:21,
24;38:5;39:23;42:17,
24;43:6;44:1,5;
46:11;48:12;62:23;
75:5,22;79:15;81:5;
82:8;87:15,18;88:3,
18,21,24;89:9,10;
91:13;92:6;93:19;
99:20,24
**Eulogio's (3)**
43:25;74:22;79:7
**even (5)**
6:11;84:14;85:6;
92:20;96:9
**event (3)**
4:25;5:4;107:23
**everyone (2)**
48:23;105:6
**evidence (6)**
13:3;30:12,14;
67:4;96:19;101:12
**exact (7)**
6:1;16:13;20:24;
41:20;48:5;52:25;
61:21
**exactly (4)**
40:6;58:21;81:2,
16
**EXAMINATION (1)**
3:5
**examined (1)**
3:3
**example (5)**
4:4;29:20;53:10;
108:12,15
**exception (1)**
30:9
**excuse (1)**
25:3
**exhibit (3)**
5:14;34:12;54:12
**Exhibit-27 (2)**
54:8,12
**Exhibit-28 (4)**
34:5,9,14,20
**Exhibit-44 (7)**
5:16,18;32:5,11,
25;33:2;105:21
**experience (2)**
25:17;44:2,7;94:4

**explain (1)**
56:18
**extent (4)**
17:9;32:6;67:11,
14
**extremely (2)**
18:9;44:13

**F**

**fact (14)**
19:18;20:14;
34:17;54:7,10;59:5,
9;72:3;78:4;79:14;
86:11;107:8,11;
108:10
**factor (2)**
86:8,17
**facts (46)**
13:2;18:17,23,24;
19:1,4,10;21:18;
22:20,23;23:1,10,20,
22;24:5;25:1,2,8,21;
27:19;30:11,13;50:3;
64:23;65:20;66:5,11;
67:3;71:19;72:15;
88:17;89:6;91:12,14,
24;92:4,5;93:5,6;
94:21;96:19,21,24;
97:8;98:6,6
**failed (1)**
91:14
**Failure (2)**
91:12;93:17
**fair (6)**
31:18;32:3;63:11;
73:5;77:4;83:24
**false (2)**
45:3;46:5
**falsely (2)**
42:24;44:23
**far (2)**
31:9;75:19
**fastened (1)**
48:20
**February (20)**
8:15;9:3,4;36:19;
37:16;46:12;47:12,
15;57:4,9,21;58:1,4,
10;59:21;61:15;
76:3;79:24;108:2,2
**federal (2)**
6:21,24
**feedback (6)**
98:16,20,23;99:3,
8,13
**feel (7)**
4:13;14:14;71:5;
73:14;74:14;92:15;
93:20
**feeling (1)**
99:12
**fellow (1)**

83:16
**felt (4)**
44:5,9;74:12;
86:23
**female (2)**
36:20;79:17
**FHWA (1)**
6:21
**field (2)**
51:16;52:10
**fifth (1)**
39:22
**fight (1)**
108:25
**figure (4)**
65:12;95:13;
100:20;101:1
**file (29)**
5:2;10:3,7,13;12:9,
25;34:6,12;35:11,14,
21;64:4,9,10,11,12,
17,20;70:24;71:22;
77:14;79:4;85:20;
86:11;88:6;100:10,
12,23;101:1
**filed (2)**
64:8;101:10
**files (15)**
9:25;10:8,9;34:8;
64:2;68:1;70:19;
100:8,13,15,19;
101:5,6,8,11
**final (2)**
69:2;72:3
**finally (1)**
4:1
**Finance (1)**
6:25
**find (13)**
10:8,9;25:1;32:23;
34:19;64:3;70:24;
78:21;81:2;83:2;
84:25;85:9;94:21
**finding (6)**
26:21,24;27:2;
46:9,15,16
**findings (7)**
22:3;26:21;64:4;
68:4;71:18,18;86:3
**fine (2)**
12:2;106:18
**Finish (3)**
29:13;66:9;106:17
**first (29)**
3:3;4:12;6:3;9:20;
12:13;13:13;19:14;
20:1;34:9,23;35:4;
38:1;40:6,16;42:24;
46:21;54:13;57:5;
59:8,22,22;62:11;
66:19;77:5;79:13,14,
21;80:2;102:1
**fit (1)**

45:15
**five (5)**
17:24;46:17,18;
48:7;106:22
**fleet (1)**
8:11
**focus (3)**
51:17;55:1;56:9
**focused (2)**
52:4;94:20
**follow (5)**
33:21;97:15,19,23;
98:19
**followed (5)**
21:13;25:11;38:2;
46:21;103:20
**following (1)**
38:22
**follows (1)**
3:4
**follow-up (1)**
15:16
**forced (1)**
103:10
**foresee (2)**
65:22;71:23
**form (4)**
4:18;54:17,17,18;
59:14;72:17
**formal (13)**
49:22;63:14,17;
64:4;70:24;77:11;
94:10;95:12,14,15,
15,17,19
**formally (1)**
52:14
**former (1)**
55:3
**forms (2)**
70:13;73:13
**formulate (1)**
87:3
**forth (2)**
108:4,13
**forward (2)**
107:8;108:25
**forwarded (5)**
10:10;12:22;
64:17;68:14;108:21
**forwards (1)**
12:19
**found (10)**
9:24;10:12;23:20;
31:24;38:13;65:21;
91:21;94:25;97:8;
105:22
**foundation (1)**
17:17
**founded (1)**
85:25
**four (10)**
46:9,15,15,17,18,
18,19;64:20;103:21;

106:22
**fourth (1)**
14:25
**frame (1)**
9:1
**Frank (4)**
101:18,20;102:4,5
**frankly (1)**
107:17
**free (2)**
4:13;12:1;14:14
**friend (1)**
36:20;38:6
**front (3)**
16:8;32:5;54:11
**FTA (1)**
6:21
**fucking (2)**
104:3,5
**full (2)**
7:15;60:8
**fully (1)**
91:17
**furnished (1)**
103:16
**further (10)**
11:22;22:21;
29:14;41:3;54:14;
65:7;71:20;81:13;
84:21;85:23

**G**

**gather (8)**
21:18;25:8;27:19;
91:12,15;93:6;98:6,6
**gathered (5)**
23:1;70:9;92:5;
98:11;100:1
**gathering (1)**
50:3
**gave (4)**
10:24;17:6;80:15;
83:3
**general (12)**
50:2;52:6,12,18;
53:20;55:9;69:25;
70:5,10,20;71:4;
76:17
**generality (1)**
108:5
**generally (9)**
29:7;45:1;53:10;
55:11,16;58:22;
68:23;78:6;108:17
**genesis (1)**
70:17
**gestures (1)**
79:16,19;80:6
**Gibbs (30)**
8:2,5;9:6,7,9;14:4;
63:7,8,11,18;76:11;
77:6,16,20,24;78:5,

18;80:10,11,15,22,
23;81:5,9,15;84:23,
23;100:16;105:8,12
**Gibbs' (1)**
54:13
**girls (1)**
37:22
**given (7)**
9:21;22:21;37:3;
58:6;59:20;60:1;
108:23
**grabbed (1)**
49:2
**graduated (2)**
51:7;52:1
**grant (2)**
6:21,24
**grants (2)**
6:19,20
**gratuitous (1)**
107:14
**green (2)**
4:7,8
**group (1)**
48:13
**guess (2)**
39:19;104:12
**guy (2)**
27:4;99:9
**guys (1)**
10:6

## H

**half-hour (2)**
39:20;107:20
**hallway (2)**
18:6;22:17
**handed (1)**
5:17
**handwritten (1)**
29:6
**happen (2)**
80:3;89:25
**happened (6)**
4:12,23;89:18,20;
90:5;93:11
**Happy (1)**
9:16
**harassment (16)**
53:17,23;54:2;
55:14,17;56:2,7,12,
19,22;69:7,10,13,17;
83:18;84:4
**hardly (1)**
52:11
**head (6)**
4:18,19,21,21;
95:5,10
**hear (2)**
90:4;105:5
**heard (20)**
38:1;59:8;90:4;

95:17;102:1,3;103:9,
13,21,22,23;104:2,7,
10,13,13,21;105:2,6,
16
**heavy (2)**
44:6,10
**held (1)**
83:15
**help (1)**
87:11
**helping (1)**
49:9
**hence (1)**
78:25
**higher (2)**
71:24;72:2
**highlighted (1)**
70:8
**himself (1)**
14:22
**Hinojos (40)**
5:22,23;7:18;8:16,
19;14:19;15:13;
16:17,25;19:8,19;
20:4,9,15;25:24;
34:2;39:15;56:1,6,
12,25;58:8,17;59:1,
6,9,14,20;60:12,24;
61:7,15,24;65:1;
70:25;76:14;86:10,
18;105:8,13
**Hinojos' (1)**
59:16
**Hispanic (18)**
37:20,24;48:15;
61:6,13,25;62:7;
102:21;103:3,6,10,
13,22,23;104:2,8,11;
105:2
**history (8)**
9:19;58:23,24;
60:23;82:15;84:1,19;
88:12
**hit (1)**
95:5
**hitting (1)**
95:10
**hold-over (1)**
79:6
**hour (3)**
38:23,25;106:21
**hours (3)**
50:23;106:23;
109:5
**hour's (1)**
107:1
**HR (4)**
10:9;64:2,12;
101:9
**Hugo (55)**
5:22,23;8:16,19,
20,22,24,24;9:4,9;
14:21;15:15;16:14;

18:11;22:19;23:11;
26:16;27:13;35:12,
14;36:4;41:7;43:3;
47:25;48:3;57:11,14;
66:21;67:1;69:18;
71:21;72:5;73:14;
74:15;76:4;77:8;
78:1;80:6;82:12;
83:15;90:5,12,14,17;
93:5,12,22;94:9;
95:4;96:3,17;98:6;
100:8;105:8,12
**Hugo's (3)**
36:2;49:10;75:10
**Human (33)**
9:10;12:20;14:8;
15:4,5,25;21:20,23;
22:8;23:3;25:3,9;
35:23;39:23;40:8;
42:9;43:4;49:23;
50:3,6;52:11,19,22;
68:14,20,24;80:18;
100:14,16,23;101:2,
9,14
**husband (1)**
52:9

## I

**idea (9)**
9:21;13:1;20:8;
23:17;39:17;47:7;
68:18;69:4;92:9
**identification (1)**
49:4
**identified (7)**
22:7,9;26:15;
27:12,15;47:5;48:3
**identify (4)**
21:17;25:6;48:1,
13
**identifying (1)**
49:10
**identity (1)**
85:9
**implications (1)**
68:24
**important (11)**
28:6,13,19;60:7,
10;63:22;70:19;
85:14,16,19,24
**impression (1)**
99:11
**improved (1)**
70:22
**inappropriate (15)**
62:24;79:16,18;
80:6;81:7;82:8,13,
21;83:5,7,22;84:6;
85:17;87:16;88:4
**incident (60)**
13:17,23;14:22;
15:1;17:13;30:21;

35:12,14,21;36:3;
37:16;46:7,7;57:11,
13,15,17,21,25;58:4,
9,11;62:6;64:7,16;
65:24;66:11;70:7;
71:16;77:23,25;78:6;
79:13,23;80:10,25;
81:13,23;82:19;84:7,
22;85:16,20,21;86:8,
16;87:20,21;88:20,
23;89:8,10,12;91:3,
5,6,18;92:23,24;96:3
**incidents (6)**
16:21;50:4;58:13,
15;106:8,11
**include (1)**
41:19
**included (1)**
41:21
**including (1)**
48:14
**incomplete (1)**
32:5
**incorporate (1)**
33:6
**incorporated (4)**
13:8;32:15,25;
33:5
**indeed (4)**
16:24;56:25;
89:10;107:7
**independent (3)**
73:10;108:18,19
**indicate (5)**
22:16;76:12,24;
77:25;89:2
**indicated (11)**
13:6,20;31:8;
42:11,12,16;68:11;
88:22;92:12;93:15;
108:21
**indication (3)**
18:25;19:6;108:19
**indirectly (1)**
75:14
**inferred (1)**
22:8
**informal (1)**
94:11
**informally (1)**
94:3
**information (32)**
36:22,25;37:23,25;
38:8,13;40:2,21,25;
41:4,10,18,21,22;
42:9,10,19;43:2,7,16,
19;70:9;80:11;81:8,
15;91:9,10,11;93:16;
99:16,17;100:1
**informed (3)**
59:14;93:24;103:5
**initial (6)**
10:2,18;16:14;

26:17;69:18;71:18
**initially (1)**
10:2
**initiate (4)**
17:7,18;18:2;
20:14
**initiated (2)**
18:4;19:15
**initiating (1)**
19:20
**initiation (2)**
14:20;16:4
**input (1)**
77:24
**inquiry (1)**
11:11
**instead (1)**
4:18
**institute (1)**
15:13
**instruct (2)**
11:14;67:14
**instructed (4)**
4:25;17:18;20:2;
64:21
**instructing (1)**
17:10;45:19,20
**instruction (2)**
17:6;22:21
**intend (2)**
86:7,15
**intended (1)**
10:17
**intent (4)**
74:23;75:7,23;
76:3
**interact (1)**
77:9
**interaction (6)**
40:16;46:11;68:3;
70:1,2;74:10
**intercede (1)**
9:23
**interest (2)**
84:17;108:24
**interesting (1)**
46:16
**interject (2)**
4:24;31:10
**interpose (3)**
17:8;55:19;67:10
**interpreted (2)**
38:7;81:6
**interrupted (1)**
66:7
**interview (30)**
13:19,22;14:1,10,
19;15:8,11,12,17;
25:2;28:21;30:7,10,
22;31:2,5;32:6,24;
38:22;46:10,13,20;
47:11,17;63:15,17;
82:11;88:6;108:16,

20
**interviewed (4)**
14:12,17;24:25;
63:4
**interviews (13)**
21:18;25:8;27:19,
20;28:20,23;63:1,2,
5;82:10;98:12;99:6;
100:2
**into (48)**
5:22;9:18;10:2,3;
11:9;13:8;14:22;
18:10,13;19:7,13;
22:8,10,18,22;23:10,
18,22;26:11;32:16,
25;33:6;36:21;
40:22;41:5;43:1;
50:20;58:7;59:7,11,
16;60:18,19;64:23;
65:20;66:4;71:19;
77:24;78:21,22;
84:21;85:23;86:8,17;
93:2;95:4;108:8,10
**introduced (1)**
6:8
**investigate (6)**
20:3;58:10;60:9;
77:17;79:7;105:12
**investigated (1)**
91:17
**investigating (2)**
62:5;88:10
**investigation (107)**
5:21;12:19,25;
13:11,12;14:11,21;
16:3,5,6,10;17:7,19;
18:8;19:15,20;20:6,
14,19;21:14,22;22:3,
6;24:6;25:19,21,24,
25;27:16,25;28:4,11;
29:3,17;32:4;35:6,
17,18;42:6,25;49:22;
50:6,13,15;55:25;
56:2,5,11,25;57:4,7;
59:23,24;63:13;64:4,
11,17,20,25;65:4,7,
13,15;66:13;68:13;
70:24;71:8,10,12,13,
25;72:6;77:14,18,24;
78:9,13,16,19,21,22;
79:10;82:5,16;83:4,
6,14;84:20,21;85:15,
22;86:1,6;91:22;
92:24,25;93:1,4,13;
94:20;95:20;96:12;
100:3;102:10;
108:12,13,15
**investigations (6)**
25:15;28:7;49:19;
68:23;70:15;71:7
**investigative (6)**
10:7;34:11;35:21;
70:20;79:4;105:21

**involve (3)**
56:6,21,22
**involved (17)**
21:17;25:6;26:15;
35:12;56:12,20;
57:11,13,14,16;58:9;
69:2;70:7;78:2;
85:21;88:19;89:6
**involvement (2)**
57:25;58:4
**involving (7)**
17:13;25:24;
35:14;58:16;78:7;
82:20;93:23
**issue (21)**
11:25;22:8;37:21;
55:5;68:20;69:10;
71:20;82:20;83:18;
91:4;92:2,21;93:18;
94:7;97:16,25;98:3,
4,10,20;109:3
**issued (2)**
54:19;55:9
**issues (3)**
49:23;93:23;
100:24
**item (5)**
37:19;56:10;
84:17,19;108:7
**items (3)**
42:19;97:25;98:1

**J**

**jacket (1)**
37:21
**January (2)**
13:15;61:17
**Jerry (8)**
8:2;77:6,16;80:9;
94:13,18;105:8,12
**job (5)**
6:18;7:6;8:8;9:18;
95:21
**jobs (2)**
7:1;103:15
**July (1)**
54:14
**justification (1)**
89:5

**K**

**keep (8)**
13:10;29:16;
43:20;45:16;80:17;
93:24;100:16;106:25
**keeper (1)**
68:1
**KENT (10)**
3:2;10:9;12:18;
15:6;43:5,19,25;
44:5;68:13;79:7

**kept (3)**
3:15;13:4,11
**Kim (25)**
40:16,17,20;41:7,
22,23;42:5,11,14,17,
20;43:4,14,18;66:20,
25;67:7,11,15,21,24;
68:1,6,15;72:7
**Kimberli (4)**
9:8,10;15:5;34:10
**kind (26)**
3:24;8:23;20:18;
29:8;44:20;49:16,21;
50:20;52:6,12;53:9,
11;54:21;60:4;61:5;
73:23;78:6,15;79:5,
18;93:3;94:16;
100:3;101:21;103:1;
108:18
**knew (7)**
20:1,8;25:14;
26:17;47:25;85:7;
91:19
**knowledge (6)**
43:17;55:13;78:5;
80:7;104:23
**known (3)**
5:25;60:8,11

**L**

**lack (4)**
69:25;70:3;81:3;
98:2
**lacked (1)**
98:9
**lacking (1)**
82:2
**language (8)**
74:24;75:3,6,24;
79:16,19;80:6;81:6
**last (15)**
9:22;11:1,1,3;
39:12;62:22;66:18;
68:12;69:6;73:5;
74:21;80:3;82:6;
86:13;87:10
**late (2)**
51:2;106:21
**later (3)**
4:7;5:4;73:6
**law (1)**
53:19
**lawsuit (3)**
11:5;66:14,17
**lawyers (4)**
3:16;10:23,24;
11:5
**lay (1)**
17:16
**lead (2)**
65:17;71:19
**leading (2)**

70:1;72:25
**leads (1)**
84:2
**leaped (1)**
4:22
**least (11)**
6:1;20:12;21:11;
23:17;32:5;56:9,13;
71:23;74:1;83:12;
107:20
**leave (1)**
107:3
**left (2)**
12:16;13:15
**left-hand (1)**
14:25
**legal (2)**
55:20;71:25
**Leier (37)**
9:8,10;15:5;16:3;
34:11;40:16,17,20,
25;41:4,9,17,22,23;
42:5,11,15,17,20;
43:4,14,18;66:3,20;
67:1,7,12,16,21,24;
68:1,6,15;72:7,13,
21;78:15
**Less (1)**
17:24
**level (8)**
65:4;71:9,12,17;
78:22;86:5;92:18;
100:7
**license (1)**
101:7
**life (1)**
55:3
**light (1)**
4:5
**liked (1)**
45:10
**likely (3)**
75:5,22;81:18
**limit (1)**
11:21
**line-up (2)**
49:13;89:17
**list (3)**
14:18;40:20;63:12
**listed (1)**
61:19
**little (10)**
3:14,22;30:25;
49:25;50:18;51:6;
55:2;59:13;77:22;
79:12
**located (3)**
31:21,24;64:5
**lock (1)**
59:15
**locked (2)**
59:11,16
**logo (1)**

37:21
**long (7)**
5:25;7:20;17:21;
39:9,17;41:15;62:16
**look (62)**
10:8;12:14;13:13;
14:13,22,24;17:4;
18:10,13;19:13;
20:10;22:8,10,18,22;
23:10,18;26:20;
27:16;30:19;31:12,
20;34:5,9,13,20;
36:1,5,8,10,14,18;
37:14;39:21;46:8;
48:7;54:7;58:7,12,
15,19,22,24;60:18,
19;62:10,21;64:1,19,
23;65:19;66:4,18;
71:19;72:1;74:21;
81:17;84:22;85:22;
87:9;98:1;100:7
**looked (15)**
23:22;32:1;36:2;
58:20,21;59:3;80:23;
81:1,18;84:25;88:24;
89:17;100:8
**looking (15)**
19:7;30:23;34:17;
35:13;41:18;78:21,
22;79:3;88:5;93:2;
95:16,18,23;96:21,
22
**looks (2)**
3:23;79:5
**lost (2)**
103:18,19
**lot (2)**
3:23;8:13
**lower (3)**
12:15;30:20;34:10
**Lunch (1)**
76:9
**lying (1)**
96:1

**M**

**maintain (3)**
101:5,8,11
**maintained (2)**
36:11,12
**major (5)**
11:24;51:16;52:4,
14,15
**making (10)**
24:16,18;31:17;
38:6;69:2;71:2;
79:15,19;80:7;
105:24
**male (5)**
37:20,24;48:15,21,
23
**manage (1)**

94:3
**management (16)**
53:14;62:15;63:5;
70:21;71:17;93:18,
21;94:8;98:17,21,23;
99:4,9,14,16;102:14
**manager (26)**
8:21;15:6,25;
16:11;21:19,24;23:2;
25:3,10,17;26:5,9,
10;35:22;43:5;
49:20;66:16;68:22;
69:3;77:15;89:5;
93:7,16;95:1,21;
97:19
**managers (3)**
69:21;76:18;94:13
**manner (2)**
13:21;104:23
**many (15)**
3:10;5:2;7:14;
20:23;26:4;35:3;
41:17,25;48:4;52:24;
66:25;67:7,21,23;
77:9
**March (39)**
12:13,18;13:19;
15:1,3;16:7,15,17;
17:1;30:10,15,18,22;
31:2,6;32:7;39:16,
23;41:6,12,14;42:8,
12,17,22;59:21;61:8,
16,19,23;62:2,8;
68:13;73:6;79:6,10;
108:3,13,16
**marked (2)**
5:16,17
**Marker (1)**
37:21
**married (1)**
101:25
**master (1)**
107:10
**material (6)**
72:24;80:16,19,23;
81:1,12
**materials (1)**
80:15
**matter (6)**
50:6,15;53:14;
57:4;102:10;107:9
**may (13)**
3:15;4:24;6:7;
45:10;68:24;71:19;
77:12;82:1,15;83:1;
84:16;101:9;104:16
**maybe (4)**
10:6;19:7;87:11;
95:1
**MBA (9)**
50:17;51:24;52:4,
6,12,20,21;53:3,20
**MBAs (1)**

52:9
**mean (27)**
11:25;23:21;30:3;
34:3;40:4;50:9;53:5,
14;54:17;56:18;
60:3;69:1;71:11,14,
14;75:18;87:17;89:3,
4,15;95:4;106:4,11;
107:1,5,6,8
**meaning (1)**
71:13
**means (1)**
34:11
**meantime (1)**
10:12
**mechanical (1)**
107:12
**meet (5)**
15:7;43:6,15;92:9,
13
**meeting (84)**
15:2;16:25;17:9,
12,17,21,22;18:2,3,4,
10,24;19:4,11,13,18;
20:2,4,8,15,20;22:10,
19,22,24;23:1,10,19,
21;39:18;42:20;
44:11;55:5;58:7,17,
25;59:21;60:1,2,8,
25;61:23;66:5,10,11,
15;68:3,5,7,15;
69:19;72:25,25;
73:14,18,23;74:15;
75:10;76:5,13,23,24;
77:8;82:20;83:3,14;
90:7,9;91:13;92:6;
93:5,18;94:7,21,23;
96:21,24;97:11;98:5,
25;105:10,11;107:4;
108:3
**meetings (7)**
55:10;67:21,23,25;
70:14;71:6;77:11
**memo (14)**
9:19,20,21,25;
12:6,14;14:3;16:7,
19;27:14;33:6,6;
68:4,9
**memorialize (1)**
28:7
**memory (3)**
17:2,3;81:16
**merit (1)**
53:11
**met (15)**
16:16;19:14;
46:20;47:8;61:7,14,
19;72:7,13,20;77:7;
91:15;93:22;94:8;
99:9
**methods (1)**
53:7
**Mexican (1)**

104:21
**Mexicans (1)**
104:3
**might (8)**
11:10;41:8;54:17;
58:16;59:20;65:17;
66:14;106:7
**mind (3)**
34:20;89:15;92:3
**minds (1)**
99:12
**mini (1)**
3:24
**minimal (1)**
64:6
**minute (1)**
95:22
**minutes (4)**
17:24;39:20;40:5;
76:3
**mischaracterization (5)**
32:19;33:7;42:14;
82:24;109:2
**Mischaracterizes (2)**
96:5,18
**misinterpreted (2)**
75:6,22
**mistake (1)**
26:24
**misunderstanding (5)**
74:13,14,18;80:10,
25
**misunderstandings (2)**
74:24;75:4
**misunderstood (1)**
79:25
**Monitors (1)**
6:21
**month (1)**
9:22
**More (16)**
20:25;21:2,7,9;
26:5;42:1;48:25;
50:23;53:1;65:16;
66:6;72:9;87:19,20;
106:12;107:19
**morning (2)**
106:21;109:5
**most (1)**
26:6
**motion (1)**
107:24
**move (2)**
13:11;43:10
**moving (1)**
50:20
**much (3)**
4:20;50:22;107:21
**multiple (1)**
34:21
**Municipal (1)**
54:15
**myself (3)**

8:22;17:20;103:19

**N**

**name (7)**
27:1,6;48:1,13;
85:10;101:18;102:9
**nature (9)**
38:8;50:2;52:18;
55:24;57:1;61:2;
70:5,11;76:18
**near (1)**
22:17
**need (9)**
4:17;6:10;10:22;
70:19;91:24;101:8,9;
107:7,18
**needed (3)**
70:11;71:21;95:25
**needs (1)**
107:3
**negative (1)**
60:24
**neither (1)**
58:8
**new (2)**
50:20;55:4
**next (14)**
5:14;34:18;37:19;
38:4;43:4;64:7,19;
70:12;74:7,7;75:5;
91:1;97:14;104:12
**nod (1)**
4:18
**nods (1)**
4:21
**none (2)**
12:24;39:3
**non-Hispanic (2)**
103:11,16
**non-Hispanics (1)**
105:4
**noon (1)**
51:1
**nor (1)**
108:18
**notations (3)**
108:1,11,14
**note (6)**
30:15,25;31:6;
47:22;95:1;108:18
**noted (7)**
83:25;84:20,24,24;
95:8,15;97:25
**notes (41)**
12:12,24;13:4,7,8,
19,22;14:1,13;22:16;
28:22,25;29:6,15,15,
16,22,25;30:10,22;
31:13,15,20;32:6,8,9,
15,24;33:1,5,7,11,13,
20;34:1;38:22;
47:18;92:18;94:14;

108:16,20
**noteworthy (1)**
88:7
**noticed (2)**
70:21;101:16
**number (22)**
25:6,8,9;26:21,24;
27:18;38:5,6;41:20;
46:9,15,18,19;48:5,
7;52:25;62:23;67:9,
25;73:12;91:4;93:17
**numerous (1)**
48:2
**Nunviller (2)**
101:19;102:4
**Nunviller's (2)**
101:24;102:9

**O**

**oath (2)**
3:3,18
**object (8)**
11:13;32:18;33:7;
42:13;82:23;87:5,7;
109:1
**objection (35)**
5:5;9:1;13:2;17:8;
18:20;19:2,9,21;
22:11;23:7,25;24:12,
21;28:8,14;30:11;
33:3,11;40:11;42:2;
45:9;46:1;50:7;
55:19;60:14;67:3,11;
77:4,5;83:2;84:8;
90:2;92:6;95:8;97:2
**objectionable (1)**
5:6
**objections (4)**
4:24;5:2;67:20;
107:15
**obligated (1)**
5:1
**observable (2)**
44:11,12
**observation (2)**
43:23;81:11
**observations (1)**
42:15
**observed (2)**
40:15;43:25
**obviously (2)**
11:3;62:5
**occur (3)**
50:4;68:22;89:10
**occurred (23)**
12:1;16:25;17:1,
11;19:11;36:4;
37:16;38:3;58:25;
63:19,19;66:5;70:1;
71:16;76:13;78:3,10;
88:21,23;89:8;91:5,
7;92:23

**occurring (1)**
  93:25
**occurs (1)**
  4:25
**off (10)**
  72:8,21;76:7,8;
  77:14;87:8;100:25;
  109:9,10,11
**offender (2)**
  82:12;84:3
**office (4)**
  10:1;12:5;39:8;
  95:5
**officer (1)**
  49:17
**often (1)**
  75:3
**on-call (3)**
  104:24;105:3,6
**Once (3)**
  3:11;4:23;42:1
**one (33)**
  10:11;14:20;20:7,
  19;25:6;29:10;
  30:19;32:22;33:20;
  38:5;39:22;43:13;
  48:14,18;52:10;53:1,
  8;55:8;57:5,6;59:5;
  74:7;76:7,23;85:20;
  87:19,20;91:4,19;
  98:1;99:19;101:25;
  108:7
**only (15)**
  4:23;6:11;9:21;
  15:10;16:4;19:10;
  20:11;32:14;41:11;
  57:2,10;90:9;92:18;
  100:13;101:5
**on-the-job (1)**
  49:20
**operate (2)**
  44:6,10
**operation (4)**
  7:7;8:10,11;101:8
**opinion (3)**
  45:24;56:20;89:5
**opportunity (1)**
  15:16
**order (7)**
  5:15;60:8;65:8;
  90:18;95:25;96:16,
  23
**organizational (1)**
  8:22
**oriented (1)**
  8:14
**original (2)**
  12:6;58:6
**originally (2)**
  12:10;54:18
**out (25)**
  4:7;10:6;16:9;
  23:20;29:21,24;

  32:23;49:12,19;50:6,
  13,14;55:5;63:24;
  65:12;72:4;82:14;
  83:2;85:9;86:5;
  89:16;95:13;100:14,
  20;101:1
**outcome (2)**
  70:15;74:10
**outline (1)**
  107:22
**outside (6)**
  18:6;53:20;66:10;
  67:15;91:5,7
**over (8)**
  7:17;21:3,3;26:8;
  77:15;95:5;96:13,13
**overall (1)**
  6:23
**overlap (1)**
  52:12
**oversee (1)**
  68:23
**overtime (1)**
  103:10
**overtures (1)**
  44:20
**own (8)**
  42:15;43:16,21,22;
  44:2,7;73:25;89:14

## P

**Pace (45)**
  9:5;14:12;15:2;
  18:11;23:10;26:16;
  27:13;33:2,12;42:25;
  44:22;46:4;57:19,19,
  23,24;61:23;65:23;
  69:18;73:15,19;
  74:15;76:13,21;77:8;
  81:22;83:15;88:14,
  16;89:2;91:2,8;93:6,
  20;94:6;95:4;97:10,
  14,21,23;98:8,18;
  99:22;102:16;105:18
**pad (1)**
  29:21
**page (31)**
  12:14;13:14;
  14:24;26:20;30:19;
  34:9;36:18;38:14;
  39:22;46:8;47:11,14;
  48:8;54:13;57:4,6;
  62:21;64:19,19;
  66:19,19;68:12;69:6;
  74:20;79:3,14;82:5;
  87:10,13;88:15;
  108:17
**pages (3)**
  34:16,21;35:4
**paragraph (11)**
  13:17,24;15:5;
  30:21;42:24;48:9;

  62:22;82:6,6;87:13;
  91:1
**paragraphs (2)**
  13:16;74:21
**parens (5)**
  26:25,25;30:21,23;
  48:14
**parenthesis (2)**
  13:18;26:22
**Park (20)**
  10:1,5;26:8;31:15;
  53:24;54:2,15;55:1,
  7,13;56:14,19;59:16;
  61:6,13;62:1,11;
  67:13;90:19;104:14
**parking (1)**
  8:11
**part (17)**
  5:3;27:16,18;35:6,
  18;56:24;64:11;
  68:18;70:3;73:18;
  75:15;80:21,22;93:1;
  94:1;95:8,20
**particular (4)**
  24:19;39:21;40:3;
  70:7
**parties (5)**
  21:17;25:6;26:15,
  17;27:11
**pattern (4)**
  87:15,17,24;88:3
**PC (11)**
  12:15;13:14;
  14:24;62:22;64:20;
  66:19;74:20;79:5;
  82:7;87:13;91:2
**peace (1)**
  49:17
**penalty (1)**
  3:18
**pending (3)**
  86:19,24;87:1
**people (5)**
  25:2;27:15;63:12;
  85:21;96:25
**perception (1)**
  97:8
**perjury (1)**
  3:19
**person (1)**
  103:1
**personal (4)**
  42:15;43:16;60:4;
  75:2
**personally (1)**
  47:25
**personnel (4)**
  7:13,16;19:7;93:3
**photo (5)**
  48:13,17;49:10,13;
  89:16
**photos (6)**
  48:2,4,16;49:4,7,

  11
**phrases (3)**
  44:16;104:7,14
**picked (1)**
  89:16
**pictures (2)**
  48:21,23
**place (2)**
  17:21;18:10
**placed (1)**
  3:3
**plain (1)**
  23:13
**please (4)**
  24:22;25:22;
  34:22;47:13
**plus (2)**
  21:11;25:14
**pm (15)**
  15:1,3;36:20;
  37:13,17;39:23;
  42:23;47:16;61:20;
  76:9,9;104:19,19;
  108:4;109:13
**point (4)**
  4:1;23:24;45:23;
  82:14
**pointing (1)**
  63:23
**Policies (9)**
  54:15,22;55:4;
  56:19;94:5,6;95:19,
  22,23
**policy (18)**
  22:5;54:1,5;55:14;
  56:14;69:7,13,21;
  94:10,11,22,25;
  95:10,12,15,17;
  96:17
**Pollard (1)**
  64:8
**poorly (1)**
  87:14
**portion (1)**
  12:16
**portions (2)**
  108:11,14
**position (6)**
  7:10;8:3,15,18;
  67:20;102:20
**possibility (7)**
  24:11,15,18;65:22;
  71:24;72:2;88:19
**possible (5)**
  16:20;29:12;65:1;
  74:8;93:10
**possibly (2)**
  28:2;65:23
**post-graduate (1)**
  51:18
**potential (8)**
  24:8;56:23;66:17;
  70:15;74:10,13,18;

  83:17
**practice (3)**
  29:16;38:21;58:12
**preceded (1)**
  59:25
**precise (2)**
  39:11,19
**precisely (2)**
  44:24,25
**preliminary (10)**
  27:25;28:11,21;
  29:2,17;65:5,14;
  71:9,11;86:5
**preparation (3)**
  39:2,6;52:20
**presence (1)**
  67:15
**present (8)**
  17:9,13;25:2;
  46:24;47:1;49:3;
  67:24;68:5
**presented (4)**
  39:7;48:1;68:4;
  72:13
**presenting (1)**
  68:9
**preserved (1)**
  71:5
**presume (2)**
  4:16;61:22
**presumed (1)**
  40:8
**previous (18)**
  23:9;35:11,14,21;
  55:12;57:10;58:13,
  15;62:23;63:3;
  70:25;77:1,25;79:6,
  12;82:7;84:13,16
**previously (2)**
  70:18;84:24
**primarily (1)**
  8:10
**prior (27)**
  19:17;19:25;15:18,
  23;34:7;35:1;55:25;
  60:24;61:6,14,23;
  62:2;68:9;69:2,17;
  77:23;81:24;91:13,
  16;92:5;93:18,24;
  96:6,9,18;98:24
**privilege (4)**
  10:19;11:14,24;
  67:13
**privileged (6)**
  10:3,13,15,16,19;
  11:10
**probably (9)**
  3:23;40:5;65:3,13;
  79:2;81:20;107:4,20;
  108:24
**problems (2)**
  55:6;90:14
**procedure (1)**

94:1
**Procedures (8)**
54:16,22;55:4;
56:20;70:13;73:13;
94:5,7
**Proceedings (1)**
109:13
**process (4)**
11:25;68:19;
70:20;95:2
**produce (5)**
10:17;106:20,24;
109:5,8
**produced (13)**
9:25;10:1,4,11,20,
23;11:4;12:8,24;
13:1;16:7;31:11;
106:20
**production (4)**
10:2,3,18;31:15
**professional (1)**
60:4
**progress (3)**
30:6;32:16;90:18
**progressive (1)**
95:2
**project (1)**
8:13
**promoted (1)**
7:25
**proper (3)**
70:13;103:15,15
**protected (1)**
67:13
**protocol (8)**
21:13,16;25:5,11,
13,16;27:19;94:2
**provide (4)**
69:20;93:7,16;
97:7
**provided (6)**
37:25;63:18;
64:15;99:16,18;
108:22
**providing (1)**
77:22
**Public (30)**
6:4,5;7:25;8:1,5,9,
12,21;15:6;25:3;
43:5;48:2,14,24;
62:12,15;63:6;79:17;
90:19;98:23;100:6,
17,18,21;101:2,3;
102:20;103:2,25;
104:8
**pulled (4)**
10:14,18;48:19;
95:4
**punch-in (1)**
37:5
**purpose (5)**
22:4;49:11;94:19;
96:12;98:5

**purposes (1)**
61:21
**put (5)**
10:2,2;16:19;
26:12;47:7
**putting (2)**
49:11;54:11
**PW (11)**
69:8,12;70:6;
93:18,21;94:8;98:17,
21;99:4,8,13

**Q**

**qualifications (1)**
67:18
**qualify (2)**
54:11;65:3
**query (2)**
11:7,23,24;12:4
**quick (2)**
29:4;50:21
**Quit (2)**
45:19,20
**quote (1)**
88:3

**R**

**racial (1)**
102:21
**raised (3)**
5:5,22;79:20
**Randall (2)**
6:10;104:18
**random (1)**
49:2
**rather (2)**
4:20;108:25
**ratify (1)**
74:2
**reached (2)**
72:3;88:5
**reacted (1)**
13:20
**reaction (1)**
75:10
**read (2)**
86:13,15
**reading (2)**
109:12,15
**really (3)**
3:15;50:24;72:11
**reason (7)**
27:24;45:5,7,22;
52:8;61:18;69:15
**reasonable (4)**
88:14,16;89:3,4
**reasoning (1)**
74:5
**reasons (1)**
53:7
**recall (63)**

10:25;13:10;
16:13;17:5;27:6;
33:21,23,25;35:8,19;
37:1,9,10;38:12;
40:24;41:3,9;44:16,
19,22,25;45:1;46:3,
6;47:6,20;49:8,9;
52:2,25;53:2;54:25;
55:8,15;56:4;58:5,
21;59:3;60:6;61:4;
63:23,23;64:1,13;
72:18,19;73:16,17,
22;74:5,17;76:17,20;
77:9;80:8;87:23;
90:16,22;92:2,7;
94:15;101:12;105:5
**receive (5)**
31:14;41:10;65:2;
67:19;90:18
**received (10)**
16:5;31:14;42:19,
21;49:16,21,24;50:1;
55:11;106:10
**Recess (5)**
6:14;29:5;51:4;
76:9;104:19
**recognize (1)**
5:18
**recognized (1)**
49:12
**recollection (22)**
16:15,16,18;33:18;
36:17;41:25;44:24;
47:23;53:17;59:17;
61:1;64:14,18;73:10,
11,20;74:12;77:13;
79:11;90:24;100:11;
105:15
**recommend (1)**
69:12
**recommendation (21)**
21:19;23:22,24;
65:7,16;66:19;69:2,
7,19,24;70:9,12,17;
71:3,19;73:12;74:8;
90:17,20,25;94:24
**recommendations (19)**
21:23;22:1,2;23:2,
5,19,21,24;5:8,16,19,
24;25:9,20;26:1;
64:24;65:20;68:21;
95:9
**recommended (1)**
69:15
**recommending (1)**
23:24
**record (26)**
5:3,21;9:24;11:16;
13:11;27:20,23,24;
28:20;31:11;36:13;
37:5,6;67:18;76:7,8,
11;81:18;87:8;97:8;
104:20;106:19;

109:1,9,10,11
**recorded (3)**
97:13;105:24;
106:3
**recording (3)**
28:7;29:14;82:2
**records (5)**
35:9,13,20;36:1,5,
16;37:4;68:1
**red (3)**
4:6,8;37:21
**refer (3)**
58:10;71:20;79:13
**reference (19)**
31:4;39:22;41:6,7;
42:5;46:14;47:14;
48:9;57:3,10;70:23;
76:2;77:12;78:25;
81:2;82:1;85:8;
86:12;108:15
**referenced (11)**
32:12;33:14,15;
34:3;41:22;42:6;
68:8;71:1;86:7,16;
108:17
**referencing (2)**
30:17;90:11
**referred (1)**
13:24
**referring (7)**
15:8;16:21;35:16;
64:10,14;70:16;71:2
**refers (1)**
31:2
**reflected (5)**
33:5;47:18,24;
61:2;71:15
**regard (50)**
6:23;13:23;14:10;
16:21;18:7;19:8;
20:20;23:1;30:16;
31:6;32:10,24;33:2,
12,19,22,24;34:1;
40:21,25;41:4,18;
44:22;49:6;52:19;
53:17,22;54:2,22;
56:6,11;63:3;67:7;
70:24;71:7;73:13,23;
82:12;94:23;96:2;
100:4,18;101:3;
102:13;103:6;
105:18;108:1,3,11,
14
**regarding (6)**
32:7;46:11;62:24;
75:7,23;82:8
**regards (1)**
56:1
**regulars (1)**
7:15
**regulatory (1)**
101:6
**relate (1)**

106:8
**related (8)**
11:8;46:6;50:3;
56:16;79:20;80:18;
84:25;106:8
**relates (2)**
49:23;56:14
**relationship (1)**
101:22
**relative (1)**
39:13
**relevance (4)**
84:6;87:24;88:2;
93:10
**relevant (5)**
5:4;31:23;88:9,11;
100:9
**relied (1)**
17:3
**relieved (1)**
44:1
**rely (2)**
41:11;47:4
**relying (1)**
41:15
**remember (1)**
30:2
**remembered (1)**
49:12
**reminded (1)**
78:3
**remove (1)**
48:21
**removed (1)**
48:21
**repeat (15)**
19:23;24:22;
25:22;28:18;34:22;
41:2;43:9;47:13;
56:8;57:23;59:12;
75:20;82:12;84:3;
102:23
**rephrase (3)**
4:15;18:22;50:12
**report (24)**
35:22;36:18;
38:14;40:22;41:1,5,
19,21;47:15;48:8;
62:22;64:7,16;68:14;
71:17;72:7,14,20,20;
73:2,6;101:17;
105:22,25
**reported (8)**
8:24,25,25;9:4,5,5,
6;37:23
**reports (2)**
12:19;37:19
**request (3)**
31:12,16;100:25
**requested (4)**
14:21;39:8;42:25;
71:18
**requests (1)**

31:24
required (3)
  35:24;55:10;105:3
requirements (1)
  36:13
reserve (3)
  106:18,23;109:12
reserving (1)
  109:7
resolution (1)
  85:22
Resource (14)
  9:10;12:20;15:6,
  25;21:20;22:8;25:4;
  43:4;49:23;50:3;
  68:14,20;80:18;
  100:14
Resources (19)
  14:8;15:4;21:23;
  23:3;25:10;35:23;
  39:24;40:9;42:9;
  50:6;52:11,20,22;
  68:25;100:16,23;
  101:2,9,14
respect (5)
  29:14;31:15,23;
  106:23;109:7
response (1)
  29:13
responses (1)
  84:13
Responsibility (1)
  7:7
responsible (3)
  8:10;107:9,11
responsive (1)
  31:11
Restaurant (2)
  36:21;37:22
result (5)
  11:5;28:3;65:24;
  66:14;106:10
retention (1)
  36:13
return (4)
  15:15;41:8;66:22;
  67:2
returned (1)
  15:22
review (12)
  3:25;10:14,18;
  12:20;34:15;35:5,6;
  68:15;71:15;74:1;
  77:16;100:10
reviewed (12)
  10:7;34:21;35:3,
  11,15,25;39:1,4,5,7,
  13;54:5
reviewing (1)
  35:8
right (64)
  3:14;6:12;7:5,20,
  23:8:3,5,8;9:6;13:16;

18:5;19:12;22:25;
23:5,12;25:5;27:11,
18;28:22;29:11;
30:19;31:5,22;32:14;
33:10,22;35:1,13;
38:4;39:21;43:24;
44:5;50:12,18;51:18;
52:3;54:21;55:22;
63:9,16;64:16;66:18;
67:5;69:6;70:12;
72:17;74:7;76:6,10;
80:9,12;83:12;87:9;
88:13;89:2;92:4;
93:17;97:6;98:1,16;
99:19;105:17;
106:19;107:22
right-hand (1)
  12:15;30:20;34:10
rights (2)
  106:23;109:7
rise (1)
  83:3
role (3)
  65:6,16;66:4
roster (1)
  100:21
run (1)
  36:20
running (1)
  13:5

S

same (8)
  3:16;27:4;42:20;
  77:10;88:15;100:7;
  105:17,19
sanctions (1)
  28:3
Sandy (2)
  62:13,14
saw (1)
  101:12
saying (1)
  11:23
scared (1)
  37:21
schedule (4)
  36:2,15;37:11;
  88:25
schedules (1)
  100:24
scratch (1)
  4:6
search (1)
  31:22
seasonal (1)
  7:16
second (12)
  13:17;15:5;20:3;
  29:10;30:21;42:23;
  46:19;48:7;69:7;
  76:6,7;87:10

seconds (1)
  6:11
select (1)
  49:1
send (2)
  77:15,19
sent (6)
  68:11;72:8,21;
  77:14;108:13;109:15
sentence (7)
  40:3,23;42:23;
  43:12;64:7;80:21;
  97:22
sentences (1)
  44:17
separate (24)
  13:7,22;31:5,13,
  15,20;32:15,24;33:1,
  11,13,19;34:1;46:9,
  13,20;47:11,17;
  71:12;100:15,19;
  101:1,1,11
separately (2)
  42:19,21
serve (2)
  8:12,12
set (5)
  31:20;64:24;
  65:20;68:21;108:4
seven (2)
  62:23;82:7
several (5)
  20:24;34:6;39:10;
  48:21;106:5
severity (2)
  75:9,10
sexual (21)
  38:8;44:20;53:17,
  23;54:2;55:13,17,24;
  56:2,7,12,19,22;
  57:1;69:7,10,13,17;
  74:23;83:18;84:4
sexually (14)
  62:24;79:15,18;
  80:5;82:8,13,21;
  83:5,7,22;84:5;
  85:17;87:15;88:3
shake (1)
  4:19
shakes (1)
  4:21
shared (1)
  91:11
sheet (1)
  37:2
sheets (2)
  35:8,25
shift (1)
  36:4
short (2)
  6:10;17:2
shorter (1)
  59:13

shortly (2)
  38:21;40:15
show (3)
  30:14;31:1;48:4
showed (1)
  48:19
side (2)
  14:25;98:6
sides (2)
  89:23;90:4
sign (2)
  55:10;74:1
signed (1)
  4:1
signing (1)
  109:12
simply (7)
  4:19;22:22;25:14;
  74:24;77:22;84:22;
  108:20
single (1)
  43:12
situation (1)
  25:18
six (6)
  26:21,24;27:12;
  39:12;46:17,18
SNOW (78)
  6:10;9:1,16,23;
  11:13,17,23;13:2;
  17:8,15;18:20;19:2,
  9,21;22:11;23:7,14,
  25;24:3,12,14,21;
  26:7,12;27:14;28:8,
  14;29:10,13;30:11;
  31:10,19;32:18;33:3;
  34:15;40:11;42:2,4,
  13;43:10;45:9,13,18;
  46:1;50:7,21,24;
  51:1;54:9;55:19;
  57:20;60:14;66:9;
  67:3,10,22;82:23;
  84:8,12;86:19,22,24;
  87:2,5,7;90:2;96:5,8,
  11,18;97:2;103:20;
  104:18;106:18;
  107:3;109:1,12,15
sole (1)
  31:4
solely (2)
  17:20;75:11
solid (1)
  81:3
somebody (5)
  78:7;93:21;94:8;
  96:1,2
someone (1)
  4:5
sometime (1)
  39:20
somewhere (4)
  12:7;26:24;32:1;
  48:6

soon (2)
  38:19,20
sorry (28)
  6:5;29:8;41:2;
  43:9,20;46:14,16;
  47:13,22;51:12,13;
  56:8;57:6,8,18,19,
  23;59:12;61:17;
  62:19,20;66:6;75:20;
  77:3;79:25;88:1,15;
  93:8
sort (22)
  19:7;30:6;49:20;
  58:22;60:23;65:2;
  70:19;72:12;85:17;
  94:1,23;96:15
source (2)
  43:12;64:13
space (1)
  59:11,16;107:10
Spanish (1)
  38:7
Spanish-speaking (1)
  74:8
speak (6)
  40:17;41:17;
  46:22;87:4;92:1,11
speaking (2)
  29:22;81:9
speaks (2)
  89:11;90:15
specific (14)
  6:22;44:16;50:14;
  52:3;53:13,21,22;
  54:1;55:6;63:2;72:9;
  101:7;106:13;108:6
specifically (16)
  22:7,9;38:15,20;
  46:6;50:11;53:5;
  55:8;59:3;69:23;
  70:10;74:16,17;82:3;
  98:14;107:25
specifics (2)
  76:20,22
speculate (2)
  20:11,12
speculation (8)
  18:20;23:7;24:14,
  21;28:9,15;46:1;
  60:14
spoke (19)
  29:19,25;30:3,4;
  37:15;38:16;39:15;
  40:21,24;41:9,13,25;
  46:24;47:1;63:12,14;
  75:12;76:11;90:12
spoken (5)
  42:5;47:23;91:19,
  22;93:21
square (2)
  30:20;38:13
stabbing (1)
  72:12

**staff (3)**
69:8,13;70:6
**stage (4)**
27:17;28:21;29:2,
17
**stamp (2)**
36:7,15
**Standard (2)**
70:12;73:13
**staring (1)**
38:5
**started (2)**
5:12;51:2
**starts (1)**
95:2
**state (10)**
11:15;35:25;
39:24;40:9,18;42:10;
44:6,10;89:8;106:19
**stated (4)**
14:6;47:11;70:18;
95:14
**statement (12)**
37:12;55:10;64:6;
70:21;71:4;73:23,25;
80:24;92:8;94:14;
97:18;98:11
**statements (4)**
38:10;45:2;72:23;
104:10
**states (5)**
13:16;41:12;
54:13,14;71:20
**stating (1)**
44:23
**stemmed (1)**
83:14
**stick (1)**
84:16
**still (7)**
5:1;8:3,5;12:6,9;
90:8;92:20
**stop (1)**
97:17
**story (5)**
89:23;90:4;92:14,
16;98:7
**strategy (6)**
97:16,20,24;98:20,
22;99:3
**Streets (1)**
104:24
**structure (1)**
8:22
**study (3)**
51:16;52:4,10
**studying (1)**
52:21
**subject (1)**
53:3
**submitted (9)**
4:1;14:2,3,4,5,7;
35:22;72:14;73:3

**summarized (1)**
47:21
**summary (3)**
27:2;32:4;47:19
**supervise (2)**
7:12;8:20
**supervised (1)**
8:18
**supervising (1)**
8:16
**supervision (1)**
42:18
**supervisor (2)**
64:8;78:3
**supervisors (3)**
14:23;18:11;69:20
**supervisory (7)**
7:9,17;69:8,12;
70:6;102:20;103:1
**support (2)**
103:15,15
**supposed (1)**
68:21
**sure (23)**
6:1,13;11:16;
14:14;28:17;36:14;
40:19;45:6;47:24;
53:19;61:20;72:11;
75:14;79:3;80:3;
81:19;82:18;83:10,
13;84:5,10;86:14;
102:23
**surrounding (2)**
66:11;93:5
**sustain (1)**
77:5
**switch (2)**
7:1,3
**switched (1)**
7:4
**sworn (1)**
3:18
**system (1)**
7:8

**T**

**table (1)**
4:22
**talk (13)**
31:25;32:2;50:18;
51:2,5;55:5;76:6;
79:12;81:21;84:23;
85:2,4;108:5
**talked (6)**
38:19;75:17;
76:21;77:7;89:15,16
**talking (7)**
9:2;26:7;29:21;
57:20;67:6;79:23;
106:4
**tape (2)**
28:7,19

**team (9)**
93:18,21;94:8;
98:17,21,24;99:4,9,
14
**telling (6)**
19:13;45:25;96:2,
16,25;97:11
**ten (5)**
6:11;20:25;40:5;
75:18;84:9
**tension (5)**
56:16,23;83:17;
88:20;92:21
**term (1)**
104:21
**terms (6)**
40:23;50:3;60:16;
85:14,19;88:11
**testified (5)**
3:3;33:8;42:14;
69:9;82:19
**testimony (12)**
5:4;32:19;39:2,6;
82:24;83:3;84:16;
89:1;96:6,10,19;
109:3
**thinking (2)**
69:23,25
**third (9)**
12:14;26:20;46:8;
48:9;82:5;87:12,13;
99:19
**thorough (1)**
29:12
**though (1)**
6:11
**thought (9)**
46:17;76:25;84:3,18;
88:6,7
**three (13)**
25:9;48:8;50:23;
62:17,22;68:12;
73:12;79:3;91:4;
93:17;97:25;98:1;
109:5
**throughout (3)**
49:24;53:20;77:10
**timeline (4)**
30:14;31:1;57:5;
79:15
**times (12)**
3:10;5:2;20:23;
26:4;41:17,25;46:24;
47:1;77:9;84:9;
96:12;103:22
**today (7)**
11:6;34:14;35:1;
39:2,6;77:5;106:15
**together (1)**
67:12
**told (23)**
5:9;17:25;19:5;

22:18;27:12;47:10,
17;76:20;77:6;78:5;
79:9;80:20,22;84:23;
91:9;96:8,11;97:21;
98:3,14,15;99:5,25
**Tom (12)**
12:19;16:11;
17:12;20:1;66:20;
67:12,15;68:6,14;
73:1;77:17;79:6
**tone (3)**
38:7;75:6,22
**took (7)**
13:8;32:9;33:1;
37:13;51:23;53:4;
77:18
**top (9)**
36:19;38:14;
47:12,15;68:12;79:4,
5;88:13,15
**topic (1)**
82:4
**topical (2)**
50:15;53:14
**toward (4)**
44:20;102:21;
104:8,11
**training (16)**
49:16,21,22,24,25;
50:2;53:20,22;54:21;
55:1;69:7,14;70:11,
13;73:13;90:18
**transcript (7)**
3:24,25;4:3,4,6,19;
5:3
**Transit (8)**
7:4,5,8,13,20,24;
8:11;64:8
**translator (1)**
74:9
**transpired (2)**
18:17;22:23;23:11
**transportation (2)**
78:2,7
**treated (3)**
105:9,14;108:5
**trial (1)**
5:4
**tried (2)**
4:22;107:12
**trouble (1)**
91:2
**Troy (46)**
9:4;14:12;15:2;
18:11;23:10;26:16;
27:13;33:19;42:25;
44:23;46:5;58:3;
59:15;61:23,25;62:7;
69:18;73:14,19;
74:15;75:18,25;
76:12,21;77:7;78:12;
81:22;83:15;88:14,
16;89:3;91:2,8;93:6,

20;94:6;95:4;97:15,
21,23;98:9,18;99:22;
102:13;105:9,14
**true (1)**
105:22
**truth (8)**
3:19,19,20;45:25;
96:2,16,25;97:11
**try (16)**
4:14;14:5;16:20;
52:20;56:10;59:13;
61:12;65:10;67:6;
73:19;77:2;85:2,9,
11;89:7;105:10
**trying (8)**
32:23;40:12,13;
65:12;83:25;95:13;
100:20;101:1
**two (23)**
11:1;12:13;13:16;
14:24;25:8;27:18;
36:18;37:3;38:6,14;
39:22;42:19;46:19;
47:11,15;50:23;
56:17,22;60:5;74:21;
76:18;88:19;92:22
**type (1)**
71:13
**types (1)**
80:5
**typo (1)**
27:1

**U**

**uh-uh (1)**
4:21
**unable (2)**
15:13;89:22
**uncovered (1)**
86:11
**under (13)**
3:3,18,18;26:21;
41:6;42:18;46:9;
47:11,12;56:19;57:5;
68:13;104:17
**undergraduate (1)**
51:14
**underlies (1)**
92:8
**understood (3)**
4:17;28:2;57:14
**undertake (2)**
20:20;69:13
**undertaken (2)**
25:19,25
**undertaking (1)**
56:6
**undertook (4)**
21:22;55:25;
56:11;71:7
**unfairly (2)**
105:9,14

**University (2)**
51:10,22
**unless (1)**
4:25
**unsafe (2)**
44:5,9
**unwanted (2)**
55:18,22
**up (18)**
3:16;12:16;38:2;
42:22;46:14,21;60:6;
61:18;64:21;69:1;
70:1;71:24;72:2,25;
81:4;100:23;102:9;
107:23
**update (1)**
30:7
**updates (1)**
55:6
**upon (18)**
12:25;21:19;22:2;
24:5;25:17;37:13;
40:2;43:24;66:22;
67:2;80:24;91:11;
97:25;98:22;99:15;
100:1;108:1,8
**upper (2)**
12:16,16
**use (2)**
4:5;94:4
**used (4)**
44:17;57:18;
75:14;104:7
**Utah (2)**
51:10,22

**V**

**vague (7)**
4:10;19:21;22:11;
23:8;24:1;50:7;97:2
**various (2)**
62:25;82:9
**vehicle (1)**
59:7
**verbal (2)**
4:18;95:3
**verbally (1)**
13:20
**verge (1)**
44:15
**verified (3)**
38:3;62:25;82:9
**verify (2)**
16:24;37:15
**victim (3)**
85:4,4,6
**violate (1)**
94:6
**violated (1)**
94:10
**violation (6)**
94:22,25;95:6,10,

15;96:17
**violations (3)**
22:5;95:17,19

**W**

**wait (1)**
15:22
**wants (1)**
45:13
**warranted (1)**
65:9
**wasted (1)**
107:15
**way (10)**
3:16;40:22;41:5;
45:13;60:24;75:16,
24;80:17;94:3;
103:25
**Wayne (12)**
13:18;14:17;
26:19,22,23,25;27:9;
30:9,22;31:6;32:7,14
**wearing (1)**
37:20
**weather (3)**
106:22;107:9;
109:3
**week (1)**
38:23
**weeks (3)**
12:13;39:10,12
**weird (1)**
46:17
**well- (1)**
83:1
**well-being (2)**
99:20,24
**weren't (2)**
63:4;84:5
**wetbacks (1)**
104:5
**what's (4)**
13:25;37:5;41:11,
16
**wherever (1)**
36:13
**whole (2)**
3:19;91:17
**Whose (1)**
92:9
**willing (1)**
92:11
**winking (1)**
38:6
**wire (1)**
104:17
**wish (3)**
99:7;106:17;
107:10
**wished (1)**
99:12
**withdraw (2)**

32:21;67:5
**within (8)**
11:1,3;38:23,25;
39:12;52:3;53:14;
95:12
**Without (2)**
60:21;103:15
**witness (11)**
13:17,23;24:19;
26:22,24;30:21;
32:14;34:10;45:19,
20;108:21
**witnesses (4)**
24:25;32:10;
40:21;85:2
**word (1)**
50:10
**words (1)**
44:16
**work (30)**
6:15;15:15,19,23;
30:6;32:16;36:2,4,
15;41:8;50:19;51:6;
53:10,24;55:14;
58:23;59:11,16;
62:11;66:22;67:2;
77:10;84:1,19;88:12;
95:22;100:24;103:6,
10;107:3
**worked (4)**
6:7,8;56:3;62:12
**worker (3)**
103:13,22,23
**workers (14)**
61:6,13;62:1,7;
102:22;103:3,7,10,
11,16;104:2,9,11;
105:3
**working (1)**
6:23
**workplace (37)**
50:4;53:11,18,23;
54:3;56:3,17,23;
58:12;62:25;69:17;
71:16;76:18;77:10;
78:1;79:16;82:9,15,
20;83:5,8,17,22;
84:4,6;85:18;87:16;
88:4,20;91:3,5,7;
92:21;93:25;98:2,4,
10
**Works (30)**
6:4,5;7:25;8:1,6,9,
13,21;15:7;43:5;
48:2,14,24,24;62:15;
63:6;79:17;90:19;
98:23;100:6,17,18,
21;101:3,3,4;102:20;
103:2,25;104:8
**worth (1)**
107:1
**write (3)**
30:4;73:22,25

**written (17)**
12:10,12;13:25;
25:13,16;28:22;
29:15;39:16;72:17,
20;80:14,16,23;81:1,
11,12,18
**wrong (1)**
82:22
**wrote (4)**
38:13;40:3;43:18;
72:20

**Y**

**year (4)**
11:1,3;55:4,12
**years (4)**
6:2;11:2;49:20;
62:17
**yesterday (1)**
9:16

EXHIBIT "C"

**LUNDELL & LOFGREN, PC**
Rick S. Lundell (8848)
Brian K. Lofgren (8890)
136 South Main Street, Suite 700
Salt Lake City, Utah 84101
Telephone: (801) 532-4663

**RANDALL K. EDWARDS, PLLC**
Randall K. Edwards (3787)
136 South Main Street, Suite 700
Salt Lake City, Utah 84101
Tel. (801) 328-0300

**WARREN L. BARNES & ASSOCIATES, LLC**
Warren L. Barnes (11379)
136 South Main Street, Suite 700
Salt Lake City, Utah 84101
Telephone: (801) 532-4663

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| EULOGIO HINOJOS<br><br>        Plaintiff,<br><br>vs.<br><br>PARK CITY MUNICIPAL CORPORATION, a municipal corporation, PACE ERICKSON, individually and in his official capacity with Park City Municipal Corporation, and TROY DAYLEY, individually and in his official capacity with Park City Municipal Corporation, and Does I Through X,<br><br>        Defendants. | **NOTICE OF TAKING OF DEPOSITION OF KENT CASHEL**<br><br><br>Case:  2:07CV00750DAK<br><br>Judge Dale A. Kimball |

TO THE DEFENDANTS AND THEIR ATTORNEY:

Please take notice that Plaintiff will take the deposition of KENT CASHEL (the

"Deposition"), before a certified court reporter and notary public, on **Tuesday, December 16, 2008**, beginning at the hour of **9:00 a.m.** and continuing thereafter until completed.  The Deposition will take place in the offices of Randall K Edwards, PLLC, and Lundell & Lofgren, P.C., 136 South Main Street, Suite 700, Salt Lake City, Utah  84101.

This deposition will be taken on oral interrogatories pursuant to Rules 26 and 30 of the Federal Rules of Civil Procedure.

DATED this \_\_\_\_\_ day of December, 2008.

RANDALL K. EDWARDS, PLLC
LUNDELL & LOFGREN, P.C.
WARREN L. BARNES & ASSOCIATES, LLC

_____

Rick S. Lundell
Randall K. Edwards
Warren L. Barnes
Attorneys for Plaintiff

Plaintiff's Address:

Eulogio Hinojos
c/o Lundell & Lofgren, PC
136 South Main Street, Suite 700
Salt Lake City, Utah  84101

2

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of December, 2008, I caused a true and correct copy

of the within and foregoing NOTICE OF TAKING OF DEPOSITION OF KENT CASHEL to be

sent, via First Class, U.S. Mail, postage prepaid, and facsimile to the following counsel of record:

CLYDE, SNOW, SESSIONS & SWENSON
Edwin C. Barnes
Christopher B. Snow
201 South Main Street, 13th Floor
Salt Lake City Utah  84111
Fac. 801-521-6280

PARK CITY MUNICIPAL CORP.
Thomas Daley
P.O. Box 1480
Park City, Utah  84060
Fac. 435-615-4916

Q & A Reporting
1872 South Main Street
Salt Lake City, Utah  84115
Fac. 801-484-5795

Rick S. Lundell
Attorney at Law

3

EXHIBIT "D"



**ATTORNEYS AT LAW**
CLYDE SNOW SESSIONS & SWENSON
A PROFESSIONAL CORPORATION

ONE UTAH CENTER · THIRTEENTH FLOOR
201 SOUTH MAIN STREET
SALT LAKE CITY, UTAH 84111-2216
TEL (801) 322-2516 · FAX (801) 521-6280
www.clydesnow.com

**CHRISTOPHER B. SNOW**

(801) 322-2516
cbs@clydesnow.com

January 2, 2009

Rick S. Lundell, Esq.
Randall K. Edwards, Esq.
Warren L. Barnes, Esq.
136 South Main Street, Suite 700
Salt Lake City, Utah  84101

        Re:   *Eulogio Hinojos v. Park City*

Gentlemen:

      After Kent Cashel's deposition he reviewed his records and found the enclosed one-page interview of Brittany Angelovich, which has been Bates numbered PC2811.  We provide it to you as a supplemental production.

            Sincerely,

            CLYDE SNOW SESSIONS & SWENSON

            Christopher B. Snow

CBS:dh

Enclosure

{00038344-1}

# MEMO



**Public Works**

1053 Ironhorse Drive
P.O. Box 1480
Park City, UT 84060
Tel 435.615.5301
Fax 435.615.4904
www.parkcity.ccc

| | |
|---|---|
| **To:** | **Investigation file** |
| **From:** | **Kent Cashel** |
| Subject: | Brittany Angelovich Interview |
| **Date:** | **March 10th, 2006** |

## When and where did alleged behavior occur?

At Davanza's in the back corner of the restaurant while waiting for a Pizza. Brittany looked through the phone log on her cell phone identified a call she had made from her phone at that time and then indicated it was about 6:30 pm on Sunday February 19th at about 6:30 pm.

## What specifically occurred?

Eulogio was staring, winking at Brittany and her friend and making comments that Brittany described as "creepy" and sexual in nature.

## Were their any witnesses to this behavior?

Brittany was with a friend (a minor) no adults were present.

## Did you know who Eulogio was before this incident?

Brittany indicated she did not know who he was by name only that he worked at the City with her father.

Brittany was shown a set of photos of approximately one dozen Park City Public Works employee photos and she identified Eulogio as the individual at Davanza's.

## Is this the first time this behavior has occurred?

She said nothing as direct as this had occurred but that she had seen Eulogio staring at her at the Library and the Skate Park. She indicated this behavior made her uncomfortable.

EXHIBIT "E"

Edwin C. Barnes (Bar No. 0217)
Christopher B. Snow (Bar No. 8858)
CLYDE SNOW SESSIONS & SWENSON
201 South Main, 13th Floor
Salt Lake City, Utah 84111
Telephone:     801-322-2516
Fax:                801-521-6280

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

|  |  |  |
|---|---|---|
| EULOGIO HINOJOS, | : | |
| Plaintiff, | : | DEFENDANT'S ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR DOCUMENTS |
| -vs- | : | |
| PARK CITY MUNICIPAL CORPORATION, a municipal corporation, and Does I through X, | : | Case No. 2:07-CV-00750 |
| | : | Judge: Dale A. Kimball |
| Defendants. | : | |

Defendant Park City Municipal Corporation ("Park City") hereby responds to Plaintiff's

First Set of Interrogatories and Requests for Documents as follows:

**GENERAL OBJECTIONS**

1.       Defendant objects to each Interrogatory and Request that seeks information

protected from disclosure by the attorney-client privilege, the work product doctrine, or any other

applicable privilege or doctrine.  The inadvertent release of privileged information shall not

constitute a waiver of any privilege.

supplement these answers and responses, and to further object to and/or deny Plaintiff's

Discovery Requests.

## INTERROGATORY RESPONSES

INTERROGATORY NO. 1: For the entire period of Hinojos' employment with you

identify each person who possesses or controls any documents or files that contain information

about Hinojos, including any information relating to his health.

**ANSWER:** Park City objects to Interrogatory No. 1 in that it is vague, overly broad,

ambiguous and not sufficiently particularized to permit Park City to determine what information

the interrogatory seeks and to make a meaningful response. Notwithstanding this objection,

Kimberli Leier is Park City's Human Resource Manager and is in possession and control of

Plaintiff's personnel records, including medical records. Moreover, Park City produces herewith

a copy of Plaintiff's personnel records.

INTERROGATORY NO. 2: For the period commencing the first date of Hinojos'

employment with Park City through the present date, identify any lawsuits or administrative

agency charges or investigations in which it is alleged or claimed that you violated any federally

or state protected employment rights of your employees, including without limitation the

following types of claims and/or charges for alleged violations by you: alleged violations of the

Family and Medical Leave Act, Title VII of the Civil Rights Act of 1964, Americans with

Disabilities Act; retaliation; or, any other lawsuit or agency investigation in which an employee

or former employee alleged that you violated conditions of their employment, and the outcome of

each such lawsuit or administrative agency charge or investigation, including any settlement

**ANSWER:**    In response to this Request, Park City produces herewith documents Bates labeled PC00001 - 2262.

REQUEST NO. 4:    Produce all documents and things relating to your personnel policies or procedures, including without limitation such things as: Employment handbooks, employment or human resource training or operational manuals, instructional videos or tapes or documents related to personnel matters, posters or other materials posted or available in the workplace regarding federal and state protected employment rights, intranet materials relating to personnel or personnel matters, including, but not limited to, the Family and Medical Leave Act, Title VII of the Civil Rights Act of 1964, and/or the Americans with Disabilities Act.

**ANSWER:**    In response to this Request, Park City produces herewith documents Bates labeled PC00001 – 2262, which includes a copy of Park City's Policies and Procedures Manual.

REQUEST NO. 5:    Produce the entire personnel file for Hinojos and/or any other records in your possession or to which you have access regarding Hinojos including, but not limited to, employment application, references, training or vocational certifications, and any other documents or things which were provided to you or which you have maintained with respect to his employment with you..

**ANSWER:**    In response to this Request, Park City produces herewith documents Bates labeled PC00001 – 2262, which includes a copy of Plaintiff's personnel records.

REQUEST NO. 6:    Produce all of Hinojos' compensation and employment benefits records, including without limitation: All of Hinojos payroll records, checks, employment tax

15

**ANSWER:** In response to this Request, Park City produces herewith documents Bates labeled PC00001 – 2262, which includes copies of Park City' s Policies and Procedures Manual.

REQUEST NO. 10: Produce all policies, manuals, memoranda, calendars, guidelines, or any other documents or things relating to your FMLA and/or ADA policies and procedures, including without limitation, all documents and things relating to your implementation or administration of any of your FMLA and/or ADA policies and procedures any forms, emails, calendars, diaries or other notes, memoranda, videos, training manuals or other instructional material, postings (electronic or otherwise) or other notices relating to your FMLA and/or ADA policies or procedures.

**ANSWER:** In response to this Request, Park City produces herewith documents Bates labeled PC00001 – 2262, which includes copies of Park City' s Policies and Procedures Manual.

REQUEST NO. 11: Produce all documents and things related to Hinojos' termination of employment with you.

**ANSWER:** In response to this Request, Park City produces herewith documents Bates labeled PC00001 – 2262, which includes a copy of Plaintiff' s personnel records.

REQUEST NO. 12: Produce all documents regarding on-call assignments in the Streets Department during the time Hinojos was assigned to that department from 1998 to 2006.

18

EXHIBIT "F"

Edwin C. Barnes (Bar No. 0217)
Christopher B. Snow (Bar No. 8858)
CLYDE SNOW SESSIONS & SWENSON
201 South Main, 13th Floor
Salt Lake City, Utah 84111
Telephone:    801-322-2516
Fax:          801-521-6280

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | | |
|---|---|---|
| EULOGIO HINOJOS, | : | |
| | : | DEFENDANT'S INITIAL |
| Plaintiff, | : | DISCLOSURES |
| | : | |
| -vs- | : | Case No. 2:07-CV-00750 |
| | : | |
| PARK CITY MUNICIPAL | : | Judge: Dale A. Kimball |
| CORPORATION, a municipal | : | Magistrate Judge Nuffer |
| corporation, and Does I through X, | : | |
| | : | |
| Defendants. | : | |

Defendant Park City Municipal Corporation ("Park City") makes these initial disclosures

in accordance with Rule 26(a)(1) of the Federal Rules of Civil Procedure.

A.     The name and, if known, the address and telephone number of each individual

likely to have discoverable information that the disclosing party may use to support its claims or

defenses, unless solely for impeachment, identifying the subjects of the information;

1.     Pace Erickson, Park City Public Works Operations Manager.
Mr. Erickson may only be contacted through Clyde Snow Sessions & Swenson, 201 South Main
Street, #1300, Salt Lake City, Utah 84111, 801-322-2516. As a long-term employee,
Mr. Erickson is knowledgeable regarding the circumstances of termination of Plaintiff's

employment, including that Plaintiff's employment was terminated for legitimate, nondiscriminatory reasons.

      2.     Troy Dayley, Park City Streets and Streets Scapes Supervisor. Mr. Dayley may only be contacted through Clyde Snow Sessions & Swenson, 201 South Main Street, #1300, Salt Lake City, Utah 84111, 801-322-2516. As a long-term employee, Mr. Dayley is knowledgeable regarding the circumstances of termination of Plaintiff's employment, including that Plaintiff's employment was terminated for legitimate, nondiscriminatory reasons.

      3.     Kent Cashel, Park City Director of Public Works. Mr. Cashel may only be contacted through Clyde Snow Sessions & Swenson, 201 South Main Street, #1300, Salt Lake City, Utah 84111, 801-322-2516. As a long-term employee, Mr. Cashel is knowledgeable regarding the circumstances of termination of Plaintiff's employment, including that Plaintiff's employment was terminated for legitimate, nondiscriminatory reasons.

      4.     Jerry W. Gibbs, Park City Public Works Director. Mr. Gibbs may only be contacted through Clyde Snow Sessions & Swenson, 201 South Main Street, #1300, Salt Lake City, Utah, 84111, 801-322-2516. As a long-term employee, Mr. Gibbs is knowledgeable regarding the circumstances of termination of Plaintiff's employment, including that Plaintiff's employment was terminated for legitimate, nondiscriminatory reasons.

      5.     Arvil Price, P.O Box 214, Park City, Utah 84060. Former Park City employee, Streets Supervisor. Mr. Price supervised Plaintiff and, if called, would testify that Park City did not discriminate against Plaintiff during the time Mr. Price and Plaintiff worked together, and that Park City did not engage in a pattern or practice of discrimination.

      6.     Krysti Peretti, Park City Analyst II, IT Department employee. Ms. Peretti may only be contacted through Clyde Snow Sessions & Swenson, 201 South Main Street, #1300, Salt Lake City, Utah, 84111, 801-322-2516. Ms. Peretti may have knowledge regarding Plaintiff's violation of Park City policies during the term of his employment.

      7.     Chris Angelovich, Park City Parks IV employee. Mr. Angelovich may only be contacted through Clyde Snow Sessions & Swenson, 201 South Main Street, #1300, Salt Lake City, Utah, 84111, 801-322-2516. Mr. Angelovich has knowledge of Plaintiff's violation of Park City's policies during the term of his employment.

      8.     Genaro Armendariz, Park City Streets III employee. Mr. Armendariz may only be contacted through Clyde Snow Sessions & Swenson, 201 South Main Street, #1300, Salt Lake City, Utah 84111, 801-322-2516. Mr. Armendariz has knowledge regarding some of the claims asserted in the Complaint.

      9.     Kim Leier, Park City Human Resource Manager. Ms. Leier may only be contacted through Clyde Snow Sessions & Swenson, 201 South Main Street, #1300, Salt Lake

2

City, Utah 84111, 801-322-2516. Ms. Leier has knowledge regarding the circumstances of the termination of Plaintiff's employment, including the legitimate, nondiscriminatory reasons for that action.

      10.     Authorized representative(s) from the University of Utah Neuropsychiatric Institute, 501 Chipeta Way, Salt Lake City, Utah 84108, 801-587-3290. Doctors, counselors, personnel or staff may have relevant information relating to Plaintiff's alleged medical conditions and treatment, threats made regarding Park City employees, and Plaintiff's inability to perform the functions of his job or return to work.

      11.     Tita Smith, employee at University of Utah Neuropsychiatric Institute, 501 Chipeta Way, Salt Lake City, Utah 84108, 801-587-3290. Smith may have information relating to Plaintiff's unstable mental condition and inability to perform functions of his job or return to work.

      12.     Bruce Dickens, former Park City employee, Parks Department Supervisor, P.O. Box 980127, 5705 Trailside Drive, Park City Utah 84098, 435-649-1564. Mr. Dickens has knowledge regarding some of the claims asserted in the Complaint and would testify, if called, that during his employment with Park City he did not observe discriminatory treatment of any employee or person.

      13.     Tom Bakaly, City Manager for Park City may only be contacted through Clyde Snow Sessions & Swenson, 201 South Main Street, #1300, Salt Lake City, Utah, 84111, 801-322-2516. As a long-term employee, Mr. Bakaly is knowledgeable regarding the circumstances of Plaintiff's employment and that he made the decision to terminate Plaintiff's employment for legitimate, nondiscriminatory reasons.

      14.     Frank Nuniviller, Park City Streets III employee. Mr. Nuniviller may only be contacted through Clyde Snow Sessions & Swenson, 201 South Main Street, #1300, Salt Lake City, Utah, 84111, 801-322-2516. Mr. Nuniviller may have information regarding Park City's nondiscriminatory practices, and the circumstances surrounding termination of Plaintiff's employment. temporary employee in Parks

      15.     Brittney Angelovich, address and phone number unknown. Ms. Angelovich may have knowledge regarding Plaintiff's violations of Park City employment policies and procedures.

      16.     Bob Stephens, former Park City employee, Administrative Services Director, 1511 Fletcher Court, Park City, Utah 84098, 435-649-3436. Mr. Stephens may have information regarding some of the allegations in the Complaint.

      17.     Clint Dayley, Parks & Golf Supervisor. Mr. Dayley may only be contacted through Clyde Snow Sessions & Swenson, 201 South Main Street, #1300, Salt Lake City, Utah,

84111, 801-322-2516. Mr. Dayley may have information regarding some of the allegations in the Complaint.

18.     Mike Lennon, Park City Building Maintenance Supervisor. Mr. Lennon may only be contacted through Clyde Snow Sessions & Swenson, 201 South Main Street, #1300, Salt Lake City, Utah, 84111, 801-322-2516. Mr. Lennon may have information regarding the allegations in the Complaint.

19.     Maria Barndt, Park City Parks IV employee. Ms. Barndt may only be contacted through Clyde Snow Sessions & Swenson, 201 South Main Street, #1300, Salt Lake City, Utah, 84111, 801-322-2516. Ms. Barnt may have information regarding the allegations in the Complaint.

20.     Casey Coleman, Park City Streets IV employee. Mr. Coleman may only be contacted through Clyde Snow Sessions & Swenson, 201 South Main Street, #1300, Salt Lake City, Utah, 84111, 801-322-2516. Mr. Coleman is knowledgeable regarding on call practice and procedure for Park City employees and may have information regarding allegations in the Complaint.

21.     Eric Nesset, former employee, 126 Rachel Lane, Thomasville, GA 31792, 435-655-8528. Mr. Nesset may have information regarding some of the information alleged in the Complaint.

22.     Bruce Lee, Park City Streets III employee. Mr. Lee may only be contacted through Clyde Snow Sessions & Swenson, 201 South Main Street, #1300, Salt Lake City, Utah, 84111, 801-322-2516. Mr. Lee may have information regarding some of the allegations in the Complaint.

23.     Darren Davis, Park City Interim Administrative Team Leader. Mr. Davis may only be contacted through Clyde Snow Sessions & Swenson, 201 South Main Street, #1300, Salt Lake City, Utah, 84111, 801-322-2516. Mr. Davis may have information regarding some of the allegations in the Complaint.

24.     Bo Kolb LPC, Social Worker, Blomquist Hale Consulting, 860 East 4500 South, #202, Salt Lake City, Utah 84107. Kolb may have information regarding Plaintiff's unstable mental state or condition, and his inability to return to work and perform the essential functions of his job.

25.     William C. Moore, Blomquist Hale Consulting, 860 East 4500 South, #202, Salt Lake City, Utah 84107. Moore may have information regarding Plaintiff's unstable mental state or condition, and his inability to return work and perform the essential functions of his job.

26.     Spencer Wood, Social Worker, Blomquist Hale Consulting, 860 East 4500 South, #202, Salt Lake City, Utah 84107. Mr. Wood may have information regarding Plaintiff's unstable mental state or condition, and his inability to return work and perform the essential functions of his job.

27.     Dr, Robert Parker, address unknown, 801-213-9200, Plaintiff's primary care physician, University Health Care Clinic. Dr. Parker may have information regarding Plaintiff's mental state or condition and his inability to return work and perform the essential functions of his job.

28.     Dr. David McCann, address unknown, 801-272-9205. Dr. McCann may have information regarding Plaintiff's mental state or condition and his inability to return to work and perform the essential functions of his job.

29.     Brooke Schroeder Moss, Park City Analyst II Human Resource employee. Ms. Schroeder may only be contacted through Clyde Snow Sessions & Swenson, 201 South Main Street, #1300, Salt Lake City, Utah, 84111, 801-322-2516. Ms. Schroeder is knowledgeable regarding the legitimate nondiscriminatory reasons Park City terminated Plaintiff's employment, including Plaintiff's inability to return to work or perform the functions of his job.

30.     Kristen Bennett, Crisis Counselor at University of Utah Crisis Center, 801-339-8863. Ms. Bennett has knowledge regarding Plaintiff's alleged medical conditions and circumstances that prevented him from being able to return to work.

31.     Donna Apperson Milhouse, former employee bus driver, P.O. Box 965, Coalville, Utah 84017  (435) 640-5030. Ms. Milhouse may have information regarding some of the allegations in the Complaint.

32.     Charlie Latterner, former Streets III Park City employee, P.O. Box 729, Coalville, Utah 84107, 435-336-4005. Mr. Latterner may have information regarding some of the allegations in the Complaint.

B.     A copy of, or a description by category and location of, all documents,

electronically stored information, and tangible things that are in the possession, custody, or

control of the party and that the disclosing party may use to support its claims or defenses, unless

solely for impeachment:

Park City's documents that may be used to support its claims or defenses, unless solely for impeachment, are located in Park City's Municipal Corporate Offices, 445 Marsac Avenue, P.O. Box 1480, Park City, Utah 84068. The documents are in the process of being Bates-labeled and will be made available upon request, subject to the attorney-client and other applicable privileges.

Without waiving any claim of privilege, Park City has identified the category of the following documents that may be used to support its claims and/or defenses:

1.      Human resource personnel files for Plaintiff;

2.      Human resource medical files for Plaintiff;

3.      Human resource benefit files for Plaintiff;

4.      Human resource personnel files for Troy Dayley;

5.      Human resource personnel files for Pace Erickson;

6.      Park City Municipal Employee Policies and Procedures Manual.

C.      A computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.

Defendants are not seeking damages from Plaintiff at this time.

D.      There is no insurance agreement believed by Park City to be applicable to the claims or defenses advanced in this matter.

Dated this 15th day of February 2008.

CLYDE SNOW SESSIONS & SWENSON

EDWIN C. BARNES
CHRISTOPHER B. SNOW
Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Initial Disclosures was mailed, postage prepaid, to the following individuals on this 15th day of February 2008:

Randall K. Edwards
136 South Main Street, Suite 700
Salt Lake City, Utah  84101

Rick S. Lundell
Brian K. Lofgren
Lundell & Lofgren, PC
136 South Main Street, Suite 700
Salt Lake City, Utah 84101

Attorneys for Plaintiff

7

EXHIBIT "G"

Edwin C. Barnes (Bar No. 0217)
Christopher B. Snow (Bar No. 8858)
CLYDE SNOW SESSIONS & SWENSON
201 South Main, 13th Floor
Salt Lake City, Utah 84111
Telephone:   801-322-2516
Fax:          801-521-6280

Attorneys for Defendant

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | | |
|---|---|---|
| EULOGIO HINOJOS, | : | DEFENDANT'S ANSWERS TO |
| | : | PLAINTIFF'S SECOND SET OF |
| Plaintiff, | : | INTERROGATORIES AND |
| | : | REQUESTS FOR DOCUMENTS |
| -vs- | : | |
| | : | Case No. 2:07-CV-00750 |
| PARK CITY MUNICIPAL | : | |
| CORPORATION, a municipal | : | Judge: Dale A. Kimball |
| corporation, and Does I through X, | : | |
| | : | |
| Defendants. | : | |

Defendant Park City Municipal Corporation ("Park City") hereby responds to Plaintiff's

Second Set of Interrogatories and Requests for Documents as follows:

### INTERROGATORIES

INTERROGATORY NO. 16: For the entire period of Hinojos' employment with you

identify each person who possesses or controls any policies and procedures regarding discipline

or discharge of any Park City employee.

   **ANSWER:**   Park City objects to Interrogatory No. 16 on the grounds that it is

vague and ambiguous and not reasonably calculated to lead to the discovery of evidence.

Notwithstanding this objection, the City Council approves Park City's policies and procedures annually in June. Park City managers and supervisors all have access to Park City's policies and procedures which include guidance on discipline or discharge.

INTERROGATORY NO. 17: Identify any and all procedures or policies (written or unwritten), documents, manuals or other documents and things which you used or to which you referred in carrying out any discipline or discharge from employment at any time relative to the following individuals:

a. Pace Erickson.

b. Troy Dayley

c. Hugo Hinojos

d. "Genaro."

**ANSWER:** In response to this Interrogatory, Park City produces herewith documents Bates labeled PC00001 – 2262, which includes the personnel files for Pace Erickson, Troy Dayley, Genaro Armendariz and Plaintiff, and copies of Park City's Policies and Procedures Manual.

INTERROGATORY NO. 18: Identify any collective bargaining agreement or other contract governing discipline or discharge of any Park City employee during the time of Hugo Hinojos' employment with Park City, including the name of the union or employee organization, the local number, the business agent or other representative thereof, and any shop steward or other person charged with overseeing any duties under such agreement or contract.

**ANSWER:** All Park City employees are at-will. Park City does not have a collective bargaining agreement or other contract with its employees.

2

EXHIBIT "H"

# In The Matter Of:

*Hinojos v.*
*Park City*

---

*Christopher Angelovich*
*October 9, 2008*

---

*Q & A Reporting, Inc.*
*1872 South Main Street*
*Salt Lake City, Utah  84115*
*801.484.2929*

Original File 10-09-08 Angelovich Chris.txt

Min-U-Script® with Word Index

Page 13

1 but I don't know the details to them.
2 Q. How did you find out about these other
3 circumstances? Did Brittany tell you that?
4 A. She did tell me. But I -- at the time, I didn't
5 know who she was referring to.
6 Q. Did she later tell you that it was, indeed,
7 Mr. Hinojos?
8 A. In a meeting with Kent Cashel, she picked his
9 picture out of a lineup.
10 Q. When she talked to you from Davanza's, did she
11 tell you who it was? Did she know Mr. Hinojos at that time?
12 Did she know his identity?
13 A. I believe in the 12 years that I've been with the
14 city, at some point we probably crossed paths at a Christmas
15 party or an outing to the city.
16 Q. Did she know Mr. Hinojos's identity?
17 A. I don't believe personally. I think --
18 Q. Did she know it was somebody working for the city?
19      MR. SNOW: Could you allow him to finish his
20 answer.
21 Q. (BY MR. EDWARDS) I'm sorry. Were you finished?
22 A. I don't believe she knew him personally. I mean,
23 I believe she knew that he was somebody that worked for the
24 city.
25 Q. What time of day was it that she called you from

Page 14

1 Davanza's?
2 A. I don't recall that.
3 Q. Was it during working hours?
4 A. I don't know.
5 Q. Did she indicate that she knew that the guy that
6 had creeped her out was a city employee?
7 A. Yes.
8 Q. Did she tell you how she knew that?
9 A. She told me there was a city truck.
10 Q. Did she ever indicate to you that he was wearing a
11 uniform or anything that would have identified him as a city
12 employee?
13 A. I don't recall if she told me that.
14 Q. And when you found out about it -- first of all, I
15 think you indicated it kind of put you over the edge. What
16 was your reaction, were you angry?
17 A. I was angry at that situation, but there was a
18 situation before that.
19 Q. Let's talk about the prior situation. What was
20 that?
21 A. I was speaking to Wayne Dayley, a private
22 contractor at the city shop. Hugo came up to me and said,
23 "You better watch out. Your daughter is almost 16, and
24 she's a cutie."
25 Q. What did you reply?

Page 15

1 A. My exact words, "If you ever talk about my
2 daughter again, I'll kill you."
3 Q. How long before this incident in February of 2006,
4 did this earlier incident happen where he talked to you
5 while Wayne Dayley was there?
6 A. The Davanza incident was, I believe, three days
7 after he had said those words to me.
8 Q. Did you talk to anybody at your job about this
9 incident where Mr. Hinojos had talked to you about your
10 daughter at the workplace?
11 A. I talked to Troy Dayley that same day.
12 Q. What did you tell him?
13 A. I told him what he said to me. And I asked that
14 nobody get hurt or fired but I would like -- I'd like it to
15 stop, both for myself and my daughter.
16 Q. What did Mr. Dayley tell you, if anything?
17 A. He said that he would talk to him.
18 Q. Did you talk to anybody else besides Mr. Dayley?
19 A. That third day, when my daughter called about the
20 Davanza's incident, I felt that nothing was being taken care
21 of so I went to Kent Cashel.
22 Q. In that three-day period between the time that
23 Mr. Hinojos had approached you and the time that your
24 daughter called from Davanza's, other than speaking to
25 Mr. Dayley did you talk to anybody else?

Page 16

1 A. I do not believe so.
2 Q. Were you at work when your daughter called you
3 from Davanza's?
4 A. I do not recall.
5 Q. Did you talk to Mr. Dayley again after you
6 received the telephone call from your daughter at Davanza's?
7 A. I only spoke with Troy Dayley one time.
8 Q. Did you speak with Mr. Erickson at all?
9 A. I don't believe so.
10 Q. Do you recall what you told Mr. Cashel?
11 A. I believe I told him that I spoke with Troy and I
12 didn't feel anything was being done about the situation and
13 explained the whole scenario to him. And at that point, he
14 asked that me and my daughter be brought in so he could
15 question us.
16 Q. What was Mr. Cashel's position with the city at
17 that time, do you know?
18 A. I do not know his title.
19 Q. Did you ever speak to Jerry Gibbs about it?
20 A. No.
21 Q. When you say you talked to him about -- I think
22 you said the whole scenario, did you mention the earlier
23 incident where Mr. Hinojos had spoken to you at the job with
24 another Mr. Dayley there present?
25 A. I did tell him of that situation.

Page 17

1 Q.  This is kind of confusing.  We have got about ten
2 Dayleys involved:  We have got Troy Dayley; we have got a
3 Wayne Dayley; we have got Mr. Daley who is here in our
4 office.  And I think Mr. Troy Dayley has got a brother as
5 well that is involved.  So if you get confused, it won't be
6 the first time because I am certainly confused about it.
7    Do you know whether your -- do you know who else
8 was there at the restaurant with your daughter at the time
9 that this incident occurred with her and Mr. Hinojos?
10 A.  Her friend's name was Jasmine.  And I believe the
11 last name is Terry.
12 Q.  Anyone else that you are aware of?
13 A.  Not that I am aware of.
14 Q.  I think you mentioned that your mother had dropped
15 them off.  Was she there at the time of the incident
16 occurred?
17 A.  She was waiting in the car.
18 Q.  What is your mom's name?
19 A.  Judith Ann Angelovich.
20 Q.  How would I be able to get in touch with her, any
21 idea?
22 A.  I can leave a phone number.
23 Q.  We don't need to put that on the record.  I will
24 ask about that as well.
25    Did she ever talk to you about this incident?  I

Page 18

1 mean, had Brittany talked to your mother and then your
2 mother talked to you about it, anything like that?
3 A.  I don't recall talking to my mom about it.
4 Q.  Did you ever talk to Jasmine Terry about it?
5 A.  No.
6 Q.  Did you then, after you talked to Mr. Cashel, go
7 get your daughter and both of you talk to him together?
8 A.  Yes.
9 Q.  How long after you talked to Mr. Cashel did you
10 and your daughter talk to him together?
11    MR. SNOW:  Objection.  Vague and ambiguous.
12 Q.  (BY MR. EDWARDS)  Did you understand my question?
13 A.  No.
14 Q.  Okay.  You talked to Mr. Cashel the first time.
15 He told you to go get your daughter and come back and talk
16 to me again.  I am just wondering how long it was between
17 the time he sent you to go get your daughter and the time
18 that you and your daughter talked to him?
19 A.  I believe approximately four days.
20 Q.  During this four days, did you have any
21 understanding that it was Mr. Hinojos that had talked to
22 your daughter?
23 A.  I do not know that I knew.
24 Q.  Did you suspect it was him?
25 A.  I suspected, yes.

Page 19

1 Q.  Is that because of the earlier comment that he
2 made?
3 A.  One, because of the earlier comment.  And, two,
4 because there was only two Hispanic males that worked for
5 the street department.
6 Q.  Did your daughter identify this person that talked
7 to her as a Hispanic?
8 A.  Yes, she did.
9 Q.  The other Hispanic male was Genaro Armendariz?
10 A.  Correct.
11 Q.  Did you have any suspicions it might be
12 Mr. Armendariz?
13 A.  No.
14 Q.  Tell me about the meeting between you and
15 Mr. Cashel and your daughter.
16 A.  I spoke briefly with Kent Cashel, told him the
17 scenario at the city shop along with Davanza's.  And I
18 believe I was asked to step out of the office briefly and he
19 put up a photo lineup and asked my daughter to pick out the
20 person.  And she picked out Hugo.
21 Q.  Were you present when that happened, when he put
22 the photos up there --
23 A.  No.
24 Q.  -- for her to look at?  How did you find out about
25 that?  Did she tell you about that?

Page 20

1 A.  Kent told me after the fact.
2 Q.  How long did Mr. Cashel speak with your daughter
3 without you present?
4 A.  Three minutes.
5 Q.  Did you then enter back into the room and talk to
6 Mr. Cashel and your daughter?
7 A.  Yes.
8 Q.  What was the conversation then?
9 A.  I believe it was he was just wanting to get more
10 information and learn more about what had transpired.
11 Q.  Do you recall any further conversation that you
12 had with him?
13 A.  After that day?  No.
14 Q.  No, you have asked a good question.  He wanted
15 more information and to learn more about what had
16 transpired.  Did he get more information?  Did either you or
17 your daughter give him more information with regards to that
18 question?
19 A.  No.
20 Q.  Now I will ask the question that I think you
21 thought I was asking.
22    After that meeting, did you speak with Mr. Cashel
23 again about the situation?
24 A.  No.
25 Q.  Did you speak to Mr. Dayley after the meeting with

EXHIBIT "T"

**RANDALL K. EDWARDS, PLLC**
Randall K. Edwards (3787)
136 South Main Street, Suite 700
Salt Lake City, Utah 84101
Telephone (801) 328-0300
Facsimile (801) 534-1559

**LUNDELL & LOFGREN, PC**
Rick S. Lundell (8848)
Brian K. Lofgren (8890)
136 South Main Street, Suite 700
Salt Lake City, Utah 84101
Telephone: (801) 532-4663
Facsimile: (801) 534-1559

**WARREN L. BARNES & ASSOCIATES, LLC**
Warren L. Barnes (11379)
136 South Main Street, Suite 700
Salt Lake City, Utah 84101
Telephone: (801) 532-4663
Facsimile: (801) 534-1559

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| EULOGIO HINOJOS<br><br>Plaintiff,<br><br>vs.<br><br>PARK CITY MUNICIPAL CORPORATION, a municipal corporation, and Does I Through X,<br><br>Defendant(s). | **AFFIDAVIT OF RICK S. LUNDELL**<br><br>Case No. 2:07-cv-750<br><br>District Judge Dale A. Kimball<br><br>Magistrate Judge David Nuffer |

STATE OF UTAH         )
                          : SS
COUNTY OF SALT LAKE  )

I, Rick Staford Lundell, being at least eighteen years of age, duly swear and state as follows:

1.      I am co-counsel for Plaintiff, Hugo Hinojos, in the present case.

2.      On Sunday, January 11, 2009, I drove to Neola, Utah, approximately 10 miles North of Roosevelt, Utah, in Duchesne County, to speak to a material defense witness in this case, Britney Angelovich ("Ms. Angelovich").

3.      Park City's Attorney, Christopher Snow provided me with Ms. Angelovich's cellular telephone number on or about December 19, 2008.

4.      I unsuccessfully telephoned Ms. Angelovich on Sunday, January 11, 2008, while in Neola. I did not leave a message. Ms. Angelovich called my number back and I answered.

5.      After I made my introduction, Ms. Angelovich refused to speak to me, in person or telephonically, until she spoke to her father, Chris Angelovich, a Park City employee.

6.      Upon information and belief, Ms. Angelovich, a minor of 17 years of age, has emancipated from her father since she has not lived with her father since August of 2007, and lives with her fiancé in Neola, Utah. *See* Transcr. Depo. Chris Angelovich, 10:13-11:5 and 25:8-26:10 (October 9, 2008) attached as Exhibit "A".

7.      After speaking to her father, Ms. Angelovich called me back and told me that she did not feel comfortable speaking to me without her father or her attorneys present.

8.      Surprised that Ms. Angelovich had counsel, I asked her who her attorneys were, and she said the "attorneys from Park City."

2

9.     I then informed Ms. Angelovich that: (1) Park City's attorneys had informed Plaintiff that they did not represent her in this matter; (2) Park City's attorneys had given me her cellular phone number so I could speak to her directly; and (3) she could talk to me without them present.

10.     Ms. Angelovich insisted that she did not wish to speak to me about this case.

Dated this 2nd day January, 2009.



Rick S. Lundell

STATE OF **UTAH**          )
                           : SS
COUNTY OF **SALT LAKE**    )

On the 2nd day of January, 2009, personally appeared before me the Affiant, **Rick S. Lundell**, the signer of this Affidavit, who duly acknowledged to me that he executed the same.

NOTARY PUBLIC

Notary Public
ZENON SANTIAGO
136 South Main Street, Suite A-200
Salt Lake City, Utah 84101
My Commission Expires
March 28, 2009
State of Utah

3

EXHIBIT "A"
(to Affidavit of Rick S. Lundell)

# In The Matter Of:

*Hinojos v.*
*Park City*

---

*Christopher Angelovich*
*October 9, 2008*

---

*Q & A Reporting, Inc.*
*1872 South Main Street*
*Salt Lake City, Utah  84115*
*801.484.2929*

Original File 10-09-08 Angelovich Chris.txt

Min-U-Script® with Word Index

Page 9

1 A.  I told him I had to give a deposition and that I
2 needed to take some time off of work.
3 Q.  Did you tell him what the case was about?
4 A.  No.
5 Q.  Do you have any idea what this case is about?
6 A.  No.
7 Q.  Have you ever heard from anybody at Park City that
8 Hugo Hinojos is suing the city of Park City?
9 A.  Could you repeat that?
10 Q.  Has anybody at Park City ever told you that
11 Mr. Hinojos is suing the city?
12 A.  I believe I read something in the paper quite some
13 time ago.
14 Q.  Have you talked to Mr. Dayley about the fact that
15 Mr. Hinojos is suing the city?
16 A.  No.
17 Q.  Have you ever talked to Mr. Erickson about that?
18 A.  No.
19 Q.  When was the last time that you talked to
20 Brittany?
21 A.  Couple days ago.
22 Q.  Did you tell her that you were going to give
23 deposition testimony in this case?
24 A.  I did.
25 Q.  What did you tell her?

Page 10

1 A.  I just said -- I brought up the fact that I was
2 having to come down here.
3 Q.  Do you know Brittany's telephone number?
4 A.  I don't have it on hand.
5 Q.  Do you have an address for her?
6 A.  I do not.
7 Q.  Do you know how I might be able to get in touch
8 with her?
9 A.  I should be able to get a phone number.
10    MR. EDWARDS:  Let's go off the record for a
11 second.
12    (Discussion off the record.)
13 Q.  (BY MR. EDWARDS)  Do you know what state Brittany
14 lives in?
15 A.  She lives in Utah.
16 Q.  Do you know what city?
17 A.  Neola.
18 Q.  Neola.  Do you have any idea where Neola is
19 because I don't.
20 A.  It is down south by Vernal, just outside of
21 Vernal.
22 Q.  Okay.  What does she do in Neola?
23 A.  I don't believe she is working at the present
24 time.
25 Q.  Is she living with friends or family?

Page 11

1 A.  She is living with her fiancé.
2 Q.  What is his name?
3 A.  Tino, I don't know his last name.
4 Q.  His name is Tina?
5 A.  Tino.
6 Q.  I'm sorry.  And let me explain, I am not trying to
7 elbow my way into your personal life so much as the fact
8 that I think she may be a witness to some of the events that
9 are at issue in this case.  That's what I wanted to talk to
10 you about today.
11    It's -- let me give you some background.  Part of
12 this case has arisen with regard to a meeting that was held
13 between Mr. Erickson and Mr. Dayley and Mr. Hinojos with
14 regard to some assertions that were made about Mr. Hinojos's
15 behavior toward your daughter, Brittany, in February of
16 2006.
17    Do you recall an incident involving Mr. Hinojos
18 and your daughter, Brittany, in 2006?
19 A.  Yes, I do.
20 Q.  Tell me a little bit, generally, about the
21 incident and then I will ask you some specifics.  What
22 happened?
23 A.  My daughter had explained to me on a few occasions
24 of Hugo gawking at her and saying things about her body.
25 The incident in 2006 was at a eating establishment up on

Page 12

1 Park Avenue.
2 Q.  At Davanza's?
3 A.  Yeah, at Davanza's.  And this was, I believe, one
4 of the things that put me over the top.  She -- her and
5 her -- my mom had taken my daughter and her friend up to
6 Davanza's to get some food.  And when my daughter called and
7 told me he was gawking at her and mentioning things about
8 her butt in specific.
9 Q.  She called you from Davanza's?
10 A.  As she was leaving Davanza's.
11 Q.  Did she tell you exactly what Mr. Hinojos had
12 said?
13 A.  I think it was -- from my understanding, it was
14 while he was passing.
15 Q.  Do you recall the words he said or did she tell
16 you the words that he said to her?
17 A.  She said something to the extent that she had a
18 nice butt.
19 Q.  Did she tell you that -- what her reaction was to
20 that?  She didn't like it?
21 A.  She was creeped out by it, yes.
22 Q.  I think you indicated that this was one of -- were
23 there more incidents involving Mr. Hinojos and your daughter
24 before this incident at Davanza's?
25 A.  I believe there was a couple other circumstances,

Page 25

1 department because I have worked with the streets department
2 for several years.
3 Q. Have you ever been party to a lawsuit before?
4 A. No.
5 Q. Were you the subject of a child support order from
6 Oregon?
7 A. I received child support from Oregon.
8 Q. At the time that your daughter talked to you about
9 the incident involving Mr. Hinojos, was she living at your
10 home?
11 A. Yes, she was.
12 Q. Did she also have a residence in Oregon at all?
13 A. No.
14 Q. Had she ever lived in Oregon?
15 A. With me.
16 Q. Has she ever lived in Oregon separate from you?
17 A. No.
18 Q. Has your daughter been legally emancipated from
19 you?
20 A. I signed over temporary custody to my second wife.
21 Q. When was that?
22 A. Last August.
23 Q. How long has it been since she lived under the
24 same roof as you?
25 A. Last August.

Page 26

1 Q. I am not trying to get personal and pry into your
2 personal affairs. I am just, again, trying to track down
3 some things here.
4    Was it last August when you and your second wife
5 split up?
6 A. No. She did not want to follow rules anymore.
7 And being a single father, I was unable to watch her 24/7.
8 Q. I understand that. And she got along well with
9 your second wife?
10 A. That was her -- that was like her mother, yes.
11 Q. The incidents that you told me about that you
12 didn't recall specifics about, I think there were a couple
13 incidents before this, did either of them involve the
14 library, do you recall?
15 A. I believe one of them was the library.
16 Q. Do you know what happened at the library?
17 A. I do not.
18 Q. Do you know what -- at Davanza's, do you know
19 where the city truck was parked that your daughter saw?
20 A. That, I do not.
21 Q. She mentioned to you that she saw a city truck,
22 though, in front of Davanza's or somewhere around Davanza's?
23 A. She mentioned a city truck was there.
24 Q. You mentioned something about Mr. Wayne Dayley
25 being a contractor for the city?

Page 27

1 A. He's a private contractor.
2 Q. Do you know whether he overheard the comment from
3 Mr. Hinojos to your daughter being almost 16?
4 A. I don't know if he overheard it or not.
5 Q. Do you have any idea how it is that Mr. Hinojos
6 knew that your daughter was about to turn 16?
7 A. That, I do not.
8 Q. Did you ask him about that?
9 A. Under the circumstances, no.
10    MR. EDWARDS: That's all the questions I have.
11    MR. SNOW: For the record, Mr. Angelovich would
12 reserve his right to review the deposition and make any
13 changes and sign it.
14    MR. EDWARDS: I would also -- not necessarily as
15 part of this deposition, but I do want it on the record so I
16 will put it here.
17    I would also like to extend discovery at least as
18 far as taking the deposition of Mr. Cashel. This is the
19 first inkling we had that Mr. Cashel was told anything about
20 this incident, anything about the photo lineup. All of the
21 answers to interrogatories and other discovery requests
22 including all the depositions to now have been bereft of any
23 reference to any investigation undertaken by Mr. Cashel or
24 any conversation between him and Mr. Angelovich.
25    We can have that fight later, but I did want to

Page 28

1 put it on the record now.
2    MR. SNOW: We can talk about that later, I agree.
3 (Proceedings were concluded at 2:14 p.m.)
4 * * *
5 (Reading copy sent to Mr. Snow.)

EXHIBIT "J"

# In The Matter Of:

*Hinojos v.*
*Park City*

---

*Pace Erickson*
*September 24, 2008*

---

*Q & A Reporting, Inc.*
*1872 South Main Street*
*Salt Lake City, Utah  84115*
*801.484.2929*

Original File 09-24-08 Erickson Pace.txt
Min-U-Script® with Word Index

Page 105

1 A. I can't recall that.

2 Q. Is the Hispanic gentleman that you are referring

3 to a man by the name of Antonio Velasquez?

4 A. Could be. I am not sure.

5 Q. What did you understand the term "Mexican backhoe"

6 to mean?

7 A. A shovel.

8 Q. While on the job, have you ever heard of anyone

9 use the term "spic" or "spics"?

10 A. No. I haven't heard that term used.

11 Q. Have you ever heard the term "wet back" or "wet

12 backs"?

13 A. I haven't.

14 Q. Have you ever heard or used the term "dumb

15 Mexicans"?

16 A. No.

17 Q. Have you ever used the term or heard the term

18 "dumb fucking Mexicans"?

19 A. No.

20 Q. Have you ever heard "you Mexicans"?

21 A. I have heard "Mexicans."

22 Q. What context?

23 A. Years ago, when we -- when I first started in

24 parks, that was what the Hispanics called themselves. And I

25 remember just over time it went away. Now it is not used --

Page 106

1 the term "Mexican" is not used. It's "Hispanics" are used.

2 Q. Have you ever heard or used the phrase "Mexicans

3 can only do a job by using shovels or push brooms"?

4 A. No.

5 Q. Would you deny you ever used such a phrase?

6 A. I wasn't even in the parks department at the time.

7 I wasn't even in the same building.

8 Q. My question is whether you deny whether you've

9 ever used that phrase?

10 A. I don't recall.

11 Q. We can take a five-minute break, and I may be

12 almost done with you.

13     (Recess from 1:59 p.m. to 2:08 p.m.)

14 Q. (BY MR. EDWARDS) I'd like to ask you what you

15 know or recollect about Mr. Hinojos's mental state in

16 February of 2006 just prior to the date that you had the

17 meeting with him on the 28th. Did you notice whether there

18 was any kind of problem that Mr. Hinojos was exhibiting?

19 A. You know, I didn't notice anything from him. I

20 know I talked to him a couple weeks before. He was -- you

21 know, he -- I don't even remember what he was talking about.

22 Might have been talking about the Unimog.

23 Q. About what?

24 A. The Unimog. It's a vehicle that we have. We

25 might have been talking about the Unimog because we bought a

Page 107

1 new one. Didn't notice anything at that time.

2 Q. Let me explain what it is that I am after here.

3 You and Troy meet with him on the 28th of February. He

4 immediately goes to the human resources. He ends up having

5 all sorts of emotional problems. And my question is whether

6 you had any clue that there was any kind of emotional issues

7 that he was dealing with in February of 2006?

8 A. He never mentioned anything to me. You know, a

9 lot of times he would confide in me with other issues. I

10 remember him talking at one time about somebody that he had

11 to actually try to get his house back -- somebody had moved

12 into his home, and he was trying to get them out of his

13 home. But he never confided in me anything that he had --

14 that he had any health problems, that he was taking any

15 medication, which is a requirement under our policies and

16 procedures. He never said anything.

17 Q. Speaking of policies and procedures, were you

18 aware of policies and procedures at Park City with regard to

19 employee discipline and discharge?

20 A. Yes.

21 Q. When you spoke with Mr. Hinojos on the 28th of

22 February, was that within the context of employee

23 discipline?

24 A. No, he was not being disciplined. And there was

25 no action taken to --

Page 108

1 Q. To your knowledge, was there ever any

2 investigation of you or Mr. Dayley with regard to a meeting

3 that you had with Mr. Hinojos on the 28th of February?

4 A. I am unaware of an investigation, a formal

5 investigation, no.

6 Q. Was there an informal investigation where you were

7 brought in and asked about what happened?

8 A. Somebody asked what happened. What -- I think it

9 was a deputy public works director. I kind of explained

10 what happened. And he said, "Well, he went home. Just so

11 you know, he went home -- went home sick."

12 Q. Do you recall who that public works director --

13 deputy public works director -- what their name was?

14 A. Kent Cashell.

15 Q. Were you ever made aware that there had been

16 threats against you by Mr. Hinojos?

17 A. I was made aware of that, yes.

18 Q. When was that, do you recall?

19 A. It was around the beginning of April.

20 Q. April of?

21 A. It would be April of 2006.

22 Q. What were you told?

23 A. That medical care facility that was treating

24 Mr. Hinojos had called the city and said that there had been

25 death threats logged against supervisors in public works.

EXHIBIT "K"

# In The Matter Of:

*Hinojos v.*
*Park City Municipal*

---

*Jerry W. Gibbs*
*September 25, 2008*

---

*Q & A Reporting, Inc.*
*1872 South Main Street*
*Salt Lake City, Utah  84115*
*801.484.2929*

Page 41

1 daughter.
2 Q.  Is Chris's last name Angelovich?
3 A.  Yes.
4 Q.  Okay.  Did Mr. Erickson indicate to you
5 what Mr. Angelovich said that Mr. Hinojos had stated to
6 Mr. Angelovich's daughter?
7 A.  I did not ask that question, nor did I --
8 was the information provided as to exactly what was
9 said.
10 Q.  Did you have any interest in knowing
11 whether indeed these comments had been made by Mr.
12 Hinojos?
13 A.  My interest was to have his direct
14 supervisor talk with him, and I was one that urged that
15 they have a discussion so we find out what was going
16 on.
17 Q.  Did you have any discussion with Mr.
18 Angelovich with regard to these allegations?
19 A.  I did not.
20 Q.  Why not?
21 A.  He didn't see any purpose in my discussion
22 with Mr. Angelovich since Pace and Troy had had the
23 initial conversation.
24 Q.  Did you instruct either Pace or Troy to
25 speak to Mr. Angelovich to determine whether there was

Page 42

1 any truthfulness to these allegations?
2 A.  I did not.
3 Q.  Did you feel that it was important that you
4 ascertain whether these allegations had any truth to
5 them before going any further in giving instruction to
6 Mr. Erickson or Mr. Dayley about meeting with Mr.
7 Hinojos?
8 A.  I did not feel that it required a full
9 exploring of the facts initially.
10 Q.  Did you feel that it required any exploring
11 of the facts?
12 A.  I did not feel at that point in time that
13 an investigation was necessary.  It was more important
14 to resolve what could be an employee/employee
15 relationship, and the purpose was just to have a
16 discussion with Hugo.
17 Q.  Did you instruct Mr. Erickson or Mr. Dayley
18 to speak to Mr. Angelovich about the possibility of
19 discipline for making any type of a false accusation?
20 A.  I did not have that conversation with
21 either one.
22 Q.  Did you ever have any discussion with Mr.
23 Angelovich about the consequences of making a false
24 accusation?
25 A.  I did not have that discussion.

Page 43

1 Q.  Why not?
2 A.  Again, it wasn't at a point of an
3 investigation.  What we were trying to do is resolve
4 it, the issue, at the lowest level, and that was the
5 purpose of the discussion with Pace, Troy and Hugo, was
6 just to get Hugo's side of the story.
7 Q.  Did you get Mr. Angelovich's side of the
8 story yourself?
9 A.  I did not.
10 Q.  Okay.  Were you ever told that the incident
11 that allegedly took place between Mr. Hinojos and Mr.
12 Angelovich's daughter took place outside work hours?
13 A.  It was my understanding that the incident
14 took place during the work schedule and paid lunch
15 hour.
16 Q.  My question was whether you ever became
17 aware that it took place at a different time?
18     MR. SNOW:  Objection, asked and answered.
19 Q.  (BY MR. EDWARDS)  It's been asked.
20 A.  I was not aware.
21 Q.  Okay.  Have you read Mr. Hinojos's
22 deposition in preparation for your testimony here
23 today?
24 A.  I have read the deposition.
25 Q.  What else did you read in preparation for

Page 44

1 your deposition today?
2 A.  That is the only thing I read.
3 Q.  Have you reviewed any other documents?
4 A.  I have not.
5     MR. EDWARDS:  Let's take a five minute
6 break.
7 (Break was taken from 2:08 p.m. to 2:22 p.m.)
8 Q.  (BY MR. EDWARDS)  We'll go back on the
9 record.  I'm going to go back to the incident involving
10 the bus driver.  By the way, does the name Donna sound
11 familiar with regard to that bus driver?  Do you have
12 any idea?
13 A.  I have no -- no idea.
14 Q.  Okay.  I'm just going to go ahead and refer
15 to her just as the bus driver.  Who was at the meeting
16 that you had with Mr. Hinojos with regard to the bus
17 driver?
18 A.  No one.  It was just a casual conversation
19 with Hugo and myself.  It was not in an office.  It was just
20 an informal -- informal meeting.
21 Q.  Did you ever have any other meeting with
22 regard to that bus driver incident that you haven't
23 told us about already?  I mean, I think you indicated
24 that you spoke with Mr. Erickson about that.  Am I
25 getting this completely mixed up?  Who else did you

EXHIBIT "L"

# In The Matter Of:

*Hinojos v.*
*Park City Municipal Corporation*

---

*Kimberli Leier*
*October 9, 2008*

---

*Q & A Reporting, Inc.*
*1872 South Main Street*
*Salt Lake City, Utah 84115*
*801.484.2929*

Original File 10-09-08 Leier Kim.txt
Min-U-Script® with Word Index

