IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| **EULOGIO HINOJOS,**<br><br>　　　　　　　　Plaintiff,<br><br>vs.<br><br>**PARK CITY MUNICIPAL CORPORATION,** a municipal corporation, and Does I through X,<br><br>　　　　　　　　Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No.  2:07CV750 DAK |

　　　　　This matter is before the court on Defendant Park City Municipal Corporation's ("Park City") Motion for Summary Judgment.  A hearing on the motion was held on December 1, 2009. At the hearing, Plaintiff Eulogio Hinojos ("Mr. Hinojos") was represented by Warren L. Barnes, Randall K. Edwards, and Rick S. Lundell.   Defendant Park City was represented by Edwin C. Barnes and Christopher B. Snow.  Before the hearing, the court carefully considered the memoranda and other materials submitted by the parties.   Since taking the motion under advisement, the court has further considered the law and facts relating to the motion.   Now being fully advised, the court renders the following Memorandum Decision and Order.

## I. STANDARD OF REVIEW

　　　　Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c);  *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In reviewing the factual record, we construe all facts and make reasonable inferences in the light most favorable to the non-moving party.  *See Tademy v. Union Pac. Corp.*, 520 F.3d 1149, 1158 (10th Cir. 2008).  "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit."  *McCowan v. All Star Maintenance, Inc.*, 273 F.3d 917, 921 (10th Cir. 2001).  Also, "[a] dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented."  *Id.*

## II. FACTS

In this case, Plaintiff Eulogio "Hugo" Hinojos, a United States citizen who was born in Mexico, has brought several claims against his employer, Park City Municipal Corporation, where he worked for approximately twenty years.  During his tenure with Park City, Plaintiff worked in the Parks Department and the Streets Department, primarily performing grounds maintenance, street maintenance, and snow removal tasks.

Plaintiff's claims arise out of his perception that there has been a longstanding and ongoing practice of pervasive discrimination against Hispanics and that Defendant has failed to correct a known hostile work environment.  Accordingly, in his Complaint, he asserted the following claims:  (1) Title VII - hostile work environment based on race/national origin; (2) Title VII - retaliation/constructive discharge; (3) 42 U.S.C. § 1983 - hostile work environment; (4)  42 U.S.C. § 1981 - hostile work environment; (5) Family and Medical Leave Act ("FMLA")

interference with FMLA rights; (6) Americans with Disabilities Act ("ADA")[1]; and (7) Intentional Infliction of Emotional Distress.

Specifically, he claims that most of the problems stemmed from the actions of two of his supervisors, Troy Dayley ("Mr. Dayley") and Pace Erickson ("Mr. Erickson"), who allegedly referred to Plaintiff and other Hispanics as "dumb Mexicans," "f***ing Mexicans," "dumb f**cking Mexicans," "dumb Mexican piece of sh*t," "wetbacks," "spics," "Mexican backhoe," etc. In addition, among other alleged wrongs, these individuals allegedly would not permit the Hispanic employees to use the break room or to drive certain vehicles. Also, according to Plaintiff, the physically demanding and/or "dirty" jobs were given to the Hispanic employees, and only the Hispanic employees were forced to be on-call during the weekends.

Plaintiff contends that he reached his breaking point during a meeting with Mr. Dayley and Mr. Erickson on February 28, 2006. In that meeting, Plaintiff claims that he was accused of "gawking" at and "commenting on the butt" of another Park City employee's teenage daughter, Brittany Angelovich, while at Davanza's restaurant earlier that month (hereinafter referred to as the "Davanza's Incident"). In the meeting, Plaintiff denied that he made any such comments, and he contends now that he was targeted because of his race/national origin. Plaintiff bases this belief on the statement made by his supervisors during the meeting that Plaintiff had made comments to a "white girl" and that the situation may be attributable to "cultural differences." He also contends that his supervisors always wanted to push him around and humiliate him.

---

[1] Plaintiff has agreed to dismiss this claim.

While many of the details surrounding the February 28, 2006 meeting are in dispute, certain material facts are not disputed. First, it is undisputed that this meeting came about because Chris Angelovich, the father of Brittany Angelovich, had voiced his concerns to Troy Dayley and/or Pace Erickson about Plaintiff's making inappropriate comments about his daughter.[2] Mr. Angelovich did not know whether to take matters into his own hands, call the police, or request that Plaintiff's supervisors talk to him.

Plaintiff also does not dispute that at least one of his supervisors, Pace Erickson and/or Troy Dayley, were told by Chris Angelovich that Plaintiff was harassing his daughter and making sexually inappropriate comments to or about her, and Mr. Angelovich requested that Plaintiff's supervisors talk to Plaintiff to request that such conduct stop. It is also undisputed that Mr. Angelovich did not want Plaintiff's job to be in jeopardy, and Plaintiff admits that his supervisors told him during the February 28, 2006 meeting that his job was not at issue.

According to Plaintiff, he had been falsely accused of sexually harassing another individual a couple of years prior to the February 28, 2006 meeting, and another false accusation was simply too much for him.[3] After the February 28, 2006 meeting, Plaintiff went to the Human Resources department to ask that an investigation be conducted regarding this allegedly false accusation. Because of Plaintiff's agitated emotional state, Kim Leier, the Human

---

[2] Plaintiff has attempted to dispute the precise timing of this conversation and exactly to whom Mr. Angelovich complained, aside from Mr. Dayley. These disputes are immaterial when it is undisputed that the February 28, 2006 meeting was prompted by Mr. Angelovich's request that at least one of Plaintiff's supervisors talk to him about not talking to Brittany Angelovich.

[3] Plaintiff was ultimately cleared of any wrongdoing in this previous incident.

Resources Director, and Kent Cashel, Deputy Public Works Director, made the determination that Plaintiff should not work his evening shift.  Plaintiff left work, but later that evening, he went to the emergency room.  He was then unable to return to work because he was suffering from anxiety, depression, and severe emotional distress.

It is undisputed that Plaintiff was subsequently admitted to the psychiatric unit, and it is also undisputed that he made threats to harm and/or kill two of his supervisors.  Indeed, his therapist warned Park City about Plaintiff's threats against his supervisors but assured them that Plaintiff had been admitted to the hospital.

Plaintiff applied for and received a leave of absence under the FMLA.  Park City informed him that, pursuant to its policy, he would not be allowed to return to work without a physician's certification that he was fit to return to work.  On April 17, 2006, Dr. Gibbs notified Park City of Plaintiff's admission to and discharge from the University of Utah Health Network.  Dr. Gibbs stated that Plaintiff "should be able to return to work on 05/01/06 but will need to be cleared by his primary care physician, Dr. Parker."

On April 21, 2006, however, Dr. Parker evaluated Plaintiff and determined that he was "unable to return to work for the next 2-4 weeks, until problem is resolved."  Plaintiff never provided Park City with a return-to-work date certified by his physician and never provided Park City with a physician's approval to return to work.  Park City terminated Plaintiff's employment by letter dated June 2, 2006.  Plaintiff was informed that "[t]he twelve (12) weeks of leave you have taken under the FMLA ended on Tuesday, May 24, 2006, and you have neither returned to work nor contacted Park City."  As of the date of Plaintiff's deposition, June 30, 2008, Plaintiff

5

admitted that he still had not recovered.

### III.  DISCUSSION

Each of Plaintiff's Claims for Relief are discussed separately below.

*A.     Title VII (hostile work environment based on race/national origin)*

Plaintiff claims that during his twenty years of employment with Park City, he was routinely subjected to slurs pertaining to his race/national origin and that he was mistreated because he was Hispanic.  Defendant, however, seeks summary judgment on the basis that Plaintiff did not subjectively perceive the environment as a hostile work environment.  As support, Defendant relies on Plaintiff's self-evaluations during his employment with Park City, which were generally quite positive.  Because Plaintiff testified that he was honest in his evaluations, Park City argues that, as a matter of law, no reasonable jury could believe that Plaintiff subjectively perceived a hostile work environment.

This argument fails.  Defendant completely ignores Plaintiff's current testimony about his perceptions during his twenty years with the City.  Park City cannot plausibly expect that an employee will express concerns about discrimination on a self-evaluation form during a process in which that employee's performance and pay is at stake.  Moreover, the fact that an employee does not complain of a hostile work environment on a self-evaluation form does not, as a matter of law, bar an employee from later stating that he actually believed that he was subjected to an environment hostile to Hispanic employees.

Moreover, in this case, Plaintiff claims that he actually reported such treatment to Human Resources and that he attempted to report the conduct to Jerry Gibbs, Director of Public Works

for Park City, who, according to Plaintiff, refused to meet with him.  Defendant simply ignores this testimony, presumably because no *written* complaints were made.  There is no requirement in the law, however, that complaints of discrimination must be in writing.  While significant impeachment material exists as to Plaintiff's subjective belief concerning an alleged hostile work environment, such evidence does not justify summary judgment for Defendant on Plaintiff's hostile work environment claim.  Plaintiff has created a genuine issue of material fact as to whether he subjectively perceived his work environment as hostile.

      This conclusion, however, does not end the court's inquiry concerning this claim.  There appears to be a significant question as to whether Plaintiff's claim was timely.  To establish a hostile work environment claim, a plaintiff must, among other things, file a claim with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the allegedly discriminatory conduct.  "As applied to hostile environment claims, however, [the 300-day] requirement has proven problematic because a hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Tademy v. Union Pac. Corp.*, 520 F.3d 1149, 1156 (10th Cir. 2008) (citing *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002)).  "'[They] occur[ ] over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.'" *Id.* (quoting *Morgan*, 536 U.S. at 115.)

      In *Morgan*, the Supreme Court applied Title VII's strict 300-day statute of limitations to hostile environment claims.  The Court held "that consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is

permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Morgan*, 536 U.S. at 105.

Accordingly, the court must determine whether at least one act contributing to the alleged hostile environment took place within 300 days of Plaintiff's filing an EEOC Charge on November 21, 2006. The parties agree that an act contributing to the alleged hostile environment must have occurred after January 2006.

While Plaintiff often refers in argument to the steady stream of racial slurs and mistreatment during the entire time he worked for Park City, he has failed to cite to specific evidence about any recent occurrences, with one exception. The only act alleged by Plaintiff to be part of a hostile work environment after January 2006 is the February 28, 2006 meeting in which Mr. Erickson and Mr. Dayley told Plaintiff about Mr. Angelovich's allegations pertaining to Plaintiff's treatment of Mr. Angelovich's daughter. Plaintiff characterizes this meeting as a false accusation of sexual harassment based on his national origin. Defendants, on the other hand, characterize it as an attempt to quell a workplace conflict. The legal question, then, is whether this incident can be said to have contributed to the allegedly hostile environment. *See Morgan*, 536 U.S. at 105.

To make this determination, the court is charged with "examining acts within the filing period and consider[ing] whether incidents outside the filing period are sufficiently related to constitute the same employment practice." *Tademy*, 520 F.3d 1149, 1157 (10th Cir. 2008); *see also Bloomer v. United Parcel Serv., Inc.*, 94 Fed. App'x 820, 825 (10th Cir. 2004) (declining to find a racially hostile work environment because "[t]he string of isolated acts . . . involved

completely different allegations, conduct, and people, and occurred months or years apart"). *Morgan* holds that a series of alleged events comprises the same hostile environment where "the pre- and post-limitations period incidents involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." *Duncan v. Manager, Dept. of Safety, City & County of Denver*, 397 F.3d 1300 (10th Cir. 2005) (citing *Morgan*, 536 U.S. at 120).

Applying this standard, the court finds that no jury could rationally conclude that the meeting about the DaVanza Incident is part of the same hostile working environment. This "meeting" consisted of addressing a delicate issue about Plaintiff's alleged conduct toward a co-worker's teenage daughter. Viewing the facts in a light most favorable to Plaintiff ( i.e., that he never made any comments to or about his co-worker's teenage daughter and that his supervisors referred to a "white woman" and to "cultural differences"), this February 28, 2006 meeting cannot be said to be part of the same alleged hostile work environment.

The other acts alleged to have constituted a hostile work environment are of a completely different nature, involving, primarily, deplorable slurs relating to Plaintiff's Hispanic origin.[4]

---

[4] Plaintiff also contends that Hispanics were given the worst jobs and that this continued throughout his employment, up until the date of his termination. Pl.'s Mem. in Opp'n at 11. Plaintiff, however, does not cite to any evidence in the record to support this statement.

Plaintiff also claims that the term "Mexican Backhoe" was used throughout his employment, but cites no specific supporting evidence. In the "Facts" section of his Memorandum in Opposition, Plaintiff recounts hearing the term "Mexican backhoe" used with regularity from early 1990s through 2006 and cites to the following support: "See Id. See also Lee Depos. 19:2-21; 23:5-25, attached as Exhibit I. See also Fuentes Depos. 23:5-12, attached as Exhibit B." See Mem. in Opp'n at xv- xvi.

Here, it is undisputed that the instigator of the meeting was Chris Angelovich, who is not alleged to have in any way ever mistreated Plaintiff. There is no evidence–or even a suggestion–that Mr. Angelovich had ill motives for calling the meeting or that he did not genuinely believe that Plaintiff had made sexually inappropriate comments to or about his teenage daughter.

There is also no suggestion that Mr. Dayley or Mr. Erickson confronted Plaintiff for any reason other than at Mr. Angelovich's request and to quell a possible workplace situation between coworkers. There is also no evidence that his supervisors took any action pertaining to the February 28, 2006 meeting that could be construed to be based on Plaintiff's Hispanic origin. During the meeting, there is no allegation of any racial slurs or derogatory comments. Indeed, even Plaintiff admits that his supervisors told him at the beginning of the meeting that it had nothing to do with his work. Specifically, Plaintiff stated that Mr. Erickson "did not believe it was a workplace issue and told [Plaintiff] it did not involve his job." Further, Plaintiff admits that Mr. Erickson "testified that he intended to speak to Hugo as a friend, heart to heart, to discuss Chris Angelovich's allegations." Moreover, Mr. Erickson, "also believed and told [Plaintiff] that there was probably a cultural misunderstanding due to cultural differences." Pl.'s Mem. in Opp'n at xlvi. Thus, no threat was made to Plaintiff's job, there were no racial slurs used, even though Plaintiff claims that references to cultural differences and references to a

---

The court has reviewed the Lee and Fuentes deposition citations, and there is no reference to this term being used through 2006. Indeed, there is no time frame mentioned. In addition, Plaintiff's citation to "See Id." appears to refer to Plaintiff's deposition at 90:18 to 91:17. Out of an abundance of caution, and while the court was not required to do it, the court reviewed the entire deposition of Mr. Hinojos. Again, there was no time frame mentioned regarding this term being used–simply that it happened.

"white woman" shows the racial animus, the court finds that no reasonable jury could so find.

If Plaintiff's allegations are true about his deplorable treatment in earlier years by Mr. Erickson and Mr. Dayley and about Park City's failure to remedy the situation, then Plaintiff likely would have had a strong Title VII claim for hostile work environment. But only if Plaintiff had timely brought such a claim. As stated by the Tenth Circuit, "Title VII is not intended to allow employees to dredge up old grievances; they must promptly report and take action on discriminatory acts when they occur. Unlitigated bygones are bygones." *Duncan*, 397 F.3d at 1308. As the court found in *Duncan*, "[t]o permit litigation now over these actions, which were taken by different individuals so long ago under different circumstances, would frustrate the Congressional purpose in passing a tight deadline for filing Title VII claims." *Id.* at 1309.

Here, while Plaintiff obviously believes that he endured a hostile work environment during at least the majority of his tenure with Park City, he has failed to marshal any evidence of this hostile work environment during the 300 days prior to filing his claim – except for the February 28, 2006 meeting, which the court finds as a matter of law to not be part of the same alleged hostile work environment due to the manner in which the meeting came about and in which the meeting was handled. This one incident is "qualitatively different" from all Plaintiff's other allegations, making it unnecessary to look at acts falling outside the limitations periods. *See Tademy*, 520 F.3d at 1160. Therefore, his Title VII hostile work environment claim must be dismissed.

B.	*Title VII (retaliation/constructive discharge)*[5]

"To state a prima facie case of retaliation, Plaintiff must show that: (1) he engaged in a protected activity; (2) Defendant took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action." *Carney v. City and County of Denver*, 534 F.3d 1269, 1276 (10th Cir. 2008); *Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir.2006). "A causal connection is established where the plaintiff presents evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002).

The court finds that Plaintiff has not demonstrated that there is any causal connection between Plaintiff's termination and his complaint to Human Resources on February 28, 2006. Moreover, even if Plaintiff had stated a prima facie case of retaliation, the burden then shifts "to the employer to produce a legitimate, nondiscriminatory justification for taking the disputed employment action." *Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004) (applying the *McDonnell Douglas* framework to a retaliation claim). The failure to provide a required medical release is a legitimate, nondiscriminatory reason for terminating an employee. *Rekstad v. First Bank Sys., Inc.*, 30 Fed. App'x 842, 846 (10th Cir. 2002) (noting that the plaintiff had notice of

---

[5] To the extent Plaintiff has alleged a constructive discharge claim in his Complaint, the court finds no merit to such a claim. To bring a claim for constructive discharge, a plaintiff must "show that [h]e had no other choice but to quit." *Sandoval v. Boulder Reg'l Commc'ns Ctr.*, 388 F.3d 1312, 1325 (10th Cir. 2004). Because Plaintiff admitted that he was never cleared by his physician to return to work – and is still not cleared to return to work – there is no merit to this claim. In addition, Plaintiff does not address this claim in his Memorandum in Opposition.

the requirement); *see also Revel v. Lucent*, 60 Fed. App'x 740, 745-46 (10th Cir. 2003) (refusing to rehire plaintiff where "doctor's note did not provide an adequate explanation of the change from 'permanently disabled' to 'able to work.'").

It is undisputed that Park City terminated Plaintiff for a legitimate, nondiscriminatory reason. Specifically, after more than twelve weeks of medical leave, Plaintiff, by his own admission, did not provide a doctor's release to return to work. Pl.'s Depo. 10:3-13, 67:7-15. This release was required by Park City and it is undisputed that Plaintiff had actual notice of this requirement. Furthermore, as of June 2, 2006, the date of Plaintiff's termination, Plaintiff had not contacted Park City nor had he returned to work. Indeed, in his June 2008 deposition, Plaintiff admitted that he still was not able to return to work. Thus, Park City had a legitimate reason for terminating Plaintiff and lawfully exercised that right.

C.      ***Plaintiff's Claims Pursuant to 42 U.S.C. § 1981 & § 1983 (hostile work environment)***

The court also finds that Mr. Hinojos's hostile work environment and retaliation claims fail under 42 U.S.C. §§ 1981 & 1983 because, for municipal liability to arise under these provisions, Mr. Hinojos must demonstrate that Park City's officials acted pursuant to a "custom or policy" of "discriminatory employment practices." *Carney v. City and County of* Denver, 534 F.3d 1269 (10th Cir. 2008); *Randle v. City of Aurora*, 69 F.3d 441, 446 n.6, 447 (10th Cir.1995).

An unconstitutional deprivation is caused by a municipal 'policy' if it results from decisions of a duly constituted legislative body or an official whose acts may fairly be said to be those of the municipality itself." *Id.* at 1274 (*quoting Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1177 (10th Cir.2003)). In order to warrant a finding of liability, a municipal policy

must be a "'policy statement, ordinance, regulation, or decision officially adopted and promulgated by [a municipality's] officers.'" *Starrett v. Wadley*, 876 F.2d 808, 814 (10th Cir. 1989).

In the case at bar, there is no evidence suggesting that Park City had an official policy favoring discrimination based on race and/or national origin. In fact, there is evidence that the City had a written city policy expressly forbidding it. Therefore, in order to defeat summary judgement, Mr. Hinojos must produce evidence that the alleged discrimination was the result of a municipal custom.

A "'custom' has come to mean an act that, although not formally approved by an appropriate decision maker, has such widespread practice as to have the force of law." *Carney*, 534 F.3d at 1269. In order to establish a custom, the actions of the municipal employees must be "continuing, persistent and widespread." *Id.* (quoting *Gates v. Unified Sch. Dist. No*. 449, 996 F.2d 1035, 1041 (10th Cir.1993)). In attempting to prove the existence of such a "continuing, persistent and widespread" custom, plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way. Furthermore, the official charged with the violation must also have "final policy making authority" with respect to the acts in question as a matter of state law. *Lankford v. City of Hobart*, 73 F.3d 283 (10th Cir. 1996) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality)).

Here, Plaintiff has not created a genuine dispute as to whether Mr. Dayley and/or Mr. Erickson had "final policy making authority" with respect to the acts in question as a matter of

state law. *See Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281, 1285 (10th Cir. 2007). A person does not qualify as a final policymaker if (1) he is constrained by policies not of his own making, (2) his decisions are subject to meaningful review, and (3) the policy decision purportedly made was not within the realm of authority granted to the person. *Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).

Even assuming arguendo that these employees participated in discriminatory acts, neither of these employees can be considered final policymakers for Park City. First, Mr. Erickson and Mr. Dayley are both constrained by the official policies of Park City, which they neither have authority to create nor change. Furthermore, it is undisputed that the actions of both individuals are subject to meaningful review. Specifically, both employees report to supervisors and are evaluated on a regular basis by upper management.

**D.  *FMLA (interference with FMLA rights)***

To establish a claim under the interference theory of the FMLA, a plaintiff must demonstrate by a preponderance of the evidence his (1) entitlement to leave under the FMLA; (2) a denial of their substantive rights under the FMLA; and (3) a causal connection between the two. *Dry v. The Boeing Co.*, 92 Fed. App'x 675, 678 (10th Cir. 2004). The substantive rights guaranteed by the FMLA consist of "12 workweeks of leave," no loss of prior accrued employment benefits, and restoration to the same or equivalent position. 29 U.S.C. §§ 2612, 2614. Thus, employers are prohibited from interfering with an employee's right to FMLA leave or to reinstatement following the leave. *Smith v. Diffee Ford-Lincoln-Mercury,*

*Inc.*, 298 F.3d 955, 960 (10th Cir. 2002) (noting that "a deprivation of this right is a violation regardless of the employer's intent."). Even so, "taking FMLA leave does not insulate an employee from being fired for other reasons." *See also Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 877 (10th Cir. 2004) (finding that employee "would have been dismissed regardless of her request for an FMLA leave, because she failed to comply with Honeywell's policy which required her to notify her supervisor of her absences.").

Plaintiff claims that Park City interfered with his FMLA rights in two distinct ways: (1) Park City called him while he was on FMLA leave and (2) Park City denied him the ability to recover by not giving him any information about the "investigation" that he had asked it to conduct after the February 28, 2006 meeting.[6] There are no facts to support Plaintiff's arguments, and they fail as a matter of law.[7]

First, in support of his interference claim, Plaintiff has alleged that Park City called him on a company phone and refused to take the phone back while he was out on FMLA leave. The

---

[6] Plaintiff also contends that other Park City employees, under the Park City policies, were entitled to 21 days of sick leave before their leave under the FMLA kicked in, and then they were entitled to 12 weeks of FMLA leave. Plaintiff claims that he was fired after twelve weeks, and thus Park City did not give him the extra 21 days that other employees had received. Plaintiff's argument appears to be based on a misreading of Park City's policies, and, moreover, Plaintiff has not produced any evidence that other employees were given 12 weeks plus 21 days.

[7] Plaintiff appears to have a misunderstanding about his rights under the FMLA. When asked in his deposition how long Park City should have given him, Plaintiff testified that Park City should have given him until the "doctor says I can come back to work" and "whatever it takes." Pl. Depo. at 67-68. Because he believes that he was entitled to more than twelve weeks, Plaintiff claims that Park City's termination of his employment after twelve weeks of leave constituted retaliation for his complaint of discrimination stemming from the February 28, 2006 meeting.

evidence demonstrates that Plaintiff was called only once, and that this was an on-call mobile phone and may have occurred because some Park City employees were unaware that Plaintiff had taken medical leave. Even though a phone call may have been bothersome or troubling to Plaintiff, it did not rise to the level of interference with Plaintiff's FMLA rights. Plaintiff applied for and was granted his full FMLA leave. Plaintiff had no obligation to respond to on-call assignments and he did not respond to the one call he received.

Second, as to Plaintiff's restoration of job claim, Plaintiff contends that Kent Cashel would not meet with him to discuss the investigation until he was cleared to return to work, and his physician would not clear him until the results of the investigation were known. Plaintiff has not cited to any case that provides support for the argument that this requirement constituted interference with Plaintiff's FMLA rights. It is undisputed that Plaintiff had notice of the requirement that he provide a physician's note that Plaintiff was ready to return to work.[8] Plaintiff admits that he never provided a doctor's release to Park City. Moreover, even in his June 2008 deposition–two years after his termination–Plaintiff testified that he still has not recovered.

For Park City to require a physician's note to return to work was not an unreasonable requirement, particularly given Plaintiff's mental state after the February 28, 2006 meeting and the fact that Plaintiff had threatened the lives of two of his supervisors. Thus, the court finds that

---

[8] Indeed, when Plaintiff contacted Kent Cashel on March 9, 2006 to let Mr. Cashel know that he wanted to return to work but was sick, Plaintiff admits that Mr. Cashel told him that he "should return to work once he was better." See Mem. in Opp'n at 17-18.

Park City did not interfere with Plaintiff's FMLA rights. Plaintiff admits that he received twelve full weeks of FMLA leave, and there is no evidence that Park City would not have reinstated him had Plaintiff provided a certification from his physician.

### E. *Intentional Infliction of Emotional Distress.*

Defendant also moved for summary judgment on Plaintiff's claim under the Americans with Disabilities Act, and Plaintiff has agreed to dismiss that claim. But Plaintiff now states that he also asserted a claim for Intentional Infliction of Emotional Distress and that Defendant failed to move for summary judgment on this claim and therefore the court cannot dismiss it.

In his Complaint, Plaintiff clearly identified his first five Claims for Relief. On his Sixth Claim for Relief, he failed to label it and used language that could be construed as either a claim under the ADA or a claim for Intentional Infliction of Emotional Distress. Defendant construed this claim as a claim under the ADA and moved for summary judgment on that claim. Plaintiff then conceded the ADA claim in his Memorandum in Opposition and pointed out that Defendant had failed to move for summary judgment on the Intentional Infliction claim. Defendant then argued in its Reply Memorandum that it had no previous indication that such a claim had been alleged and that a claim for Intentional Infliction of Emotional Distress was pre-empted by the Utah Anti-Discrimination Act. Even though the scheduled oral argument on the motion was over a month away at the time the Reply Memorandum was filed, Plaintiff did not request leave to file a surreply memorandum and did not mention this argument at the hearing on the motion. The court therefore will consider Defendant's argument on this claim.

In *Gottling v. P. R. Inc.*, the Utah Supreme Court determined that the Utah Anti-

Discrimination Act preempts all common law remedies for employment discrimination on the basis of race, color, sex, pregnancy, age, religion, national origin, or disability. 61 P.3d 989, 997-98 (Utah 2002). Moreover, the claim is also barred by the Utah Worker's Compensation Act unless Plaintiff can prove that Defendant had a "conscious and deliberate intent directed to the purpose of inflicting an injury." *Lanta v. Nat'l Semiconductor Corp.*, 775 P.2d 937, 939 (Utah Ct. App. 1989). There is no such evidence in this case. For both of these reasons, Plaintiff's claim for Intentional Infliction of Emotional Distress is dismissed.

## IV. CONCLUSION

Accordingly, IT IS HEREBY ORDERED that Park City's Motion for Summary Judgment [Docket # 77] is GRANTED. Plaintiff's action is DISMISSED with prejudice. Each party is to bear his/its own costs.

DATED this 1st day of March, 2010.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge